IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK
_____

VICTOR ALTHEUS DE PONCEAU,

                        Plaintiff,

                                            Civil Action No.
                                            9:09-CV-00605 (GTS/DEP)

            v.

J. BRUNER, Corrections Officer; J. SMITH,
Corrections Lieutenant; C. GOODMAN,
Corrections Lieutenant; D. MURRAY, Watch
Commander; D. WILLIAMS, Grievance Sergeant;
REYNOLDS, Corrections Sergeant; RUSSELL,
Corrections Officer; J. TAYLOR, Corrections Officer;
POMAINVILLE, Corrections Officer; LeDUCA,
Corrections Sergeant, and JOHN AND JANE
DOES, Great Meadow Correctional Facility,

                        Defendants.
--------------------------------------------------------------------

APPEARANCES:                        OF COUNSEL:

FOR PLAINTIFF:

VICTOR ALTHEUS DE PONCEAU, *Pro Se*
08-B-1912
Great Meadow Correctional Facility
P.O. Box 51
Comstock, NY 12821

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN         CATHY Y. SHEEHAN, ESQ.
Office of the Attorney General    Assistant Attorney General
State of New York
Department of Law
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT, RECOMMENDATION AND ORDER</u>

*Pro se* plaintiff Victor Altheus De Ponceau, a New York State inmate and an active litigant before this and other federal courts within New York, has commenced this action pursuant to 42 U.S.C. § 1983 alleging deprivation of his civil rights.  Since inception of the action both the number of defendants sued and the claims asserted have been radically reduced as a result of court review of his earlier filed pleadings.  Plaintiff's currently operative complaint, though vague, disjointed, and unorganized, appears to assert claims arising from defendants' alleged use of excessive force; failure to intervene and protect him from assault; retaliation, threats, and harassment; the issuance of one or more false misbehavior reports; and, interference on one occasion with his incoming packages.

Currently pending before the court in connection with this action is a motion by those defendants remaining in the case seeking dismissal of plaintiff's claims for failure to state a cause of action upon which relief may be granted.  For the reasons set forth below, I recommend a finding that plaintiff has stated plausible claims alleging the use of excessive force

and failure to protect, but that the remaining causes of action set forth in his complaint be dismissed as facially insufficient.[1]

I.   BACKGROUND[2]

Plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Corrections and Community Supervision ("DOCCS").  *See generally*  Third Amended Complaint (Dkt. No. 24).  At the times relevant to his claims plaintiff was confined in the Great Meadow Correctional Facility ("Great Meadow"), located in Comstock, New York, where he is currently incarcerated.  *Id.*

On September 13, 2008, plaintiff was verbally insulted and physically attacked by Corrections Sergeant Leduca, who choked him, kicked his back, and pushed his face into a door with the assistance of Grievance Sergeant D. Williams and Watch Commander D. Murray.  Third

---

[1]      Also pending before the court are various applications of a miscellaneous nature from the plaintiff.  For the reasons set forth below, I recommend denial of those applications, which are both vague and to a significant degree indecipherable.

[2]      In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's amended complaint, the contents of which have been accepted as true for purposes of the pending motion.  *See Erickson v. Pardus,* 551 U.S. 89, 94, 127 S. Ct. 2197, 2200 (2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56, 127 S. Ct. 1955, 1965 (2007)); *see also Cooper v. Pate*, 378 U.S. 546, 546, 84 S. Ct. 1733, 1734 (1964).  It should be noted, however, that plaintiff's third amended complaint and attachments appear to be rambling, unorganized, vague and confusing, making it exceedingly difficult to discern both the claims being asserted and the factual underpinnings supporting those claims.

Amended Complaint (Dkt. No. 24) p. 1.  Plaintiff accuses Corrections

Lieutenant J. Smith of covering up Sergeant Leduca's racial hatred and

assault.  *Id.*

Though somewhat unclear from the plaintiff's complaint and

attachments, it appears that De Ponceau was accused of misbehavior in

connection with the incident, resulting in the convening of a Tier III

disciplinary hearing conducted by Corrections Lieutenant C. Goodman to

address the matter.[3]  Third Amended Complaint (Dkt. No. 24) at p. 1.

Plaintiff asserts that the hearing was "one sided", in retaliation for his

placing a call to the New York State Police concerning the incident.  *Id.*

In addition to the September 2008 incident and resulting hearing,

plaintiff's complaint addresses other matters.  Plaintiff alleges, for

example, that he was threatened with harm by Corrections Officer J.

Bruner and that defendant Bruner issued him a false misbehavior report in

---

[3]     The DOCCS conducts three types of inmate disciplinary hearings.  See 7
N.Y.C.R.R. § 270.3.  Tier I hearings address the least serious infractions and can
result in minor punishments such as the loss of recreation privileges.  Tier II hearings
involve more serious infractions, and can result in penalties which include confinement
for a period of time in the Special Housing Unit ("SHU").  Tier III hearings concern the
most serious violations and can result in unlimited SHU confinement and the loss of
"good time" credits.  *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied*,
525 U.S. 907, 119 S. Ct. 246 (1998).

July 2008.[4]  Third Amended Complaint (Dkt. No. 24) at p. 1.  Plaintiff

additionally asserts that Corrections Sergeant Reynolds, as well as John

and Jane Doe defendants working in the package room at Great Meadow,

withheld a package from him, allegedly in retaliation for his role in the

Sergeant Leduca incident.  *Id.* at p. 2.  Plaintiff further accuses

Corrections Officers Russell and J. Taylor of threatening him with bodily

harm, and claims that Corrections Officer Pomainville authored a false

misbehavior report regarding DePonceau on November 20, 2008, and lied

at a subsequent hearing, also conducted by defendant C. Goodman,

concerning the matter.[5]  *Id.*

_____

[4]       According to the exhibits submitted by the plaintiff, the misbehavior
report issued in July 2008 by defendant J. Bruner led to a disciplinary hearing and a
finding of guilt with regard to prison rules violations, resulting in a brief sentence of
keeplock confinement and loss of package, commissary, and telephone privileges, a
sentence that was  suspended to November 17, 2008.  Plaintiff's Exhibits (Dkt. No. 56-
6) at p. 49 of 93.

[5]       The record before the court regarding the November 2008 misbehavior
report is equivocal.  While plaintiff asserts that the misbehavior report was issued by
defendant Pomainville and resulted in a hearing conducted by corrections Lieutenant
C. Goodman, Third Amendment Complaint (Dkt. No. 24) at p. 2, the documents
submitted by the plaintiff in opposition to defendants' motion suggest that it was
Lieutenant Goodman who issued a misbehavior report and that another individual,
identified as Hearing Officer Harvey, actually presided over the disciplinary proceeding.
Plaintiff's opposition (Dkt. No. 56-6) at p. 48 of 93.  Those documents also reflect that
the hearing resulted in a finding of guilt and a penalty which included three months of
keeplock confinement as well as a loss of package, commissary and telephone
privileges. That determination was upheld on appeal to DOCCS Central Office.  *See*
*id.*

II.   <u>PROCEDURAL HISTORY</u>[6]

Plaintiff commenced this action by the filing of a complaint on May 26, 2009, accompanied by an IFP application.  Dkt. Nos. 1, 2.  In his initial complaint, which consisted of fifty-one pages of handwritten text together with two hundred and twenty-two pages of unorganized, unnumbered, largely unidentifiable and, in some instances, incomplete, exhibits De Ponceau asserted a wide array of civil rights violations alleged to have occurred both before his incarceration and while  imprisoned against two hundred and two defendants, including the United States of America, the State of New York, Monroe County, the City of Rochester, Livingston County, eleven Assistant District Attorneys, various attorneys appointed to represent him in criminal proceedings, at least twenty judicial officers (including judicial hearing officers and state and federal court judges), other public officials, numerous employees of the DOCCS, and several other individuals and entities.  By decision and order dated October 27, 2009, the court granted plaintiff IFP status, denied his motion for appointment of counsel, and conditionally dismissed his complaint for

_____

[6]       On more than one occasion DePonceau has requested a copy of the docket sheet pertaining to this action.  *See* Dkt. Nos. 56, 69.  As an accommodation to the plaintiff, and in deference to his *pro se* status, the clerk will respectfully be directed to provide him with a copy of the current docket sheet relating to this action.

frivolousness and failure to state a claim upon which relief may be

granted, pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915(A), with leave

to file an amended complaint in compliance with the terms of that order.

Dkt. No. 12.

Plaintiff filed an amended complaint on November 9, 2009.  Dkt. No.

13.  Four days later, on November 13, 2009, he filed both a second

amended complaint and a motion to reinstate his original complaint,

together with a motion for reconsideration of the court's October 27, 2009

order denying his motion for appointment of counsel.  Dkt. Nos. 14, 15,

16.  On November 19, 2009 plaintiff filed a motion for leave to add various

other parties as defendants, together with a motion for an evidentiary

hearing.  Dkt. Nos. 17, 18.  Plaintiff filed a second motion for

reconsideration of the October 27, 2009 order regarding his application for

appointment of counsel on December 7, 2009.  Dkt. No. 21.  By decision

and order dated September 2, 2010, District Judge Glenn T. Suddaby

directed the clerk to strike plaintiff's amended complaint; dismissed many

of the named defendants from the action, some with and others without

prejudice; identified the defendants remaining in the action; directed that

plaintiff be permitted to pursue the claims set forth in his third amended

complaint only with respect to the defendants at Great Meadow; and, denied the remaining applications made by the plaintiff.[7]  Dkt. No. 23.

As a result of the foregoing procedural history, the operative pleading now before the court is plaintiff's third amended complaint, which is comprised of designated portions of plaintiff's second amended complaint ordered by Judge Suddaby on September 2, 2010 to be filed as a third amended complaint.  *See* Dkt. Nos. 23, 24.  That amended complaint asserts a variety of claims alleging the utterance of threats and insults, the issuance of false misbehavior reports, the use of excessive force and failure to intervene and protect him from assault, a deprivation of procedural due process, and mail tampering.  *Id.*  Named as defendants are several DOCCS employees assigned to work at Great Meadow, including Corrections Officer J. Bruner, Corrections Lieutenant J. Smith, Corrections Lieutenant C. Goodman, Watch Commander D. Murray, Grievance Officer D. Williams, Corrections Sergeant Reynolds, Corrections Officer Russell, Corrections Officer J. Taylor, Corrections Officer Pomainville, Corrections Sergeant Leduca, and unnamed "John

---

[7]      A subsequent application filed by the plaintiff seeking District Judge Suddaby's recusal and the transfer of the case out of the district's Syracuse division (Dkt. No. 26) was denied by decision and order issued by District Judge Suddaby on December 14, 2010.  Dkt. No. 32.

Doe" and "Jane Doe" defendants.[8,9]  Plaintiff's third amended complaint is

accompanied by approximately sixty-eight pages of exhibits which appear

to be random documents, submitted without organization and most if not

all of which are wholly unrelated to the matters remaining in controversy.

In response to plaintiff's third amended complaint the remaining

defendants in the action have moved pursuant to Federal Rule of Civil

Procedure 12(b)(6) to dismiss plaintiff's complaint for failure to state a

claim upon which relief may be granted.  Dkt. No. 54.  In their motion

defendants argue that 1) plaintiff has failed to state a plausible claim of

excessive force; 2) plaintiff's allegations of the issuance of false

misbehavior reports do not give rise to a finding of a constitutional

_____

[8]      Plaintiff's third amended complaint also names Deputy of Programs Karen LaPolt and First Deputy P. Heath.  Neither of those individuals is included within the list of defendants identified in the court's September 2, 2010 order as remaining in the case, however, and plaintiff has neither sought nor obtained court approval for leave to join those additional parties.  Accordingly, they are not currently before the court.

I note further that in the request for relief portion of his third amended complaint plaintiff reiterates his attack on the validity of his underlying conviction and sentence, and seeks release pursuant to 28 U.S.C. § 2254.  Plaintiff's habeas claims, however, were previously dismissed, without prejudice, and have not been reinstated, *See* Order dated September 2, 2010 (Dkt. No. 23) at p. 48.

[9]      In accordance with this court's local rules, *see* N.D.N.Y.L.R. 9.2, plaintiff has filed a statement of a claim asserted under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.  See* Dkt. No. 57.  However, plaintiff's third amended complaint, which is the currently-operative pleading, does not contain a civil RICO cause of action.

violation; 3) plaintiff's allegations regarding verbal abuse are not actionable; 4) plaintiff's allegation of a single instance of a package being withheld does not state a cognizable First Amendment mail interference claim; and, 5) plaintiff's conspiracy claim is not adequately pleaded.  *Id.* Defendants further assert their entitlement to Eleventh Amendment immunity, to the extent they may be sued in their official capacities, and to qualified good faith immunity in connection with the claims against them as individuals, and seek a protective order precluding plaintiff from engaging in discovery pending a final disposition in regard to their motion. *Id.*  Plaintiff has since responded in opposition to defendants' motion.[10] Dkt. No. 56.

Defendants' dismissal motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).  *See also* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

A.    Dismissal Motion Standard

---

[10]    Much of plaintiff's opposition focuses on both a civil RICO claim, which has not been properly pleaded, and the claim of academic fraud, which was previously dismissed by the court.  *See* September 2, 2010 Decision and Order (Dkt. No. 23) at p. 49.

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny.  *Ashcroft v. Iqbal*, 556 U.S. 662, ___, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555, 127 S. Ct. 1955, (2007)).  Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  *Id.*  While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  *Iqbal,* 129 S. Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face.  *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (citing *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974).  As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact

pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974).

When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action.  *Erickson*, 127 S. Ct. at 2200 ("'[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers'") (quoting *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 292 (1976) (internal quotations omitted)); *Davis v. Goord*, 320 F.3d 346, 350 (2d Cir. 2003) (citation omitted); *Donhauser v. Goord*, 314 F. Supp. 2d 119, 121 (N.D.N.Y. 2004) (Hurd, J.).  In the event of a perceived deficiency in a *pro se* plaintiff's complaint, a court should not dismiss without granting leave to amend at least once if there is any indication that a valid claim might be stated.  *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir.1991); *see also* Fed. R. Civ. P. 15(a) (leave to amend "shall be freely given when justice so requires").

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Cooper v. Pate*, 378 U.S. 546, 546, 84 S. Ct. 1723, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292, 300 (2d Cir. 2003), *cert. denied*, 540 U.S. 823, 124 S. Ct. 153 (2003); *Burke v. Gregory*, 356 F. Supp. 2d 179, 182 (N.D.N.Y. 2005) (Kahn, J.). However, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. *Iqbal*, 129 S. Ct. at 1949.  In the wake of *Twombly* and *Iqbal*, the burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) remains substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, "'but whether the claimant is entitled to offer evidence to support the claims.'" *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.*, 223 F. Supp.2d 435, 441 (S.D.N.Y. 2001) (quoting *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995)) (citations and quotations omitted).

B.   Excessive Force

In their motion defendants first argue that plaintiff's threadbare and conclusory allegations regarding Corrections Sergeant Leduca's actions

toward him, allegedly taken with the assistance of defendants Williams and Murray, fail to demonstrate the existence of a plausible excessive force claim.

Plaintiff's excessive force cause of action is asserted under the Eighth Amendment, which outlaws punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle,* 429 U.S. at 102, 104, 97 S. Ct. at 290, 291 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S. Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle*).    A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley,* 475 U.S. at 319, 106 S. Ct. at 1084 (citations and quotations omitted); *Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir. 1999).

A prison employee's use of force against an inmate can in certain circumstances run afoul of the Eighth Amendment's prohibition against cruel and unusual punishment.  The lynchpin inquiry in deciding claims of excessive force against prison officials is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and

sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S. Ct. 995, 998-999 (1992) (applying *Whitley* to all excessive force claims); *Whitley*, 475 U.S. at 320-21, 106 S. Ct. at 1085 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.) (Friendly, J.), *cert. denied sub nom.*, *John v. Johnson*, 414 U.S. 1033, 94 S. Ct. 462 (1973)).

Analysis of claims of cruel and unusual punishment requires both objective examination of the conduct's effect and a subjective inquiry into the defendant's motive for his or her conduct. *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (citing *Hudson,* 503 U.S. at 7-8, 112 S. Ct. at 999 and *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)). As was recently emphasized by the United States Supreme Court in *Wilkins v. Gaddy*, however, after *Hudson* the "core judicial inquiry" is focused not upon the extent of the injury sustained, but instead whether the nature of the force applied was nontrivial. 130 S. Ct. 1175, 1179 (2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness since, as the Supreme Court has noted,

15

> [w]hen prison officials maliciously and sadistically
> use force to cause harm, contemporary standards
> of decency always are violated . . . . This is true
> whether or not significant injury is evident.
> Otherwise, the Eighth Amendment would permit
> any physical punishment, no matter how diabolic or
> inhuman, inflicting less than some arbitrary
> quantity of injury.

*Hudson*, 503 U.S. at 9, 112 S. Ct. at 1000 (citations omitted); *Velasquez*

*v. O'Keefe*, 899 F. Supp. 972, 973 (N.D.N.Y. 1995) (McAvoy, C.J.)

(quoting *Hudson*, 503 U.S. at 9, 112 S. Ct. at 1000); *see Romaine v.*

*Rewson,* 140 F. Supp. 2d 204, 211 (N.D.N.Y. 2001) (Kahn, J.).  Even a *de*

*minimis* use of physical force can constitute cruel and unusual punishment

if it is "repugnant to the conscience of mankind."  *Hudson*, 503 U.S. at 9-

10, 112 S. Ct. 1000 (citations omitted).

    With its focus on the harm done, the objective prong of the inquiry is

contextual and relies upon "contemporary standards of decency."  *Wright*,

554 F.3d at 268 (quoting  *Hudson*, 503 U.S. at 8, 112 S. Ct. at 1000)

(internal quotations omitted)).  When addressing this component of an

excessive force claim under the Eighth Amendment calculus, the court

can consider the extent of the injury suffered by the inmate plaintiff.  While

the absence of significant injury is certainly relevant, it is not dispositive.

*Hudson*, 503 U.S. at 7, 112 S. Ct. at 999.  The extent of an inmate's injury

is but one of the factors to be considered in determining a prison official's use of force was "unnecessary and wanton"; courts should also consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Whitley*, 475 U.S. at 321, 106 S. Ct. at 1085 (citing *Johnson*, 481 F.2d at 1033). "But when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency are always violated . . . . This is true whether or not significant injury is evident.'" *Wright*, 554 F.3d at 268-69 (quoting *Hudson*, 503 U.S. at 9, 112 S Ct. at 1000).

That is not to say that "every malevolent touch by a prison guard gives rise to a federal cause of action." *Griffen*, 193 F.3d at 91 (citing *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir. 1993)); *see also Johnson*, 481 F.2d at 1033 ("Not every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights"). Where a prisoner's allegations and evidentiary proffers, if credited, could reasonably allow a rational factfinder to find that corrections officers used force maliciously and sadistically, however, summary judgment dismissing an excessive use of force claim is

inappropriate.  *Wrigh*t, 554 F.3d at 269 (citing *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003) (reversing summary dismissal of prisoner's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the "medical records after the . . . incident with [that officer] indicated only a slight injury")) (other citations omitted).

To be sure, plaintiff's allegations regarding the use of excessive force against him are extremely modest, with little elaboration regarding the circumstances associated with the claim.  Nonetheless, in his third amended complaint plaintiff has set forth the date of the assault and identified the participants, alleging that with the assistance of defendants Murray and Williams, Corrections Sergeant Leduca choked him, kicked his back, and pushed his face into a door as part of a racially motivated assault.  While it may well be that on a more fully-developed record plaintiff will be unable to sustain a cognizable excessive force claim based upon the incident described in his complaint, at this early procedural juncture I am unable to conclude with certainty that plaintiff has failed to state a plausible excessive force claim against defendants Leduca,

Williams, and Murray.  For this reason, I recommend denial of the portion of defendants' motion seeking dismissal of plaintiff's excessive force claim.[11]

### C.     False Misbehavior Report Claims

Plaintiff's third amended complaint alleges two instances of having received false misbehavior reports, one issued in July 2008 by defendant J. Bruner, and the other on November 20, 2008 by Corrections Officer Pomainville.  Defendants assert these claims do not give rise to a cognizable constitutional claim.

---

[11]      It is unclear from plaintiff's complaint whether he alleges that defendants Murray and Williams actively participated in the assault, or instead that they merely stood by while it occurred.  If it is the latter, they may nonetheless bear responsibility for a civil rights violation growing out of the incident.  *See Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994).  It is well-established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other officers.  *See Mowry v. Noone,* No. 02-CV-6257 Fe, 2004 WL 2202645, at *4 (W.D.N.Y. Sept. 30, 2004); *see also Curley v. Village of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001) ("Failure to intercede results in [section 1983] liability where an officer observes excessive force being used or has reason to know that it will be.") (citations omitted).  In order to establish liability on the part of a defendant under this theory, a plaintiff must prove the use of excessive force by someone other than the individual, and that the defendant under consideration 1) possessed actual knowledge of the use of excessive force by another corrections officer; 2) had a realistic opportunity to intervene and prevent the harm from occurring; and 3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force.  *See Curley*, 268 F.3d at 72; *see also Espada v. Schneider*, 522 F. Supp. 2d 544, 555 (S.D.N.Y. 2007).  Mere inattention or inadvertence, it should be noted, does not rise to a level of deliberate indifference sufficient to support liability for failure to intervene.  *See, e.g., Schultz v. Amick*, 955 F. Supp. 1087, 1096 (N.D. Iowa 1997) (noting that "liability in a § 1983 'excessive force' action cannot be founded on mere negligence") (citing, *inter alia, Daniels v. Williams*, 474 U.S. 327, 335-36, 106 S. Ct. 662, 667 (1986)).

It is well-established, as defendants argue, that standing alone the mere allegation that a false misbehavior report has been filed against an inmate does not implicate constitutional conduct.[12]  *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997); *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir. 1986), *cert. denied*, 485 U.S. 982, 108 S. Ct. 1273 (1988)). Accordingly, I recommend that plaintiff's false misbehavior reports against defendants Corrections Officers J. Bruner and Pomainville be dismissed.

    D.    <u>Plaintiff's Claims of Verbal Harassment and Abuse</u>

Defendants next seek dismissal of plaintiff's claims of verbal abuse. In support of that request defendants assert that even if they are accepted as true, the allegations contained within plaintiff's complaint regarding verbal abuse by defendants Bruner, Russell, Taylor, and Williams do not rise to a level of constitutional significance.

42 U.S.C. § 1983 represents a vehicle by which a plaintiff may seek redress for civil rights violations committed under color of state law; it does not impose upon federal, state, and local prison officials a general code of

---

[12]    The further assertion that the false misbehavior report has been prompted by retaliatory animus and relates to an inmate having engaged in protected activity can suffice to state a claim for retaliation.  *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988).  In this instance, however, plaintiff's complaint, even when read with the utmost lenity, fails to advance such a claim.

professional conduct.  *Alnutt v. Cleary*, 913 F. Supp. 160, 165-66

(W.D.N.Y. 1996) (citations omitted); *Williams v. United States*, No. 07 Civ.

3018, 2010 WL 963474, at * 16 (S.D.N.Y. Feb. 25, 2010), *report and*

*recommendation adopted*, 2010 WL 963465 (Mar. 16, 2010); *see also*

*Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986); *Gill v. Hoadley*, 261

F. Supp. 2d 113, 129 (N.D.N.Y. 2003); *Shabazz v. Pico*, 994 F. Supp. 460,

474 (S.D.N.Y. 1998).  Whether applying section 1983, or otherwise,

federal courts are neither equipped nor in the business of overseeing

prison operations and performing human resource functions within such

settings; rather, the role of a court in a case such as this is to safeguard

the constitutional rights of the inmate plaintiff, in this instance his right to

be free of cruel and unusual punishment running afoul to the Eighth

Amendment.  *Estelle*, 429 U.S. at 102, 97 S. Ct. at 291.  Mere allegations

of verbal abuse do not rise to a level of constitutional violation and are not

cognizable under 42 U.S.C. § 1983.  *See Moncrieffe v. Witbeck*, No. 97-

CV-253, 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000) (Mordue, J.)

(allegations that corrections officer laughed at inmate not actionable under

section 1983) (citation omitted); *Carpio v. Walker*, No. Civ.A.95CV1502,

1997 WL 642543, at *6 (N.D.N.Y. Oct. 15, 1997) (Pooler, J. & DiBianco,

M.J. ) ("verbal harassment alone, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not rise to the level of an Eighth Amendment violation").  Nor do threats amount to a constitutional violation.  *Malsh v. Austin*, 901 F. Supp. 757, 763 (S.D.N.Y. 1995).

Plaintiff's claims against defendant J. Bruner, Russell, and J. Taylor arising from alleged verbal abuse and threats by those officers toward DePonceau are therefore subject to dismissal.

E.     Plaintiff's Claim Against Corrections Lieutenant J. Smith

In his complaint plaintiff alleges that Corrections Lieutenant Smith "cover[ed] up a racial hate of Sergeant Leduca" and his assault of plaintiff occurring on September 13, 2008.  Third Amended Complaint (Dkt. No. 24) p. 1.  Interpreting this claim as asserting a cause of action for conspiracy, defendants seek its dismissal as legally deficient.

A claim that a prison employee has taken steps to conceal evidence of a past constitutional violation which is not ongoing does not alone state a cognizable constitutional claim under 42 U.S.C. § 1983.  *See Clayton v. City of Poughkeepsie*, No. 06 Civ. 4881, 2007 WL 2154196, at *5 (S.D.N.Y. Jun. 21, 2007) (dismissing conspiracy claim where "[p]laintiff's

only reference to the purported conspiracy in the Complaint indicates that *after* the [alleged constitutional violations] the Officer Defendants 'subsequently conspired to conceal the truth as to the circumstances of the incident.'"). (emphasis in original).  Accordingly, any claim arising from the mere fact of concealment fails to state a cognizable claim.  *See id.*

In the event that the plaintiff's claim against defendant Smith is property construed as alleging a conspiracy cause of action, as defendants suggest, it is nonetheless equally deficient and cannot withstand a motion brought under Rule 12(b)(6).  To sustain a conspiracy claim under § 42 U.S.C. 1983, a plaintiff must demonstrate that a defendant "acted in a wilful manner, culminating in an agreement, understanding or meeting of the minds, that violated the plaintiff's rights . . . secured by the Constitution or the federal courts." *Malsh*, 901 F. Supp. at 763(citations and internal quotation marks omitted).  Conclusory, vague, or general allegations of a conspiracy to deprive a person of constitutional rights do not state a claim for relief under section 1983.  *Arar v. Ashcroft*, 585 F.3d 559, 569 (2d Cir. 2009); *see also Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir.), *cert. denied*, 464 U.S. 857, 104 S. Ct. 177 (1983).  Plaintiff's complaint fails to set forth the details necessary to sustain a

conspiracy claim and show both the existence of an agreement and a meeting of the minds; it likewise fails to provide at least some detail as to the time, place, and alleged effect of the conspiracy.  *Clayton*, 2007 WL 2154196, at *5 (quoting *Jessamy v. City of New Rochelle*, 292 F. Supp. 2d 498, 513 (S.D.N.Y. 2003) (other citations omitted), instead merely stating plaintiff's claim in conclusory fashion.  I therefore recommend dismissal of plaintiff's claims against Corrections Lieutenant J. Smith.

>   F.   <u>Plaintiff's Package Withholding Claim</u>

In their motion defendants next challenge the legal sufficiency of plaintiff's claim that on one isolated occasion an incoming package was wrongfully withheld from him by Corrections Sergeant Reynolds as well as other unknown "John Doe" and "Jane Doe" defendants.

Undeniably, prisoners have a recognized First Amendment right to the free flow of incoming and outgoing mail.[13] *Davis*, 320 F.3d at 351;

---

[13]    This right is not unfettered, however, but instead is subject to the right of corrections employees to lawfully examine an inmate's incoming mail in accordance with DOCCS Directive No. 4422, which generally authorizes inspections for money, printed materials, photographs and contraband and has been upheld as being reasonably related to legitimate concerns for the security and order of prison facilities. *Gillard v. Rovelli*, No. 9:09-CV-0431, 2010 WL 514977, at *7 (N.D.N.Y. Aug. 30, 2010) (Peebles, M.J.), *report and recommendation adopted*, 2010 WL 5147258 (N.D.N.Y. Dec. 13, 2010) (McAvoy, S.J.) (citing *Webster v. Mann*, 917 F. Supp. 185, 187 (W.D.N.Y. 1996) (Directive No. 4422 held reasonably related to legitimate penological interests); *France v. Coughlin*, No. 85 Civ. 6347, 1987 WL 10724, at *2-3 (S.D.N.Y. May 4, 1987) (addressing constitutionality of DOCS Directive No. 4422)*; see also Nieves v. Gonzalez*, No. 05-CV-00017S(SR), 2006 WL 758615, at * 5 (W.D.N.Y. Mar.

*Minigan v. Irvin,* 977 F. Supp. 607, 609 (W.D.N.Y. 1997).   The mere

allegation of a single isolated instance of mail tampering, however, in and

of itself is insufficient to assert a plausible First Amendment violation.  *See*

*Davis*, 320 F.3d at 351; *see also Morgan v. Montanye*, 516 F.2d 1367,

1371 (2d Cir. 1975).  Plaintiff's complaint does not indicate how long his

package was held, nor does not provide any other specifics.  Standing

alone this allegation would therefore be insufficient to support a First

Amendment claim.

It is true that plaintiff's complaint further alleges that his package

was held by prison officials in retaliation for the "sergeant Leduca

matters."  Third Amended Complaint (Dkt. No. 24) at p. 2.  When adverse

action is taken by prison officials against an inmate, motivated by the

inmate's exercise of a right protected under the Constitution, including the

free speech provisions of the First Amendment, a cognizable retaliation

claim under 42 U.S.C. § 1983 lies.  *See Franco*, 854 F.2d at 588-90.  As

the Second Circuit has repeatedly cautioned, however, such claims are

easily incanted and inmates often attribute adverse action, including the

issuance of misbehavior reports, to retaliatory animus; courts must

───────────────

2, 2006) (citations omitted).

25

therefore approach such claims "with skepticism and particular care." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Davis*, 320 F.3d at 352 (same).

In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) a causal connection exists between the protected activity and the adverse action – in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff.  *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S. Ct. 568, 576 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Dawes*, 239 F.3d at 492.  If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct."  *Mount Healthy*, 429 U.S. at 287, 97 S. Ct. at 576.  If taken for both proper and improper reasons, state action may be upheld if

the action would have been taken based on the proper reasons alone. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (citations omitted).

As one can imagine, analysis of retaliation claims requires careful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two.  When such claims, which are exceedingly case specific, are alleged in only conclusory fashion, and are not supported by evidence establishing the requisite nexus between the protected activity alleged and the adverse action complained of, dismissal is warranted. *Flaherty*, 713 F.2d at 13.

Although plaintiff's complaint is far from clear on this score, and the exhibits thereto provide no illumination, the court presumes that plaintiff contends he complained, either through the grievance process or in some other way, regarding the alleged assault by Sergeant Leduca.  Such a complaint could constitute protected activity.  *Alnutt*, 913 F. Supp at 169 (quoting *Franco*).  Plaintiff's complaint, however, is lacking in other details necessary to support a plausible retaliation cause of action.  It is doubtful that a single isolated instance of package withholding of unknown duration, without more, could chill a person of ordinary firmness and

therefore suffice to show adverse action sufficient to state a plausible retaliation claim.  *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 374 (S.D.N.Y. 2011) ("Delaying delivery of an inmate's mail for a short time does not rise to the level of adverse action") (citing *Tafari v. McCarthy*, 714 F. Supp. 2d at 347 ("Courts in this circuit have held that claims of mail tampering do not constitute adverse action."); *Islam v. Goord*, 05 Civ. 7502, 2006 WL 2819651 at *7 (S.D.N.Y. Sept. 29, 2006) ("Plaintiff also suggests that [a defendant's] alleged tampering with his family and legal mail was retaliatory. However, this is not the type of conduct that would deter an ordinary individual from exercising his constitutional rights. Plaintiff does not allege that he suffered any injury as a result of the alleged tampering, and therefore these isolated instances of mail tampering are not 'adverse actions' supporting a cause of action for First Amendment retaliation."); *Battice v. Phillip*, No. CV–04–669, 2006 WL 2190565 at *6 (E.D.N.Y. Aug. 2, 2006) (Defendant's "failure to deliver [plaintiff's] mail on one occasion does not constitute the type of conduct that would deter an ordinary individual from exercising his constitutional rights. [Plaintiff] does not allege, much less present any evidence to show, that he suffered any injury as a result of the minor delay in receiving one

piece of mail. Even if intentional, this isolated incident is 'simply de minimis and therefore outside the ambit of constitutional protection.' ").

Moreover, even assuming that the plaintiff could establish the existence of constitutionally significant adverse action, he has failed to allege any facts, either through temporal proximity or otherwise, that would satisfy the third essential element and demonstrate the requisite connection between the protected activity and the alleged adverse action. *Dillon*, 497 F.3d at 251.  Even if properly regarded as a First Amendment retaliation claim, plaintiff's mail tampering claim is therefore nonetheless insufficiently stated and subject to dismissal.

For these reasons, I recommend dismissal of all claims set forth in plaintiff's third amended complaint against defendant Reynolds as well as the Jane and John Doe defendants, based upon mail tampering .

G.    Plaintiff's Procedural Due Process Claim

Plaintiff's complaint alleges that Lieutenant C. Goodman conducted a "one sided" Tier III disciplinary hearing.  Third Amended Complaint (Dkt. No. 24) p. 1.  This allegation could be viewed as alleging a deprivation of procedural due process.  Although defendants' motion does not specifically address this claim the court has the power *sua sponte* to

address each cause of action for frivolity, if appropriate. *Gianello v. Port of Authority of N.Y. and N.J.*, No 11 Civ. 3829, 2011 WL 2436674, at *1 (citing *Fitzgerald v. First E. Seventh Street Tenants Corp.*, 221 F.3d 362, 363-64 (2d Cir. 2000)).

To successfully state a claim under 42 U.S.C. § 1983 for the denial of procedural due process arising out of a disciplinary hearing, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient process. *See Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000) (citations omitted); *Hynes*, 143 F.3d at 658; *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996). Not every sanction imposed upon a prison inmate as a result of a disciplinary hearing represents constitutionally significant liberty interest deprivation. Plaintiff's complaint fails to set forth any facts which would enable the court to gauge whether, as a result of the Tier III hearing, he was subjected to a penalty which could properly be viewed as a deprivation of the liberty interest.

Plaintiff's complaint is also lacking in details as to the manner in which he was denied due process in connection with that alleged liberty interest deprivation. The procedural safeguards to which a prison inmate

is entitled before being deprived of a constitutionally cognizable liberty interest are well-established, the contours of the requisite protections having been articulated in *Wolff v. McDonnell*, 418 U.S. 539, 564-67, 94 S. Ct. 2963, 2978-80 (1974).  Under *Wolff*, the constitutionally mandated due process requirements, include 1) written notice of the charges; 2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 4) in some circumstances, the right to assistance in preparing a defense.  *Wolff*, 418 U.S. at 564-67, 94 S. Ct. at 2978-80; *see also Eng v. Coughlin*, 858 F.2d 889, 897-98 (2d Cir. 1988).  In order to pass muster under the Fourteenth Amendment, hearing officer's disciplinary determination must garner the support of at least "some evidence".  *Superintendent v. Hill*, 472 U.S. 445, 105 S. Ct. 2768 (1985).

In this instance, plaintiff's complaint fails to set forth sufficient allegations to plausibly demonstrate that he did not receive due process, even if he can show the deprivation of a liberty interest.  The allegation of a "one-sided" hearing appears to potentially call into question whether

defendant Goodman, as the hearing officer, was biased.  Plainly, due process requires that any hearing conducted in association with the deprivation of a liberty interest must be presided over by a person who is unbiased.  *Francis v. Coughlin*, 891 F.2d 43, 48 (2d Cir. 1989) (citing *Bolden v. Alston*, 810 F.2d 535, 358 (2d Cir.), *cert. denied*, 848 U.S. 896, 108 S. C.t 229 (1987)).  Here, there are no clarifying allegations in plaintiff's complaint to support a plausible claim of bias on the part of defendant Goodman.  Because plaintiff's complaint is devoid of factual allegations that could support a finding that he was deprived of a liberty interest as a result of the Tier III disciplinary hearing in question and that defendant Goodman, the assigned hearing officer, was biased, aside from plaintiff's conclusory accusation to that effect, I recommend dismissal of any potential due process claim contained within plaintiff's complaint.

> H.    Eleventh Amendment

It is unclear from plaintiff's amended complaint whether the defendants named are sued only as individuals, or instead in their official capacities as well.[14]  To the extent they may be named in their official

---

[14]     It appears from his response papers that plaintiff may have intended to name the defendants in their individual capacities only, and not as state officials.  *See* Plaintiff's Motion Opposition (Dkt. No. 56-4) at p. 1 of 14.

capacities, defendants seek dismissal of such claims under the Eleventh Amendment.

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought. *Alabama v. Pugh*, 438 U.S. 781, 782, 98 S. Ct. 3057, 3057-58 (1978). This absolute immunity which states enjoy under the Eleventh Amendment extends both to state agencies, and in favor of state officials sued for damages in their official capacities when the essence of the claim involved seeks recovery from the state as the real party in interest.[15] *Richards v. State of New York Appellate Division, Second Dep't*, 597 F. Supp. 689, 691 (E.D.N.Y. 1984) (citing *Pugh* and *Cory v. White*, 457 U.S. 85, 89-91, 102 S. Ct. 2325, 2328-29 (1982)). To the extent that a state official is sued for damages in his or her official capacity the official is entitled to invoke the Eleventh Amendment immunity belonging to the state.[16] *Kentucky v. Graham*, 473 U.S. 159, 166-67, 105 S. Ct. 3099,

---

[15]    In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the State. As the Supreme Court has reaffirmed, the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment. *Northern Ins. Co. of New York v. Chatham County*, 547 U.S. 189, 193, 126 S. Ct. 1689, 1693 (2006).

[16]    By contrast, the Eleventh Amendment does not establish a barrier against suits seeking to impose individual or personal liability on state officials under

3105 (1985);  *Hafer v. Melo*, 502 U.S. 21, 25, 112 S. Ct. 358, 361 (1991).

Since plaintiff's damage claims, to the extent they may be asserted against the named defendants in their official capacities, are in reality claims against the State of New York, thus exemplifying those against which the Eleventh Amendment protects, they are subject to dismissal. *Daisernia v. State of New York*, 582 F. Supp. 792, 798-99 (N.D.N.Y. 1984) (McCurn, J.).  I therefore recommend this portion of defendants' motion be granted, and that plaintiff's damage claims against the defendants in their capacities as state officials be dismissed.

I.    Qualified Immunity

As an alternative basis for dismissing plaintiff's claims, defendants assert their entitlement to qualified immunity from suit.  Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982) (citations omitted).  "In assessing an officer's eligibility for the shield, 'the appropriate question is the objective inquiry whether a

---

section 1983.  *See Hafer*, 502 U.S. at 30-31, 112 S. Ct. at 364-65.

reasonable officer could have believed that [his or her actions were] lawful, in light of clearly established law and the information the officer[ ] possessed." *Kelsey v. County of Schoharie*, 567 F.3d 54, 61 (2d Cir. 2009) (quoting *Wilson v. Layne*, 526 U.S. 603, 615, 119 S. Ct. 1692 (1999)).  The law of qualified immunity seeks to strike a balance between the need to hold government officials accountable for irresponsible conduct and the need to protect them from "harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 815 (2009) .

In *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151 (2001), the Supreme Court "mandated a two-step sequence for resolving government official's qualified immunity claims."  *Pearson*, 555 U.S. at 232, 129 S. Ct. at 815-16.  The first step requires the court to consider whether, taken in the light most favorable to the party asserting immunity, the facts alleged show that the conduct at issue violated a constitutional right,[17] *Kelsey*, 567 F.3d at 61, with "the second step being whether the right is clearly established", *Okin v. Village of Cornwall-On-Hudson Police Dept.*, 577

_____

[17]     In making the threshold inquiry, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.  *Saucier,* 533 U.S. at 201, 121 S. Ct. 2151.

F.3d 415, 430 n.9 (citing *Saucier*).[18]  Expressly recognizing that the

purpose of the qualified immunity doctrine is to ensure that insubstantial

claims are resolved prior to discovery, the Supreme Court recently

retreated from the prior *Saucier* two-step mandate, concluding in *Pearson*

that because "[t]he judges of the district courts and courts of appeals are

in the best position to determine the order of decisionmaking [that] will

best facilitate the fair and efficient disposition of each case", those

decision makers "should be permitted to exercise their sound discretion in

deciding which of the . . .  prongs of the qualified immunity analysis should

be addressed first in light of the circumstances of the particular case at

hand."[19]  *Pearson*, 555 U.S. at 236, 242, 129 S. Ct. at 818, 821.  In other

words, as recently emphasized by the Second Circuit, the courts "are no

longer *required* to make a 'threshold inquiry' as to the violation of a

---

[18]     In *Okin*, the Second Circuit clarified that the "'objectively reasonable'
inquiry is part of the 'clearly established' inquiry", also noting that "once a court
has found that the law was clearly established at the time of the challenged conduct and
for the particular context in which it occurred, it is no defense for the [government]
officer who violated the clearly established law to respond that he held an objectively
reasonable belief that his conduct was lawful."  *Okin*, 577 F.3d at 433, n.11 (citation
omitted).

[19]     Indeed, because qualified immunity is "an immunity from suit rather than
a mere defense to liability. . .", *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806
(1985), the Court has "repeatedly . . . stressed the importance of resolving immunity
questions at the earliest possible stage in the litigation."  *Pearson*, 555 U.S. at 231,
129 S. Ct. at 815 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S. Ct. 524 (1991)
(per curiam)).

constitutional right in a qualified immunity context, but we are free to do so." *Kelsey*, 567 F.3d at 61(citing *Pearson*, 129 S. Ct. at 821) (emphasis in original).

For courts engaging in a qualified immunity analysis, "the question after *Pearson* is 'which of the two prongs . . . should be addressed in light of the circumstances in the particular case at hand.'" *Okin*, 577 F.3d 430 n.9 (quoting *Pearson*).  "The [*Saucier* two-step] inquiry is said to be appropriate in those cases where 'discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all.'" *Kelsey*, 567 F.3d at 61 (quoting *Pearson*, 129 S. Ct. at 818).

The causes of action which will remain in this action, should this report be adopted, are limited to claims of excessive force and failure to intervene.  The right of a prison inmate to be free from the use of excessive force, and to be protected from such use of excessive force by prison officials, were well-established long before the relevant acts in this case.  The question of whether defendants Leduca, D. Williams, and D. Murray acted with a reasonable belief of the lawfulness of their actions is inextricably intertwined with the merits of plaintiff's claims, and thus those

claims are not well-suited for disposition on the basis of qualified immunity

at this early procedural juncture.  Accordingly, I recommend that

defendants' request for a finding of qualified immunity be denied, without

prejudice.

> J.       Defendants' Motion for a Stay of Discovery

Defendants also move order pursuant to Federal Rule of Civil

Procedure 26(c)(1) for a protective order staying discovery pending the

resolution of defendants' motion to dismiss. Rule 26(c)(1) of the Federal

Rules of Civil Procedure provides, in relevant part, that

> [a] party or any person from whom discovery is sought may
> move for a protective order in the court where the action is
> pending . . . The Court may, for good cause, issue an order to
> protect a party or person from annoyance, embarrassment,
> oppression, or undue burden or expense, including one or
> more of the following: (A) forbidding the disclosure or
> discovery.

Fed. R. Civ. P. 26(c)(1); *see also, Spencer Trask Software and*

*Information Services, LLC v. RPost Intern. Ltd.*, 206 F.R.D. 367, 368

(S.D.N.Y. 2002) (granting stay of discovery pending determination of

motion to dismiss where court found defendants presented "substantial

arguments" for dismissal of many if not all of the claims in the lawsuit);

*United States v. County of Nassau*, 188 F.R.D. 187, 188-89 (E.D.N.Y.

1999) (granting stay of discovery during the pendency of a motion to dismiss where the "interests of fairness, economy and efficiency . . . favor[ed] the issuance of a stay of discovery,"  and where the plaintiff failed to claim prejudice in the event of a stay.).

In light of my recommendation that the court dismiss the majority of plaintiff's claims, one which if adopted would significantly narrow the claims and defenses to be addressed in discovery, I find the existence of good cause to issue an order protecting the defendants from the burden of engaging in discovery until after the court determines whether to adopt my recommendation, issue is thereafter properly joined by defendants' filing of an answer, and the court has issued its standard Rule 16 pretrial scheduling order in the action.

K.    Plaintiff's Motions

As was previously noted, plaintiff has filed various motions in this case, though the relief sought in those applications is for the most part puzzling.  *See* Dkt. Nos. 60, 61, 62, 66.  The title of the first motion suggests that it is addressed exclusively to the length of documents, purportedly requesting permission to file oversized documents in opposition to defendants' motion.  Dkt. No. 60.  The body of the motion,

however, though exceedingly difficult to decipher, appears to request a stay of the action. *Id.*

To the extent that plaintiff is requesting permission to file oversized documents, that request is denied as moot since none of the documents submitted to date appear to exceed the limits imposed under the court's local rules. The intertwined request for a stay of the action is addressed to the sound discretion of the court. *Curtis v. Citibank, N.A.*, 226 F.3d 133, 138 (2d Cir. 2000) (citation omitted). With regard to this request plaintiff has not provided the court with any basis for his application. The court notes, however, that this case has been pending for over two and one-half years, and yet remains in its procedural infancy. While it is presumably the plaintiff who has the greater interest in expediting the proceedings and pursuing his claims to resolution, defendants also have a right to have the claims against them heard and decided in an efficient and expeditious basis, and the court has the independent duty of insuring that it dispenses justice not only fairly, but in addition efficiently and economically. *Fried v. Lehman Bros. Real Estate Associates III, L.P.*, No. 11 Civ. 4141(BSJ), 2012 WL 252139, at * 5 (S.D.N.Y. Jan. 25, 2012) (citing *Landis v. N. Am. Co.*, 299 U.S. 248, 254, 57 S. Ct. 163 (1936);

*Curtis*, 226 F.3d at 138.  In light of these considerations and the length of time that this case has been pending, I will deny plaintiff's request for the issuance of a stay of this action.

Plaintiff's second motion, which is equally indecipherable, appears to contain both a request for permission to amend or supplement his complaint, and to seek the scheduling of a Rule 16 pretrial conference and permission to engage in discovery in the action.  Dkt. No. 61.  To the extent that plaintiff's motion may be construed as seeking leave to amend or supplement, the motion is rejected based upon plaintiff's failure to comply with the provision of this court's local rules requiring that such a motion be accompanied by a proposed amended pleading to supplant and supersede the existing pleading.[20]  *See* N.D.N.Y.L.R. 7.1(a)(4).  Plaintiff's motion for the scheduling a pretrial conference and permission to engage in discovery is denied as premature.  Issue has not yet been joined in the case by the filing of answers on behalf of the defendants.  Once that occurs, the court will issue a standard Rule 16 pretrial scheduling order,

---

[20]     Though this is far from clear, it appears that plaintiff may also be requesting that the United States be added as a party to the action, and that the caption be amended to reflect this fact.  Dkt. No. 61.  In addition to being procedurally defective as failing to meet the court's requirements, as noted above, based upon the existing complaint there does not appear to be any basis upon which to conclude that the United States bears responsibility for the civil rights violations claimed.

which will require both sides to make certain disclosures, and the parties will thereafter be permitted to engage in whatever other pretrial discovery is authorized by rule and deemed necessary.

Plaintiff's third motion similarly appears to seek permission to amend and/or supplement his complaint. Dkt. No. 62. For the same reasons set forth above, that motion is rejected as not in compliance with the court's local rules.

Plaintiff's last and final motion, filed on April 21, 2011 – after his response to defendants' dismissal motion was submitted – appears to seek an extension of the time to oppose defendants' motion. Dkt. No. 56. Because he has in fact opposed defendants' pending motion, plaintiff's recent application for an extension of time to submit opposition will be denied as moot.

L.     Whether to Grant Plaintiff's Leave to Amend

The last issue to be addressed is whether to permit plaintiff leave to amend his third amended complaint in order to cure the deficiencies noted in this report. Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend at least once if there is any indication that a valid claim might be stated. *Branum v. Clark*, 927 F.2d

698, 704-05 (2d Cir.1991) (emphasis added); *see also* Fed. R. Civ. P.

15(a) (leave to amend "shall be freely given when justice so requires");

*see also Mathon v. Marine Midland Bank, N.A.,* 875 F.Supp. 986, 1003

(E.D.N.Y.1995) (leave to replead granted where court could not say that

under no circumstances would proposed claims provide a basis for relief).

The court must now determine whether plaintiff is entitled to the benefit of

this general rule, given the procedural history of the case and its

pendency since May of 2009.

   A court is not required to offer a plaintiff an opportunity to amend

where "the problem with [plaintiff's] causes of action is substantive" such

that "[b]etter pleading will not cure it."  *Cuoco v. Moritsugu*, 222 F.3d 99,

112 (2d Cir. 2000) (finding that repleading would be futile) (citation

omitted); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48

(2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact

sufficient to support its claim, a complaint should be dismissed with

prejudice.")  (affirming, in part, dismissal of claim with prejudice) (citation

omitted); *cf. Gomez* v. USAA Fed. Sav. Bank, 171 F.3d 794, 796 (2d Cir.

1999) (granting leave to amend is appropriate "unless the court can rule

out any possibility, however unlikely it might be, that an amended

43

complaint would succeed in stating a claim.").  Many of the deficiencies noted in this report are substantive in nature, and it appears unlikely that even if afforded the opportunity to amend the plaintiff would be able to cure those deficiencies.

I note, moreover, that while leave to amend is generally granted freely, particularly to *pro se* plaintiffs, the duty to indulge a *pro se* plaintiff by permitting serial amendments is not limitless, and should not be viewed as such to the detriment of the court's obligation to insure that pending cases proceed smoothly and expeditiously through the litigation process. In this instance, plaintiff has been granted multiple opportunities to amend his complaint, in each case with the benefit of a thorough explanation regarding perceived deficiencies, yet has not fully availed himself of those chances, nor has he heeded the court's admonitions concerning the controlling pleading requirements.  Accordingly I recommend that plaintiff not be afforded a further opportunity to amend so that this case may finally move forward toward resolution of the surviving claims.  *See Prezzi v. Schelter*, 469 F.2d 691, 692 (2d Cir. 1972) (per curiam), 411 U.S. 935, 93 S. Ct. 1911 (1973); *see also Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) (citing *Prezzi*).

III.   SUMMARY AND RECOMMENDATION

The task of reviewing plaintiff's various complaints in this action and addressing them for legal sufficiency has proven to be a daunting challenge.  While plaintiff's initial attempts at crafting a complaint in this action resulted in hopelessly vague and indecipherable claims being asserted against an array of many individuals and entities, with guidance from the court the plaintiff has now reduced his claims to those against a handful of DOCCS employees stationed at the Great Meadow Correctional Facility.

Based upon a review of plaintiff's recent complaint, which unfortunately remains extremely vague and to a large degree hopelessly unintelligible for the purpose of gauging the sufficiency of his claims in the face of defendants' dismissal motion, I recommend dismissal of the majority of those claims, without leave to replead.  In addition, I will order that discovery in this action will be stayed, and plaintiff's various pending applications for non-dispositive relief will denied, either as moot or on the merits.  Based upon the foregoing it is respectfully

RECOMMENDED, that defendants' motion to dismiss (Dkt. No. 54) be GRANTED, in large part, and that all of plaintiff's claims against the

defendants in this action be DISMISSED, without leave to replead, with the exception of plaintiff's claims against defendants Sergeant Leduca, Grievance Sergeant D. Williams, and Watch Commander D. Murray for the use of excessive force and/or failure to intervene growing out of the incident occurring on or about September 13, 2009; and it further

ORDERED that plaintiff's motions for leave to amend and/or supplement his complaint (Dkt. Nos. 61, 62) are rejected as failing to comply with this court's local rules based upon the failure to include a proposed supplemental and/or amended complaint; and it is further

ORDERED, that pending final disposition of defendants' dismissal motion, the filing of an answer on behalf of the remaining defendants, and the issuance by the court of a standard Rule 16 pretrial scheduling order in the case, all discovery in this action be and is hereby STAYED; and it is further

ORDERED that plaintiff's motion for expansion of the page limitations set forth in this court's local rules (Dkt. No. 60) is DENIED as moot; and it is further hereby

ORDERED that plaintiff's motion for a stay of this action (Dkt. Nos. 60, 61) is DENIED; and it is further hereby

ORDERED that plaintiff's application for a pretrial conference and for permission to engage in discovery in this action (Dkt. No. 61) is DENIED; and it is further

ORDERED, that plaintiff's application for an extension of time to respond to defendants' dismissal motion (Dkt. No. 66) is DENIED, as moot.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the clerk of the court within FOURTEEN days of service of this report.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is further ORDERED that the clerk of the court serve a copy of this report, recommendation and order upon the parties in accordance with this court's local rules, and that the clerk additionally forwarded to the plaintiff a copy of the docket sheet in the action.

Dated:     February 21, 2012
           Syracuse, NY

David E. Peebles
U.S. Magistrate Judge

47



Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.
Frank G. MOWRY, Plaintiff(s),
v.
Robert F. NOONE, In his Individual and Official
Capacity and Douglas Dickenson, Individually and in
his Official Capacity as an employee/agent of the
County of Seneca, Defendant(s).
**No. 02-CV-6257FE.**

Sept. 30, 2004.

Frank G. Mowry, Gowanda, NY, pro se.

Thomas J. Lynch, Esq., Law Offices of Thomas J. Lynch,
Syracuse, NY, Thomas Desimon, Esq., Harris Beach LLP,
Pittsford, NY, for Defendants.

DECISION AND ORDER

*Preliminary Statement*

FELDMAN, Magistrate J.

**\*1** Plaintiff Frank G. Mowry ("Mowry" or "plaintiff"),
proceeding *pro se,* brings this action pursuant to 42 U.S.C.
§ 1983. Plaintiff alleges that (1) defendant Robert F.
Noone, Jr. ("Noone") used excessive force to effectuate
his arrest, in violation of his rights under the Fourth
Amendment of the Constitution, (2) defendant Douglas
Dickenson ("Dickenson") failed to intervene to stop
Noone from using excessive force, and (3) both Noone
and Dickenson deliberately denied him medical care in
violation of his rights under the Fourteenth Amendment of
the Constitution. Defendants now move for summary

judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure (Docket # 70). In accordance with the
provisions of 28 U.S.C. § 636(c), the parties have
consented to the jurisdiction of this Court for all
dispositive matters, including trial. (Docket # 11). For the
reasons set forth herein, defendants' motion for summary
judgment is granted.

*Factual Background*

Mowry alleges that on July 22, 1999 he was stopped at a
traffic light in the left turn only lane at the Ovid Street
bridge in Seneca Falls, New York. Mowry continued
straight ahead onto Cayuga Street when the light turned
green. Defendant Officer Robert F. Noone, Jr. of the
Seneca Falls Police Department, observed Mowry disobey
the traffic sign, activated the emergency lights on his
vehicle and began following Mowry. (Mowry Dep. Trans.
p. 17, 17-18 FN1). Mowry knew that he was driving
illegally but did not pull over. (Mowry Dep. Trans. p. 18,
12). Noone continued to follow Mowry for several miles.
(Mowry Dep. Trans. p. 20, 8). When Mowry turned onto
Route 318, Deputy Douglas Dickenson of the Seneca
County Sheriff's Department, joined the pursuit and
activated his emergency lights. (Mowry Dep. Trans. p. 22,
5-6, p. 24, 3). Mowry continued driving even though he
knew he was the subject of pursuit. (Mowry Dep. Trans.
p. 25, 7). Mowry lead defendants on a highspeed chase
that reached speeds of over 75 mph and narrowly avoided
several head-on collisions as he attempted to pass vehicles
on the two-lane road. (Mowry Dep. Trans. p. 21, 12-13,
22). Mowry turned onto Birdsey Road and continued
driving until a construction road closure forced him to stop
his car. (Mowry Dep. Trans. p. 28, 9-22).

FN1. Deposition references are to the page and
line number of transcript of the May 27, 2003
deposition of plaintiff Frank. G. Mowry.

Mowry exited his car and when he saw Dickenson,
followed by Noone, turn onto Birdsey Road he began to
flee. (Dep. Trans. p. 38, 9-13; p. 39, 3). Dickenson ran
after Mowry yelling at him to stop. (Mowry Dep. Trans. p.
39, 8). Once Mowry saw that he was about to be overtaken

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))

by Dickenson, he stopped and Dickenson brought him to the ground. (Mowry Dep. Trans. p. 34, 20). Mowry landed with his hands and knees on the gravel. (Mowry Dep. Trans. p. 37, 2; p. 40, 20-21). Dickenson asked Mowry if he was alright, and Mowry responded yes. (Mowry Dep. Trans. p. 42, 15-20).

Dickenson gave Mowry 30 seconds to catch his breath on his hands and knees, then pulled Mowry's right arm behind his back to handcuff him. (Mowry Dep. Trans. p. 42, 12-13, p. 39, 21-22). At the same time, Mowry heard a car door slam and saw Noone running towards them. (Mowry Dep. Trans. p. 72, 19-21). Mowry testified that when he saw Noone running towards them he only had time to turn his head away. (Mowry Dep. Trans. p. 46, 6-8). Mowry testified that Noone was running too fast and overran Mowry and Dickenson. (Mowry Dep. Trans. p. 46, 18-19). As Noone jumped over the top of Mowry's head, the toe of Noone's boot hit the side of Mowry's head. (Mowry Dep. Trans. p. 49, 4-5). Noone landed on one foot before regaining his balance. (Mowry Dep. Trans. p. 48, 21-23). Noone and Dickenson pulled Mowry off the ground and placed him in Noone's car. (Mowry Dep. Trans. p. 49, 13-14). Mowry claims to have lost consciousness until he was placed in the back of the patrol car. (Mowry Dep. Trans. 50, 9-14). Mowry denies telling anyone that he was injured until after he got to the police station and was formally "booked in" at the county jail. (Mowry Dep. Trans. 55, 7-13). Mowry concedes that he did not ask for any medical attention at that time. (Mowry Dep. Trans. 55, 17-22, 68, 10-15).

**\*2** Mowry was taken to the Seneca Falls Police Station where he was charged with Driving While Intoxicated, Aggravated Unlicensed Operation of a Motor Vehicle in the First Degree, and Reckless Endangerment.[FN2] Within 24 hours of his arrest, Mowry was examined by medical personnel at the county jail and was treated for neck pain. (Mowry Dep. Trans. p. 68, 19; p. 58, 3-4).

FN2. Mowry later admitted guilt to all three charges. (Mowry Dep. Trans. p. 63, 8-20).

Mowry alleges that he was later diagnosed with a fractured left cheekbone. (Mowry Dep. Trans. p. 65, 5-9). He also asserts that as a result of this injury he experiences blurred

vision and migraine headaches. (Mowry Dep. Trans. p. 65, 6-9). According to Mowry, the results of an MRI taken while he was in prison were "normal." (Mowry Dep. Trans. p. 82, 18-19).

*Discussion*

*Summary Judgment Standard:* Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" only if it has some affect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Catanazaro v. Weiden,* 140 F.3d 91, 93 (2d Cir.1998).

The burden of showing the absence of any genuine issue of material fact rests on the moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When a court is confronted with facts that permit different conclusions, all ambiguities and inferences that may reasonably be drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir.1996). Rule 56(e), however, also provides that in order to defeat a motion for summary judgment, the opposing party must "set forth specific facts showing that there is a genuine issue for trial. Such an issue is not created by a mere allegation in the pleadings [citations omitted], nor by surmise or conjecture on the part of the litigants." *United States v. Potamkin Cadillac Corp.,* 689 F.2d 379, 381 (2d Cir.1982) (per curium). "Affidavits submitted in opposition to a motion for summary judgment must set forth such facts as would be admissible in evidence." *Franklin v. Krueger Int'l,* 1997 WL 691424 at \*3 (S.D.N.Y. November 5, 1997) (citing *Raskin v. The Wyatt Co.,* 125 F.3d 55 (2d Cir.1997) ("only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment").

In addition, *pro se* submissions, particularly those alleging civil rights violations, are construed liberally and are

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))

treated as raising the strongest arguments that they might suggest. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). *See also Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (because plaintiff's "complaint alleges civil rights violations and he proceeded *pro se* in the District Court, we must construe his complaint with particular generosity") (citations omitted).

**\*3** *I. Excessive Force Claim:* The Supreme Court has held that claims against police officers for excessive force must be examined under the Fourth Amendment's reasonableness standard. *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Determining whether the force used was reasonable requires a balancing of the intrusion on the individual's Fourth Amendment rights against the interests of the government. *Id.* at 396. The reasonableness of a particular use of force must be judged objectively from the perspective of a reasonable officer at the scene of the arrest. *Graham,* 490 U.S. at 397. In evaluating the officer's actions, courts should consider the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, and whether he was actively resisting arrest or attempting to evade arrest by flight. *Id.* at 396. It is well established that the right to make an arrest necessarily carries with it the right to use some degree of physical coercion. *Id.* See *Mickle v. Morin,* 297 F.3d 114, 120 (2nd Cir.2002)(in the context of excessive force used during an arrest, "not every push or shove" is excessive.)(internal citations omitted).

In this case, the record is clear that the officers were faced with an extremely dangerous situation as Mowry drove erratically down narrow roads to avoid capture. Indeed, Mowry's actions repeatedly put the lives of other motorists in imminent danger. Applying the *Graham* balancing test to these circumstances, there is no question that the officers acted appropriately in stopping and arresting Mowry. See *Washington v. City of Riverside Illinois,* 2003 WL 1193347, \*5 (N.D.Ill. March 13, 2003) (summary judgment granted when driver's decision to flee justified officer's subsequent use of force to arrest.). Simply put, Mowry has produced no evidence upon which a reasonable jury could find that the defendants used excessive force during his take down and arrest.

As for Mowry's allegation that Noone applied excessive

force by "kicking him in the head," this Court will not credit Mowry's attempt to change his deposition testimony with the affidavit he submits in opposition to defendants' motions. Rather, this Court relies on Mowry's deposition testimony which clearly establishes the accidental nature of any injury caused by Noone. See *Mack v. United States,* 814 F.2d 120, 124 (2d Cir.1987)("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment."); *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 619 (2d Cir.1996) ("[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial.").

The undisputed facts here are that after Mowry was taken down by Dickenson, Noone exited his vehicle, ran toward Mowry with such speed that he overran Mowry and Dickenson, and tripped over Mowry. In light of the prolonged chase, the officers had a reasonable basis for believing that Mowry posed a serious threat, especially since he continued to run and evade arrest after he exited his vehicle. Under these circumstances, this Court finds that it was objectively reasonable for Noone to approach Mowry at a high rate of speed in his effort to assist Dickenson in subduing Mowry, and that his actions can not constitute excessive force.

**\*4** *II. Failure to Intervene Claim:* Mowry also makes a claim for failure to intervene. It is well established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by others. *Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001); *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994); *O'Neill v. Krzeminski,* 839 F.2d 9, 11 (2d Cir.1988). Failure to intercede results in liability where an officer observes the use of excessive force or has reason to know that it will be used. *Anderson,* 17 F.3d at 557. In order to be held liable, the law enforcement official must have had a realistic opportunity to intervene in order to prevent the harm from occurring. *Id.* at 557.

Here, based on the facts as presented by Mowry, Dickenson did not have the opportunity to intercede before Noone tripped over Mowry, and therefore cannot be held liable. See *O'Neill v. Krzeminski,* 839 F.2d 9, 11

Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))

(2d Cir.1988) (defendant entitled to judgment where record clear that blows were struck in such a rapid succession that officer "had no realistic opportunity to attempt to prevent them."). At the time the alleged excessive force was used, Dickenson had one hand on Mowry's left arm and was attempting to pull Mowry's right arm behind Mowry's back. Even Mowry stated that when he heard Noone running toward them he only had time to turn his head away before Noone overran them. Moreover, Noone's alleged use of excessive force was a single kick to the head, an event which Mowry concedes happened quickly and without warning. This was not a situation where the alleged excessive force continued for such a period of time that Dickenson, upon realizing what was happening, could have stopped it. *Id.* at 11-12.

Because a reasonable jury could not conclude otherwise, summary judgment should be granted in favor of Dickenson on the failure to intervene claim.

*III. Denial of Medical Treatment:* Mowry's third claim is for denial of medical treatment. The denial of medical treatment for a pre-trial detainee is evaluated under the Due Process Clause of the Fourteenth Amendment. *City of Revere v. Massachusetts General Hospital,* 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983); *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996). Although not specifically defined by the Supreme Court, the due process rights of a pre-trial detainee are at least as great as the Eighth Amendment rights of a convicted prisoner. *City of Revere,* 463 U.S. at 244; *Weyant v. Okst,* 101 F.3d. at 856.

In *Weyant,* the Second Circuit established a two-part test to determine liability for denial of medical treatment. First, the denial of medical treatment must concern an objectively serious injury. *Weyant,* 101 F.3d at 856. A serious injury has been defined as "one that may produce death, degeneration or extreme pain." *Mills v. Fenger,* 2003 WL 251953, *4 (W.D.N.Y.2003) (citations omitted). Second, the plaintiff is required to show that based on what the defendant knew or should have known, the defendant acted with deliberate indifference to plaintiff's serious medical needs. *Weyant,* 101 F.3d at 856. Deliberate indifference is established if the defendant acted with reckless disregard for the substantial risk posed by the plaintiff's serious medical condition. *Weyant,* 101 F.3d at 856.

*5 Here, the undisputed facts establish that the defendants did not deny plaintiff medical treatment. Even assuming arguendo that Mowry's injury rose to the level of an objectively serious medical injury, there is no credible evidence in the record to base a finding that either Noone or Dickenson should have been aware of his need for medical treatment, but were indifferent to his needs. Indeed, the record demonstrates that Mowry never told the defendants that he needed medical attention and the injuries he now alleges were not apparent to them. Contrary to plaintiff's claims, Dickenson demonstrated his concern for plaintiff's well-being when he asked Mowry if he was alright and gave him time to catch his breath. Mowry did not ask for medical assistance or complain about his alleged injuries immediately following the arrest. At the county jail, Mowry stated that he did not need medical attention. It was not until the following day that Mowry first requested medical attention. Mowry admits that in response to this request, he was then treated by the medical personnel at the county jail and given a prescription for neck pain.

The record is devoid of credible evidence that either defendant acted with reckless disregard for the substantial risk posed by the plaintiff's serious medical needs. *See Thomas v. Nassau County Correctional Center,* 288 F.Supp.2d 333, 338 (E.D.N.Y.2003) (to establish a constitutional violation the facts must give rise to a reasonable inference that defendants *knew* of serious medical needs and intentionally disregarded them.). Based on the record here, summary judgment should be granted in favor of defendants Dickenson and Noone on plaintiff's denial of medical treatment claim.

*Conclusion*

For all the foregoing reasons, defendants' Motions for Summary Judgment (Docket # 67, 70) are granted. Having granted defendants' motion for summary judgment by determining that plaintiff has failed to adduce evidence of a constitutional violation, plaintiff's motions for "dismissal of defendant's (sic) motion" and "cross motion" for summary judgement (Docket # 75) are denied.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))


SO ORDERED.


W.D.N.Y.,2004.
Mowry v. Noone
Not Reported in F.Supp.2d, 2004 WL 2202645
(W.D.N.Y.)


END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff
and not assigned editorial enhancements.**

United States District Court,

S.D. New York.
Larry WILLIAMS, Plaintiff,
v.
UNITED STATES of America, et al., Defendants.
No. 07 Civ. 3018(RJS)(THK).

Feb. 25, 2010.
**REPORT AND RECOMMENDATION**

[THEODORE H. KATZ](), United States Magistrate Judge.
**\*1 TO: HON. RICHARD J. SULLIVAN, UNITED
STATES DISTRICT JUDGE FROM: THEODORE H.
KATZ, UNITED STATES MAGISTRATE JUDGE**

Plaintiff Larry Williams ("Plaintiff"), proceeding *pro
se,* brings this action against Defendants the United States
of America, the United States Marshal's Service
("USMS"), Detention Officers Luis Figueroa, Donny
LaRosa, Thomas Ventiere, A.J. Krause, and unnamed
detention officers John Does Nos. 4, 6, 7, and 8
(collectively, "Defendants"), alleging that they violated his
rights under the First, Fifth, Sixth, and Eighth
Amendments to the United States Constitution. Plaintiff
asserts his claims against Defendants Figueroa, LaRosa,
Ventiere, Krause, and John Does Nos. 4, 6, 7, and 8
(collectively, the "Individual Defendants") in their official
as well as individual capacities.

Defendants have moved to dismiss the action pursuant
to [Rules 12(b)(1), (5), and (6) of the Federal Rules of
Civil Procedure](). Defendants contend that the Court lacks
subject matter jurisdiction, Plaintiff fails to state a claim
upon which relief can be granted, and Plaintiff has failed
to serve Defendants within 120 days of the filing of the
Amended Complaint. The case was referred to this Court
for a Report and Recommendation on Defendants' motion.
For the reasons that follow, this Court recommends that
Defendants' motion be granted.

**BACKGROUND**

The events at issue in this action took place while
Plaintiff was involved in criminal proceedings in the
Southern District of New York ("S.D.N.Y."). Plaintiff
alleges that the Individual Defendants, employees of the
USMS assigned to the S.D.N.Y., violated his
constitutional rights by mistreating him when they
transported him to and from the S.D.N.Y. courthouse, and
while he was in the courthouse's holding cells during the
course of his criminal trial. Unless otherwise noted, the
following facts are taken from Plaintiff's Amended
Complaint, and assumed to be true for purposes of
Defendants' motion to dismiss. (*See* Amended Complaint,
dated Jan. 7, 2009 ("Am.Compl.").)

**I. The Incidents of 2004 through 2006**

On February 8, 2004, Defendant Figueroa transported
Plaintiff and other inmates from the Metropolitan
Detention Center ("MDC"), where Plaintiff was
incarcerated during his criminal trial, to the S .D.N.Y.
courthouse. (*See* Am. Compl. ¶ 4.) During the trip,
Defendant Figueroa began to discuss another inmate's
case, who was in protective custody with one of Plaintiff's
co-defendants in his criminal case. (*See id.* ¶ 5.) Plaintiff
told Defendant Figueroa that "such discussions should not
take place in the presence of inmates." (*See id.* ¶ 6.) In
response, Defendant Figueroa called Plaintiff a "rat,"
which, according to Plaintiff, put his "life in jeopardy."
(*See id.* ¶ 7.) Defendant Figueroa then told Plaintiff that he
would be placed in the "Zebra Tank"-a
solitary-confinement cell at the courthouse that was
typically reserved for inmates who were cooperating with
the government. (*See id.* ¶ 8.) Upon arrival at t he
courthouse, Plaintiff was placed in the Zebra Tank. (*See
id.*)

**\*2** On March 1, 2004, during another trip to the
S.D.N.Y. courthouse, Defendant Figueroa told another
inmate on the bus-one of Plaintiff's co-defendants in his
criminal proceeding-that Plaintiff would be placed in the
Zebra Tank every time he went to the courthouse. (*See id.*
¶¶ 9-10.) He told Plaintiff, "You don't know who you are
messing with. I'm from the street too." (*Id.* ¶ 11.)

When they arrived at the courthouse, Defendant
LaRosa escorted the inmates inside the building and
toward the holding cells, while Defendant Figueroa

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

walked side-by-side with Plaintiff. (*See id.* 12.)

All of the prisoners were restrained with leg shackles, as well as handcuffs connected by chains to waist restraints. (*See id.* ¶ 13.) When the group reached an area of the building outside of the U.S. Marshal's office, Defendant Figueroa encountered Defendant Ventiere, and told him to make sure that Plaintiff was sent to the Zebra Tank. (*See id.* ¶ 14.) Defendant Ventiere instructed Plaintiff to step out of the line and stand by the wall opposite the other inmates. (*See id.* ¶ 15.) Plaintiff complied, but informed Defendant Ventiere that he would like to speak to a supervisor whenever possible. (*See id.* ¶ 16.)

At that point, Defendant Figueroa grabbed Plaintiff and "slammed him back into the wall." (*Id.* ¶ 17.) Defendant Ventiere joined Defendant Figueroa, and together they began "manhandling, choking, wrestling, and otherwise using excessive force" on Plaintiff as they moved him down the hall and into the Zebra Tank. (*Id.* ¶ 18.) When they arrived, they "smashed" Plaintiff into the metal cell door and the iron cell bars, and finally "slammed" Plaintiff into the metal bench. (*See id.* ¶ 19.) They then punched Plaintiff in the head and back, leaving him in a state of semiconsciousness. (*See id.* ¶¶ 21-22.) Plaintiff remained in restraints during this incident and was unable to physically defend himself. (*See id.* ¶ 20.)

After Defendants Figueroa and Ventiere left, Plaintiff "managed to use the toilet in the Zebra Tank and then fell to the floor." (*See id.* ¶ 23.) Defendants Krause and John Doe No. 4, who were standing nearby, told Plaintiff to get up, because "it did not look good for the camera." (*Id.* ¶ 24.) Plaintiff complied, afraid that he would be subjected to further assault. (*See id.*) Plaintiff was later taken to the courtroom by Defendants Ventiere and John Doe No. 4, where his attorney "took note of the effects of the assault." (*See id.* ¶¶ 25-26.) Plaintiff was not offered medical assistance by any of the Individual Defendants. (*See id.* ¶ 27.)

After Plaintiff's court appearance that day, Defendant Figueroa replaced Plaintiff's restraints for the trip back to the MDC. (*See id.* ¶ 28.) According to Plaintiff, Defendant Figueroa applied the restraints "unduly tight," inflicting

"considerable additional pain." (*Id.*) When he arrived at the MDC, Plaintiff requested treatment by a physician's assistant for his injuries. (*See id.* ¶ 29.) A physician's assistant refused to examine Plaintiff's injuries, but prescribed "two pills," and recommended that Plaintiff file a sick-call form. (*See id.* ¶ 30.)

**\*3** Plaintiff completed and filed the form the following morning, March 2, 2004. (*See id.* ¶ 31.) Several hours later, Plaintiff was taken to the Special Housing Unit ("SHU"), where he informed SHU Lieutenant Wilkens of the events of earlier in the day. (*See id.* ¶ 32.) Wilkens had Plaintiff examined by a physician's assistant, and photographed Plaintiff's bruises and injuries so that Bureau of Prisons officers would not be mistakenly blamed for the assault. (*See id.*)

The following day, March 3, 2004, Plaintiff was "spitting up blood," and was taken to a local hospital for further examination. (*See id.* ¶ 33.) The hospital prescribed pain medication and scheduled a follow-up examination for the following week. (*See id.*) Plaintiff did not receive medication until March 18, 2004. (*See id.*) MDC staff, "at the behest of the defendants," kept Plaintiff in SHU confinement until March 30, 2004. (*See id.* ¶ 34.)

As a result of Figueroa's and Ventiere's actions on March 1, 2004, Plaintiff "suffer[ed] from disorientation, and had difficulty swallowing food." (*Id.* ¶ 35.) Plaintiff had lacerations, bruising, and swelling on parts of his arms, legs and back. (*See id.* ¶ 36.) Plaintiff complained of "[d]izziness, faintness, and breathing problems." (*Id.*) In addition, Plaintiff claims that he "suffered from emotional anguish and psychological distress," and requires psychiatric treatment and medication for depression, psychosis, and anxiety. (*See id.* ¶ 37.)

On March 23, 2004, Plaintiff was again taken to the courthouse in order to attend a suppression hearing of one of his codefendants. (*See id.* ¶ 40.) He spent approximately six hours in the Zebra Tank, and was returned to the MDC several hours after his co-defendants, at the end of the day. (*See id.*) During this time, Plaintiff alleges that the Individual Defendants called him a "rat," and "humiliated [him] with jokes and teasing about the complaints made following the assault of March 1." (*See

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

*id.*) This treatment left Plaintiff so uncomfortable and mistrustful that he did not want to eat the food that the Individual Defendants gave him. (*See id.*)

Approximately one week later, on March 29, 2004, Plaintiff claims that the Individual Defendants "lost" his legal folder, which contained "valuable legal materials and strategies concerning Plaintiff's suppression hearing." (*Id.* ¶ 41.) Plaintiff does not specify which of the Individual Defendants lost these papers.

On April 23, 2004, Defendant Figueroa "continued his constant habit of taunting and teasing Plaintiff." (*Id.* ¶ 42.) On May 14, 2004, the Individual Defendants again put Plaintiff in the Zebra Tank. (*See id.* ¶ 43.) After Plaintiff complained of the cold temperature, Defendant John Doe No. 6 told Plaintiff "that's your problem." (*Id.*) Plaintiff inquired as to John Doe No. 6's name, but he did not provide it to Plaintiff. (*See id .*) Plaintiff was later placed in a regular holding cell. (*See id.*)

**\*4** While in the regular holding cell, Defendant Figueroa approached Plaintiff and asked "What's wrong?" while laughing. (*See id.* ¶ 44.) Although Plaintiff had arrived at the courthouse at 8:00 a.m. that morning, Plaintiff was not returned to MDC custody until approximately 8:30 p.m. (*See id.*) Plaintiff alleges that a similar delay occurred several months later, on August 16, 2004. (*See id.* ¶ 45.)

In September and October 2004, during Plaintiff's criminal trial, the Individual Defendants subjected Plaintiff to "constant taunting and harassment" that he alleges "negatively effected [his] due process and right to a fair trial." (*Id.* ¶ 46.) During this time period, Defendant John Doe No. 7 told Plaintiff, "I don't know why you are going to trial, you will never win," and on one occasion, pushed Plaintiff while he was walking from the courtroom. (*Id.* ¶¶ 47, 49.) Defendant John Doe No. 8 called Plaintiff a "crybaby" after he cried at his criminal trial. (*See id.* ¶ 50.) Plaintiff also alleges that one of the Individual Defendants-unspecified by Plaintiff-told Plaintiff that if he "pissed them off[, Plaintiff would] suffer a worse fate than before ." (*Id.* ¶ 48.) At the conclusion of Plaintiff's trial, on October 27, 2004, Defendant John Doe No. 7 told Plaintiff, "You're going to Leavenworth," and "You'll get

what you deserve." (*Id.* ¶ 51.) Plaintiff alleges that, in December 2005, at another criminal hearing, he complained about the Individual Defendants' "constant and continued mistreatment of Plaintiff." (*Id.* ¶ 52.)

Finally, on May 5, 2006, Plaintiff claims that Defendant Ventiere "popped from out of a door of a room with a large one-way mirror" as Plaintiff was being escorted to a holding cell by a USMS officer. (*Id.* ¶ 53.) Plaintiff had been telling the officer about the previous incidents with the Individual Defendants when Defendant Ventiere said, "I heard that, and I'll teach you a lesson." (*Id .* ¶ 53.) Plaintiff was returned to a holding cell, where he sat in "utter fear, not knowing if something would happen." (*Id.*) Defendant Ventiere took no further action against Plaintiff, but Plaintiff was kept in the holding cell until the last bus back to the correctional facility. (*See id.*)

**II. The Filing and Service of the Complaint**

Plaintiff filed this action on February 28, 2007.[FN1] In his initial Complaint, he named only "John Does 1-11, sued in their individual capacities" as Defendants. (*See* Complaint, dated Feb. 28, 2007 ("Compl."), at 1.) Plaintiff's Complaint was stamped "received" by the Court's Pro Se Office on March 9, 2007, but was not docketed until April 14, 2007. On August 10, 2007, Plaintiff mailed a service package to the USMS. The paperwork was returned to Plaintiff on August 27, 2007, indicating that the Complaint could not be served without the names and addresses of Defendants. Plaintiff then wrote to the Court on September 5, 2007, requesting additional time to serve Defendants and assistance in obtaining the identity of the then-John Doe Defendants. (*See* Pl .'s Ltr., dated Sept. 5, 2007.) After Plaintiff's request went unanswered, he submitted a second letter to the Court on October 10, 2007. (*See* Pl.'s Ltr., dated Oct. 10, 2007.)

> FN1. It is well-settled that, as a *pro se* prisoner, Plaintiff's papers are deemed filed on the date that he hands them over to prison officials to be mailed. *See Houston v. Lack,* 487 U.S. 266, 270, 108 S.Ct. 2379, 2382 (1988); *Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993) (applying *Houston* to constitutional tort suits). Absent evidence to the contrary, the Court assumes that Plaintiff gave his Complaint to prison officials to mail on

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

the date he signed it, February 28, 2007. *See, e.g.* *Frith v. Hill,* No. 07 Civ. 5899(JSR), 2009 WL 3073716, at *8 n. 4 (S.D.N.Y. Sept. 23, 2009); *Rhodes v. Senkowski,* 82 F.Supp.2d 160, 165 (S.D.N.Y.2000).

**\*5** On October 30, 2007, District Judge Richard J. Sullivan ordered the United States Attorney's Office ("USAO") to identify the officers described in the Complaint, if possible, and to provide each officer's name and last known address to Plaintiff and the Court within 45 days. (*See* Order, dated Oct. 30, 2007, at 2.) Plaintiff was ordered to file an amended complaint identifying Defendants by their proper names no later than 30 days after receiving the names, and to serve the amended complaint via the Court's Pro Se Office. (*See id.*) Plaintiff was cautioned that *"[f]ailure to comply with this deadline may result in the dismissal of the plaintiff's complaint."* (*Id.* at 3.)

By letter dated December 17, 2007, the USAO identified Defendant Figueroa as John Doe No. 1, and Defendant Ventiere as John Doe No. 3, based on the allegations in the Complaint. (*See* Defs.' Ltr., dated Dec. 17, 2007.) The USAO was unable to identify the remaining John Does. The USAO noted that the Complaint contained no allegations against John Does Nos. 9-11. Finally, the USAO wrote that "no less than forty different officers and/or independent contractors hired by the USMS may have come into contact with Plaintiff while he was being transported from prison to Court, and to the Courthouse cellblock while attending Court conferences, hearings, or his trial," and without more specific information, the USMS was unable to determine which of those officers might have been the John Does described in the Complaint. (*Id.*)

On January 6, 2008, Plaintiff requested that the Court order the USAO to produce the names and pictures of all forty of the officers and independent contractors. (*See* Pl.'s Ltr., dated Jan. 6, 2008.) On January 17, 2008, Judge Sullivan denied this request as premature, ordered Plaintiff to submit additional details about the remaining John Doe Defendants by February 17, 2008, and ordered the USAO to make reasonable efforts to identify the remaining Defendants within 45 days of receiving the new details

from Plaintiff. (*See* Order, dated Jan. 17, 2008.) Plaintiff was also ordered to either amend the Complaint within 30 days of receiving the names of the John Doe Defendants, or renew his request for photographs of all forty individuals, should identification by the USAO prove unsuccessful. (*See id.*)

By letter dated February 17, 2008, Plaintiff provided physical descriptions of four of the remaining John Doe Defendants, and an additional factual allegation against a fifth John Doe Defendant.[FN2] (*See* Pl.'s Ltr., dated Feb. 17, 2008.) After 45 days passed and the USAO did not submit a response, Plaintiff wrote to the Court to request a status update. By letter dated June 30, 2008, the USAO indicated that it never received Plaintiff's February 17, 2008 letter.[FN3] (*See* Defs.' Ltr., dated June 30, 2008.) By Order dated July 3, 2008, Judge Sullivan ordered the USAO to respond to Plaintiff's letter within 20 days, and ordered Plaintiff to file an amended complaint within 30 days of receipt, or renew his request for the photographs. (*See* Order, dated July 3, 2008.)

> FN2. After the USAO identified John Does Nos. 1 and 3, six John Does remained unidentified, not including John Does Nos. 9-11.

> FN3. Plaintiff's February 17, 2008 letter indicated that the USAO was copied on the letter. (*See* Pl.'s Ltr., dated Feb. 17, 2008.)

**\*6** On August 15, 2008, the USAO informed the Court that they had been unable to conclusively identify any more of the unnamed Defendants based on the information that Plaintiff provided.[FN4] (*See* Defs.' Ltr., dated Aug. 15, 2008.) The USAO indicated that they believed that one of the John Doe Defendants was "most likely" A.J. Krause, but Plaintiff's descriptions were simply too vague to further identify the unnamed Defendants with reasonable certainty. (*See id.*)

> FN4. The Court granted the USAO additional time, beyond the 20 days originally provided, to submit its response.

On September 17, 2008, Plaintiff renewed his request for the names and photographs of all 40 officers, claiming

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

that he needed the information in order to set forth his claims of a "civil conspiracy." [FN5] (*See* Pl.'s Ltr., dated Sept. 17, 2008.) Judge Sullivan denied Plaintiff's request, finding that Plaintiff's "conclusory allegations" did not warrant such an order. (*See* Order, dated Sept. 30, 2008.) Instead, Plaintiff was granted leave to amend the Complaint to add parties as appropriate, and to include any new information that had been developed after the action was commenced. (*See id.*) Judge Sullivan instructed Plaintiff to "add as much identifying detail as possible in order to satisfy the requirements of a valid pleading," and informed him that, to the extent that the amended pleading stated claims against employees of the USMS, he could use the pre-trial discovery process and possibly Court assistance to identify the remaining unnamed Defendants. (*See id.*) Finally, Judge Sullivan reminded Plaintiff of the three-year statute of limitations that governed his claims, and warned him that "[A]n amended complaint adding new defendants [does not] relate back [to the date of the original complaint] if the newly-added defendants were not named originally because the plaintiff did not know their identities." (*See id.* (quoting *Barrow v. Wethersfield, 66 F.3d 466, 470 (2d Cir.1995)*).)

> FN5. Neither Plaintiff's Complaint nor his Amended Complaint alleges claims for civil conspiracy.

Plaintiff filed the Amended Complaint on January 2, 2009. He named as Defendants the United States of America, the USMS, Luis Figueroa (formerly John Doe No. 1), Donny LaRosa (whom Plaintiff refers to as "Donny LNU," and was formerly John Doe No. 2),[FN6] Thomas Ventiere (formerly John Doe No. 3), and A.J. Krause (formerly John Doe No. 5). Plaintiff also maintained his action against John Does Nos. 4, 6, 7, and 8, although John Doe No. 8 is not included in the caption of the Amended Complaint. Plaintiff sued the Individual Defendants in their official as well as individual capacities.

> FN6. Plaintiff identified John Doe No. 2 as "Donny LNU," (presumably, "last name unknown"), without assistance from Defendants. Defendants have identified this individual as Donny LaRosa.

Judge Sullivan ordered Plaintiff to serve the Amended Complaint by April 1, 2009. (*See* Order, dated Mar. 2, 2009.) Due to a change of address, Plaintiff did not receive this Order, and, on April 9, 2009, Plaintiff requested an extension of time to serve Defendants. Judge Sullivan granted Plaintiff's request, and ordered Plaintiff to serve the Amended Complaint by May 15, 2009, and to submit a status letter to the Court by May 29, 2009, describing his efforts to serve Defendants. (*See* Order, dated Apr. 14, 2009.)

**\*7** Having received no updates or certificates of service from Plaintiff by June 5, 2009, Judge Sullivan ordered the action dismissed pursuant to Federal Rule of Civil Procedure 41(b). (*See* Order, dated June 5, 2009.)

On June 17, 2009, Plaintiff requested reconsideration of the Order of Dismissal, on the grounds that he had served Defendants, but had been awaiting the process receipts, which he did not receive until June 10, 2009. (*See* Pl.'s Ltr., dated June 17, 2009.) Plaintiff claimed that he had been under the impression that if he served Defendants, he did not need to submit a status letter by May 29, 2009. (*See* Order, dated June 23, 2009.) Plaintiff thereafter submitted the process receipts, which indicated that Plaintiff mailed service packages to the USMS on May 12, 2009; the forms were acknowledged as received on May 27, 2009; and process was effectuated on June 2 and 4, 2009.

## DISCUSSION

Defendants contend that (1) the claims against the United States, the USMS, and the Individual Defendants in their official capacities are barred by sovereign immunity, and should be dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure; (2) the claims against the Individual Defendants in their personal capacities are time-barred and/or fail to state claims upon which relief can be granted, and should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure; and (3) Plaintiff failed to effectuate service on the Individual Defendants within 120 days of the filing of the Amended

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

Complaint, and those claims should be dismissed pursuant to Rule 12(b)(5) of the Federal Rules of Civil Procedure. (See Defs.' Memorandum of Law, dated Aug. 21, 2009 ("Defs.' Mem."), at 8-19.)

In response, Plaintiff primarily addresses Defendants' argument that the Amended Complaint fails to state a claim upon which relief can be granted, based on Plaintiff's alleged failure to comply with the applicable statute of limitations. Plaintiff argues that the initial Complaint was timely filed, and the Amended Complaint "relates back" to the date of the original filing. (See Pl.'s Memorandum of Law, dated Aug. 31, 2009 ("Pl.'s Mem."), at 1-3.) Plaintiff does not address Defendants' arguments regarding sovereign immunity and insufficiency of service of process.

**I. Subject Matter Jurisdiction Under Rule 12(b)(1)**

A. *Legal Standard*

On a Rule 12(b)(1) motion, "the plaintiff bears the burden of proving by a preponderance of the evidence that jurisdiction exists." *Dong v. Ridge*, No. 02 Civ. 7178(HB), 2005 WL 1994090, at *3 (S.D.N.Y. Aug. 18, 2005) (quoting *Chayoon v. Chao*, 355 F.3d 141, 143 (2d Cir.2004)); see also *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir.2000); *Marshall v. Nat'l Ass'n of Letter Carriers*, Nos. 00 Civ. 3167(LTS), 01 Civ. 3086(LTS), 2003 WL 223563, at *6 (S.D.N.Y. Feb. 3, 2003).

**\*8** It is "axiomatic" that, under the principle of sovereign immunity, "the United States may not be sued without its consent, and the existence of consent is a prerequisite for jurisdiction." *Adeleke v. United States*, 355 F.3d 144, 150 (2d Cir.2003). "The United States, as sovereign, is immune from suit save as it consents to be sued, and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 769-70 (1941) (citations omitted); see also *Lehman v. Nakshian*, 453 U.S. 156, 160-61, 101 S.Ct. 2698, 2701-02 (1981); *United States v. Testan*, 424 U.S. 392, 399, 96 S.Ct. 948, 953-54 (1976); *Dotson v. Griesa*, 398 F.3d 156, 177 (2d Cir.2005) ("a finding of sovereign immunity ... deprive[s][a] court of subject matter jurisdiction"). In other words, the United States must unequivocally express

its consent to be sued by specifically waiving sovereign immunity in a statutory text. See *Lane v. Peña*, 518 U.S. 187, 192, 116 S.Ct. 2092, 2096 (1996); see also *United States v. Nordic Village, Inc.*, 503 U.S. 30, 33-44, 112 S.Ct. 1011, 1014-15 (1992); *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 1351 (1980). Further, the "limitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied." *Lehman*, 453 U.S. at 161, 101 S.Ct. at 2702 (quoting *Soriano v. United States*, 352 U.S. 270, 276, 77 S.Ct. 269, 273 (1957) (quotation marks omitted)); see also *Lane*, 518 U.S. at 192, 116 S.Ct. at 2096 ("a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign").

The United States need not be an expressly named defendant for an action to be considered as one against the sovereign. "The general rule is that a suit is against the sovereign if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or compel it to act ." *B.K. Instrument, Inc. v. United States*, 715 F.2d 713, 723 (2d Cir.1983) (internal quotation marks and citations omitted) (quoting *Dugan v. Rank*, 372 U.S. 609, 620, 83 S.Ct. 999, 1006, (1963); *Land v. Dollar*, 330 U.S. 731, 738, 67 S.Ct. 1009, 1012 (1947); and *Larson v. Domestic & Foreign Corp.*, 337 U.S. 682, 704, 69 S.Ct. 1457, 1468 (1949)). It follows that a suit against a federal agency or its officers, acting in their official capacities, constitutes a lawsuit against the federal government. See *Dotson*, 398 F.3d at 177 (federal agencies and officers acting in official capacities protected by sovereign immunity); see also *FDIC v. Meyer*, 510 U.S. 471, 475, 114 S.Ct. 996, 1000 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit"); *Kemer v. Johnson*, 900 F.Supp. 677, 681 (S.D.N.Y.1995) (citing *B.K. Instrument*, 715 F.2d at 723) (federal officers acting in official capacities protected by sovereign immunity)).

B. *Application*

**\*9** In the instant case, Plaintiff has named the United States and the USMS as Defendants, and asserted claims against the Individual Defendants in their official

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

capacities, as well as their personal capacities. Because the USMS is a federal agency, and the Individual Defendants, in their official capacities, are officers of that agency, claims asserted against them are in fact asserted against the United States. Thus, absent an "unequivocally expressed" statutory waiver of sovereign immunity for claims of this type, these claims will be barred by sovereign immunity. *See Lane, 518 U.S. at 192, 116 S.Ct. at 2096.*

Here, as Plaintiff alleges that Defendants used excessive force and harassed him, in violation of the First, Fifth, Sixth, and Eighth Amendments of the United States Constitution, he is asserting constitutional torts, and there is no waiver of sovereign immunity. *See Castro v. United States, 34 F.3d 106, 110 (2d Cir.1994)* ("[T]he United States has not waived its sovereign immunity with respect to claims that its employees have committed constitutional torts."); *see also Robinson v. Overseas Military Serv. Corp., 21 F.3d 502, 510 (2d Cir.1994); Doe v. Torres, No. 05 Civ. 3388(JSR)(GWG), 2006 WL 290480, at *4 (S.D.N.Y. Feb. 8, 2006); James v. United States. No. 99 Civ. 4238(BSJ)(HBP), 2003 WL 22149524 at *4 (S.D.N.Y. Sept. 17, 2003).* Because sovereign immunity has not been waived, the Court lacks subject matter jurisdiction over Plaintiff's claims against the United States, the USMS, and the Individual Defendants in their official capacities. Accordingly, those claims must be dismissed.

Defendants also contend that, to the extent that the Amended Complaint is construed to assert common law tort claims, they are also barred for lack of subject matter jurisdiction. (*See* Defs.' Mem. at 10-11.) As an initial matter, the United States is the only proper Defendant in a claim brought under the Federal Tort Claims Act ("FTCA"). *See 28 U.S.C. § 2679(b)(1).* And, although the United States has waived sovereign immunity for a limited subset of tort claims via the FTCA, *See id.* § 1346(b), Plaintiff must first exhaust all administrative remedies prior to commencing a federal action. *See id.* § 2675(a). This requirement is jurisdictional, and cannot be waived. *Keene Corp. v. United States, 700 F.2d 836, 841 (2d Cir.1983).* Plaintiff does not dispute that he has not presented his claims to the USMS, and so they remain unexhausted. (*See* Declaration of Gerald M. Auerbach, USMS General Counsel, dated Aug. 20, 2009.)

Accordingly, any common law tort claims must also be dismissed for lack of subject matter jurisdiction.

## II. Failure to State a Claim Under Rule 12(b)(6)

Defendants contend that Plaintiff's claims against the identified Individual Defendants in their individual capacities should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.[FN7] (*See* Defs.' Mem. at 11-17.) Defendants' argument is two-fold. First, Defendants argue that Plaintiff's claims arising out of conduct more than three years prior to the filing of the Amended Complaint, where Plaintiff first identified some of the Individual Defendants, are time-barred. (*See id.* at 12-14.) Second, Defendants assert that any remaining claims do not rise to the level of a constitutional violation. (*See id.* at 14-17.)

> FN7. Defendants do not address the claims against the remaining John Doe Defendants. Because those Defendants have not been named, and thus have not been served, this Court lacks personal jurisdiction over them. Accordingly, those claims should also be dismissed. *See Williams v. Winfield, No. 94 Civ. 6384(TPG), 2002 WL 91619, at *2 (S.D.N.Y. Jan. 24, 2002)* (dismissing claims against unidentified correctional officer for lack of personal jurisdiction, after counsel for defendants could not identify him despite good faith efforts to do so).

*10 In response, Plaintiff contends that the claims of the Amended Complaint "relate back" to the date of the original Complaint, February 28, 2007, and are therefore timely.[FN8] (*See* Pl.'s Mem. at 3.) This would include any claims arising out of conduct occurring on or after February 28, 2004.

> FN8. Plaintiff also argues that 28 U.S.C. § 2401(a) provides for a six-year statute of limitations for *Bivens* claims. (*See* Pl.'s Mem. at 3-4.) The Second Circuit Court of Appeals has made clear that *Bivens* claims are governed by a three-year statute of limitations. *See Kronisch v. United States, 150 F.3d 112, 123 (2d Cir.1998).*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

After the parties fully briefed the motion to dismiss, the Court requested additional submissions on two questions: (1) which, if any, of Plaintiff's *Bivens* claims would be timely pursuant to Federal Rule of Civil Procedure 15(c)(1)(A), which permits the Court to look to New York State's more forgiving body of statute of limitations law?; and (2) to the extent Plaintiff's claims "relate back" under this framework, do the surviving claims rise to the level of constitutional violations? (*See* Order, dated Dec. 29, 2009.) The Court also requested Plaintiff to provide details regarding his efforts to determine the identities of the John Doe Defendants, both before and after filing the Complaint. (*See id.*)

In response to the Court's inquiry, Defendants contend that Rule 15(c)(1)(A) is wholly inapplicable to *Bivens* claims, but even if it were to apply, Plaintiff's surviving claims do not rise to the level of constitutional violations. (*See* Defendants' Supplemental Memorandum of Law, dated Jan. 15, 2010 ("Defs.' Supp. Mem.").)

Plaintiff, on the other hand, responded to the Court's request by merely stating that he acted diligently and to the best of his abilities at all times given his *pro se* status and limited resources as a prisoner. (*See* Plaintiff's Supplemental Memorandum of Law, dated Jan. 26, 2010 ("Pl.'s Supp. Mem."), at 2.) Plaintiff further contends that New York law permits tolling of the statute of limitations when a plaintiff is unable to identify a defendant, provided he acts diligently in his attempts to do so. (*See id.* at 2-3 (citing *Mabry v. N.Y.C. Dep't of Corr.*, No. 05 Civ. 8133(JSR) (JCF), 2008 WL 6190003 (S.D.N.Y. Mar. 7, 2008)).)

A. *Statute of Limitations*

1. *Legal Standard*

"A *Bivens* action is a judicially-created remedy designed to provide individuals with a cause of action against federal officials who have violated their constitutional rights." *See Higazy v. Templeton,* 505 F.3d 161, 169 (2d Cir.2007); *see also Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 510 (2d Cir.1994). Federal courts sitting in New York apply a three-year statute of limitations period to *Bivens* claims. *See*

*Kronisch,* 150 F.3d at 123; *see also Tapia-Ortiz v. Doe,* 171 F.3d 150, 151 (2d Cir.1999). Therefore, a plaintiff filing a constitutional claim against federal officers in their individual capacities must institute his suit no more than three years after the cause of action first accrued. If it is determined that the relevant date for statute of limitations purposes in this case is the date of Plaintiff's original Complaint, the majority of his claims are timely (i.e., those accruing on or after February 28, 2004). On the other hand, if the date of the Amended Complaint (January 2, 2009) is the relevant date, Plaintiff is left with only those claims accruing on or after January 2, 2006.

**\*11** The Second Circuit has stated that "[i]t is familiar law that 'John Doe' pleadings cannot be used to circumvent statutes of limitations because replacing a 'John Doe' with a named party [in an amended pleading] in effect constitutes a change in the party sued." *Aslanidis v. United States Lines, Inc.,* 7 F.3d 1067, 1075 (2d Cir.1993). Therefore, "[s]uch an amendment may only be accomplished when all of the specifications of Fed.R.Civ.P. 15(c) are met." *Id.; see also Barrow v. Wethersfield,* 66 F.3d 466, 468 (2d Cir.1995). If the requirements of Rule 15(c) are met, an amended pleading will be said to "relate back" to the date of the original complaint. *See* Fed.R.Civ.P. 15(c).

Pursuant to Rule 15(c), an amended pleading relates back to the date of the original pleading when:

(A) the law that provides the applicable statute of limitations allows relation back;

... or

(C) the amendment changes the party or the naming of the party against whom a claim is asserted, if [the amendment arose out of the same conduct in the original pleading] and if ... the party to be brought in by amendment:

(i) received such notice of the action that it will not be prejudiced in defending on the merits; and

(ii) knew or should have known that the action would have been brought against it, but for a mistake

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

concerning the proper party's identity.

Fed.R.Civ.P. 15(c)(1). Because "state law supplies the statute of limitations period" for a *Bivens* claim, *see Kronisch,* 150 F.3d at 122, the Court has the option of applying state law to determine if the amended pleading relates back.

In deciding whether to apply state or federal relation back law, the Court must determine which law "affords a more forgiving principle of relating back." *See Wilson v. The City of N.Y.,* No. 03 Civ. 2495(RLC), 2006 WL 2528468, at *2 (S.D.N.Y. Aug. 31, 2006) (citation omitted). In comparing the two, the Advisory Committee's Notes to Rule 15(c) direct the Court to look at " 'controlling bod[ies] of limitations law,' which in this case includes all the tolling provisions in the New York Civil Practice Law and Rules ("CPLR") and the interpretations of these statutes found in New York case law." *Id.* (citing Fed.R.Civ.P. 15(c) (1) Advisory Committee's Note (1991); *see also Mabry,* 2008 WL 619003, at *6; *Murphy v. West,* 533 F.Supp.2d 312, 316 (W.D.N.Y.2008); *Laureano v. Goord,* No. 06 Civ. 7845(SHS)(RLE), 2007 WL 2826649, at *6 (S.D.N.Y. Aug. 31, 2007) (all applying New York limitations law to claims brought against "John Doe" defendants in federal court).[FN9]

> FN9. Defendants' contention that Rule 15(c)(1)(A) is inapplicable to *Bivens* claims is without merit. While such claims are purely federal in nature, the three-year statute of limitations that governs *Bivens* claims is derived from state law. *See Kronisch,* 150 F.3d at 122 (noting that "state law supplies the statute of limitations period" for *Bivens* claims).

Turning first to the federal relation-back rule (Fed.R.Civ.P. 15(c)(1)(C)), it is well-established in this Circuit that "an amended complaint adding new defendants [does not] relate back [to the date of the original complaint] if the newly-added defendants were not named originally because the plaintiff did not know their identities." *Barrow,* 66 F.3d at 470; *see also Tapia-Ortiz,* 171 F.3d at 152. This is because "the failure to identify individual defendants when the plaintiff knows that such defendants must be named cannot be

characterized as a mistake." *Barrow,* 66 F.3d at 470.

**\*12** New York law, however, is more forgiving in the case of "John Doe" defendants. *See Laureano,* 2007 WL 2826649, at *6. The controlling body of New York limitations law "creates a special procedure for John Doe cases that focuses on notice to possible defendants rather than whether the failure to name the defendant was an excusable mistake." *Wilson,* 2006 WL 2528468, at *3; *see also* N.Y. CPLR 1024.

CPLR 1024 permits a plaintiff to file an action against an unknown defendant, provided that several conditions are met. *See Bumpus v. N.Y.C. Transit Auth.,* 66 A.D.3d 26, 29-30, 883 N.Y.S.2d 99, 103-04 (2d Dep't 2009). First, a plaintiff must "exercise due diligence, prior to the running of the statute of limitations, to identify the defendant by name." *Id.* The failure to act diligently to ascertain the unidentified defendant's name "subjects the complaint to dismissal as to that party." *Id.* If a plaintiff is unable to identify the defendant, he may commence the action against a "John Doe" defendant "describ[ing] [the unknown party] in such form as will fairly apprise the party that she is the intended defendant."[FN10] *Id.* (citation omitted). A plaintiff must then "ascertain the identity of unknown 'Jane Doe' parties, and ... serve process upon them, within 120 days from filing." *Id.* at 31, 883 N.Y.S.2d at 105. The 120-day deadline imposed by CPLR 305-b may be extended "upon good cause shown or in the interest of justice."[FN11] N.Y. CPLR 305-b.

> FN10. In New York state cases applying CPLR 1024, plaintiffs commencing actions against unidentified defendants are typically required to "present an affidavit stating that a diligent inquiry has been made to determine the names of such parties." *Luckern v. Lyonsdale Energy Ltd. P'ship,* 229 A.D.2d 249, 253, 654 N.Y.S.2d 543, 546 (4th Dep't 1997) (citation omitted).

> FN11. Rule 4(m) of the Federal Rules provides a similar 120-day requirement with extensions granted upon a showing of "good cause." *See* Fed.R.Civ.P. 4(m).

To identify unknown parties after filing, a plaintiff is

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

advised to serve discovery demands upon any known parties, seek disclosures pursuant to a Freedom of Information Law ("FOIL") request, or otherwise act with diligence. *Bumpus,* 66 A.D.3d at 33-34, 883 N .Y.S.2d at 107. If the unknown parties are identified prior to the deadline for service of process, the statute provides for amendment of the pleadings *nunc pro tunc. See Florence v. Krasucki,* 533 F.Supp. 1047, 1053 n. 3 (W.D.N.Y.1982) (citing N.Y. CP LR 1024). In essence, an amended pleading identifying previously unknown parties does not "relate back" to the date of the original pleading under New York's "unity of interest" test, *see, e.g., Monaardi v. BJ's Wholesale Club,* 45 A.D.3d 1149, 1150-51, 846 N.Y.S.2d 441, 442 (3d Dep't 2007), but rather, the statute of limitations is actually tolled from the date of the original filing until service. *See Wilson,* 2006 WL 2528468, at *3; *see also Luckern,* 229 A.D.2d at 255, 654 N.Y.S.2d at 546 (Under CPLR 1024, "an action commenced against unknown parties is deemed interposed, for Statute of Limitations purposes, when the 'John Doe' summons with notice is filed with the clerk of the court.").

2. *Application*

Here, it is clear that Plaintiff's failure to identify any of the Individual Defendants prior to the running of the three-year statute of limitations is fatal to his *Bivens* claims under the federal relation-back rule, because it was not the result of mistake. *See* Fed.R.Civ.P. 15(c)(1)(C); *see also Tapia-Ortiz,* 171 F.3d at 152; *Barrow,* 66 F.3d at 470. The Court must therefore decide whether Plaintiff may avail himself of New York's more forgiving statute of limitations rules. To succeed in this regard, the Court must conclude that (1) Plaintiff has acted with due diligence in identifying the Individual Defendants both before and after filing his original Complaint; (2) Plaintiff provided sufficient detail in the original Complaint such that the Individual Defendants would be on notice of the claims had they read the pleading; and (3) Plaintiff served the Amended Complaint on the Individual Defendants within 120 days of filing the Complaint.

**\*13** Plaintiff has provided no information regarding his pre-filing efforts to identify the Individual Defendants. Despite this Court's request that Plaintiff provide additional details in this regard, Plaintiff merely wrote that

he has "made his best effort to carry out the case accordingly." (*See* Pl.'s Supp. Mem. at 2.) While the Court recognizes Plaintiff's limitations, given his incarceration and *pro se* status, Plaintiff must show that he exercised some due diligence in an attempt to identify the Individual Defendants prior to filing the Complaint. The incidents in the Complaint are alleged to have occurred as early as February 2004. Yet, Plaintiff appears to have expended no efforts at all to identify the Individual Defendants in the three years that followed. Between February 2004 and February 2007, Plaintiff could have filed FOIL requests or written letters to the USAO or even his criminal defense attorney. *See Laureano,* 2007 WL 2826649, at *6 (plaintiff sent letters, discovery requests, and searched public records to identify defendants); *Wilson,* 2006 WL 2528468, at *3 (plaintiff served "several unanswered discovery requests" and FOIL requests in order to identify defendants). Even if unsuccessful, this would have at least evinced some degree of diligence. And, Plaintiff certainly could have filed the original Complaint much sooner than he did-which happened to be the day before the statute of limitations was to run on his most serious claim regarding the physical assault of March 1, 2004. Had he done so, he could have then sought Court assistance with identifying the Individual Defendants.

Having failed to offer any evidence of diligence prior to filing the Complaint, on this basis alone, Plaintiff does not meet the requirements of CPLR 1024, and the Amended Complaint should be dismissed as time-barred. *See. e.g., Hall v. Rao,* 26 A.D.3d 694, 695, 809 N.Y.S.2d 661, 662 (3d Dep't 2006) (dismissing complaint, purportedly filed under CPLR 1024, when "record is utterly devoid of proof documenting what efforts, if any, plaintiffs undertook to identify [defendant] prior to the expiration of the statute of limitations").

The absence of effort by Plaintiff to identify Defendants prefiling, continued after the Complaint was filed. Upon filing the Complaint in February 2007, Plaintiff made no effort to ascertain the Individual Defendants' names until more than six months later, in September 2007. The Court's Pro Se Office sent Plaintiff the initial summons and service package on April 25, 2007, yet, the case otherwise remained dormant through August, when Plaintiff first mailed the service package to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

the USMS. At that point, however, it was clear that there could be no service, since Plaintiff provided no information as to whom to serve.

It was not until September 5, 2007, after service was unable to be effectuated, that Plaintiff first wrote to the Court to request assistance in identifying the Individual Defendants, and to seek an extension of time to serve them (despite their John Doe status at that time). But by then, the statute of limitations had already run on most of the incidents alleged in the Complaint. Further, more than 120 days had elapsed since the Complaint had been filed and Plaintiff had received the service package. This too was fatal to tolling the statute of limitations under New York law, since, as discussed, a John Doe complaint must be served within 120 days of filing, unless the court has extended that period prior to its expiration.

**\*14** Nevertheless, the Court breathed life into Plaintiff's claims when it requested that the USAO attempt to identify the Individual Defendants. In December 2007, the USAO identified two of the Individual Defendants, but the vague descriptions in the Complaint prevented identification of the remaining nine John Does. Rather than amend the Complaint at this time to identify and serve the two known Defendants, in February 2008, Plaintiff provided further descriptions of five John Does. However, these were again, too vague, and resulted only in the identification of Defendant Krause, in August 2008.

Failing again to amend the Complaint, Plaintiff renewed his request for the names and photographs of every employee of the USMS that he came into contact with on the dates within the Complaint. This was denied on several occasions. (*See* Order, dated Jan. 17, 2008; Order, dated July 3, 2008; Order, dated Sept. 30, 2008.) In one Order, Judge Sullivan forewarned Plaintiff of the statute of limitations problems inherent in Plaintiff's continued delay in filing the Amended Complaint. (*See* Order, dated Sept. 30, 2008.) Three months later, nearly two years after the statute of limitations had expired, and approximately five years after most of the alleged incidents occurred, Plaintiff filed the Amended Complaint, on January 2, 2009, identifying four of the Individual Defendants. On June 2 and 4, 2009, the Amended Complaint was served on the identified Defendants. While

Plaintiff's post-filing efforts were certainly better than those prior to February 2007, more is required under CPLR 1024.

In light of the absence of any pre-filing efforts to identify the Individual Defendants, Plaintiff's failure to identify or serve any Defendants within 120 days of filing the Complaint, the deficiencies in Plaintiff's post-filing efforts to ascertain the Individual Defendants' identities, and Plaintiff's delay in filing and serving the Amended Complaint, Plaintiff may not avail himself of New York's more forgiving law regarding the statute of limitations and John Doe defendants. In those federal cases that have invoked CPLR 1024, the plaintiffs have exercised a degree of diligence not shown by Plaintiff in the instant case. *See, e.g., Mabry,* 2008 WL 619003, at \*6 (plaintiff "aggressively sought the identities of defendants" through letters and discovery requests); *Murphy,* 533 F.Supp.2d at 316 (plaintiff sought identities of John Does from identified defendants prior to the expiration of the statute of limitations); *Laureano,* 2007 WL 2826649, at \*6 (plaintiff's counsel submitted an affidavit detailing efforts undertaken to identify defendants, which included letters, discovery requests, and a search of public records); *Wilson,* 2006 WL 2528468, at \*3 (plaintiff served "several unanswered discovery requests" and FOIL requests). Accordingly, Plaintiff's claims arising out of conduct occurring more than three years prior to January 2, 2009, the date on which some of the Individual Defendants were first identified in the Amended Complaint, are time-barred.

B. *Plaintiff's Remaining Timely Claims*

**\*15** In the Amended Complaint, Plaintiff asserts a single timely claim against one Defendant. Plaintiff claims that, on May 5, 2006, as he was being escorted to a holding cell after a post-trial hearing, Defendant Ventiere "popped from out of a door of a room with a large one-way mirror and said 'I heard that and I'll teach you a lesson.' " (*See* Am. Compl. ¶ 53.) According to Plaintiff, he had been explaining his problems with the Individual Defend ants to another U.S. Marshal when this occurred. (*See id.*) Afterwards, Plaintiff alleges that he sat in a holding cell "in utter fear, not knowing if something would happen." (*See id.*) There is no allegation that anything did

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

happen.

Liberally construing Plaintiff's *pro se* Complaint, the Court views Plaintiff's claim as one of retaliation under the First Amendment. In the alternative, Plaintiff appears to allege that the verbal threat, in and of itself, constituted a constitutional violation.

1. *Legal Standard on a Motion to Dismiss Under Rule 12(b) (6)*

On a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all well-pleaded allegations contained in the complaint as true, and must draw all reasonable inferences in favor of the plaintiff. *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555-56, 127 S.Ct. 1955, 1964-65 (2007). A plaintiff need not include "heightened fact pleading of specifics" to survive a Rule 12(b)(6) motion, *see id.* at 570, 127 S.Ct. at 1974, but the "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all of the allegations in the complaint are true." *See id.* at 555, 127 S.Ct. at 1965 (citation omitted). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1949 (2009).

Ultimately, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U .S. at 570, 127 S.Ct. 1974. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. In contrast, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *See id.* (quoting *Twombly,* 550 U.S. at 557, 127 S.Ct. at 1966) (citations omitted). Thus, if a plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974.

2. *First Amendment Claim*

To state a retaliation claim under the First Amendment, the Plaintiff must allege that (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the plaintiff's speech and the adverse action. *See Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004). In the prison context, the Second Circuit has defined an "adverse action" as conduct "that would deter similarly situated individuals of ordinary firmness from exercising ... constitutional rights." *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003). Specifically, the Court of Appeals has found that "[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens before a [retaliatory] action taken against them is considered adverse." *Dawes v. Walker,* 239 F.3d 489, 493 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992 (2002). In determining whether a verbal threat constitutes an adverse action, a court must consider the statement's specificity and the context in which it was given. *See Mateo v. Fischer,* No. 08 Civ. 7779(RJH)(DCF), 2010 WL 431229, at *8 (S.D.N.Y. Feb. 8, 2010).

**16** Here, the adverse action alleged by Plaintiff is facially insufficient to state a claim for relief. Defendant Ventiere's statement is more akin to a general threat, made in response to Plaintiff's casual conversation with another U.S. Marshal regarding his purported mistreatment.[FN12] *See Dawes,* 239 F.3d at 493 (calling plaintiff-prisoner a "rat" or "informant" insufficient to state a First Amendment claim); *Bartley v. Collins,* No. 95 Civ. 10161(RJH), 2006 WL 1289256, at *4 (S.D.N.Y. May 10, 2006) (dismissing plaintiff's First Amendment claim based on prison official's threat that "we [are] going to get you, you better drop the suit"); *Alicia v. Holwell.* 387 F.Supp.2d 227, 237 (W.D.N.Y.2005) (defendant's statements that there were "no secrets in prison," and that plaintiff would "have to pay the consequences" for filing a grievance do not state a retaliation claim); *Cruz v. Hillman,* No. 01 Civ. 4169(DAB)(DCF), 2002 WL 31045864, at *7 (S.D.N.Y. May 16, 2002) (Report and Recommendation) (dismissing retaliation claim based on defendant's purported "dislike" for inmates who file civil lawsuits, followed by a statement to plaintiff that "Green Haven is an open battlefield, so be careful"); *cf. Lunney v. Brureton,* No. 04 Civ. 2438(LAK) (GWG), 2007 WL 1544629, at *23 (S.D.N.Y. May 29, 2007) ("if you don't

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

stop writing grievances I'm going to break your fuckin' neck" was direct and specific enough to state retaliation claim). Accordingly, Plaintiff's First Amendment retaliation claim, arising out of Defendant Ventiere's conduct on May 5, 2006, should be dismissed.

> FN12. It is questionable whether Plaintiff's conversation with the U .S Marshal would constitute "protected speech." Plaintiff had not yet filed the instant suit, nor had he filed any grievances at the time. Nor was he making a request for assistance to a supervisory official.

3. *Other Constitutional Claims*

To the extent that Plaintiff claims that Defendant Ventiere's statements, standing alone, give rise to a constitutional violation, the Court recommends dismissal pursuant to Rule 12(b)(6).

It is well-established law that, without more, verbal threats and intimidation do not rise to the level of a constitutional violation. *See, e.g., Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (name calling insufficient to allege a constitutional violation); *Jean-Laurent v. Wilkerson,* 438 F.Supp.2d 318, 325 (S.D.N.Y.2006) ("verbal intimidation does not rise to the level of a constitutional violation"); *Ramirez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996) ("[a]llegations of threats or verbal harassment, without any injury or damage, do not state a claim under 42 U.S.C. § 1983"); *see also Petty v. Goord,* No. 00 Civ. 803(JSR), 2008 WL 2604809, at *5 (S.D.N.Y. June 25, 2008) (verbal harassment related to inmate's HIV-positive status did not state a claim under the Eighth Amendment); *Davidson v. Tesla,* No. 06 Civ. 861, 2008 WL 410584, at *4 (D.Conn. Feb. 13, 2008) (no constitutional violation based on officer acting in an "angry, hostile, aggressive and belligerent manner").

Here, Plaintiff merely alleges that Defendant Ventiere threatened to "teach [him] a lesson." (Am.Compl.¶ 53.) This general threat, detached from the other untimely alleged incidents by more than two years, and not followed by any physical acts, is insufficient to state a constitutional violation. Accordingly, Plaintiff's claim based on Defendant Ventiere's verbal threat on May 5, 2006, should be dismissed.FN13

> FN13. Because this Court recommends dismissal of all of Plaintiff's claims pursuant to Rules 12(b)(1) and (6), discussion of Defendants' third and final ground for dismissal-insufficient service of process-is unnecessary.

**CONCLUSION**

*17 For the above reasons, I respectfully recommend that Defendants' motion to dismiss be granted, and all claims against Defendants be dismissed. Plaintiff's claims against the United States, the USMS, and the Individual Defendants in their official capacities are barred by sovereign immunity. Plaintiff's claims against the Individual Defendants in their individual capacities are time-barred and/or fail to state a claim upon which relief can be granted.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this report to file written objections. *See also* Fed.R.Civ.P. 6(a). Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Richard J. Sullivan, United States District Judge, and to the chambers of the undersigned, Room 1660. Any requests for an extension of time for filing objections must be directed to Judge Sullivan. Failure to file objections will result in a waiver of those objections for purposes of appeal. *See* Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475 (1985); *IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Small v. Sec'y of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989).

S.D.N.Y.,2010.

Williams v. U.S.
Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 1

Slip Copy, 2010 WL 963465 (S.D.N.Y.)

(Cite as: 2010 WL 963465 (S.D.N.Y.))

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

S.D. New York.
Larry WILLIAMS, Plaintiff,
v.
UNITED STATES of America, et al., Defendants.
No. 07 Civ. 3018(RJS)(THK).

March 16, 2010.
*ORDER ADOPTING REPORT AND RECOMMENDATION*

RICHARD J. SULLIVAN, District Judge.
**\*1** On February 28, 2007, Plaintiff Larry Williams, who is incarcerated and proceeding *pro se,* initiated this suit by delivering a complaint to prison officials for them to file on his behalf. The complaint was received by the court's Pro Se Office on March 9, 2007 and docketed on April 14, 2007. (Doc. No. 1.) The case was originally assigned to the Honorable Kenneth M. Karas, District Judge, and reassigned to the docket of the undersigned on September 4, 2007. (Doc. No. 3.)

The only Defendants named in the complaint were "John Does 1-11, sued in their individual capacities," whom Plaintiff described as United States Marshals. Accordingly, on October 30, 2007, the Court ordered the United States Attorney's Office for the Southern District of New York ("the USAO") to identify the officers described in the complaint. After an extended investigation period, four Marshals were eventually identified by name: Luis Figueroa, Donny LaRosa, Thomas Ventiere, and A.J. Krause. Plaintiff then filed an amended complaint on January 2, 2009-more than twenty-two months after the original complaint was filed-adding the named defendants, in their individual and official capacities, and other parties. (Doc. No. 19.) The Court ordered Plaintiff to serve the amended complaint by April 1, 2009 (Doc. No. 20), which was later extended until May 15, 2009 at Plaintiff's request (Doc. No. 22). Plaintiff mailed service packages to the Marshals Service on May 12, 2009, and process was effectuated on June 2 and 4, 2009. On August 21, 2009, Defendants moved to dismiss the amended complaint. The motion was fully submitted on September 22, 2009, and was subsequently referred to the Honorable Theodore H. Katz, Magistrate Judge, for a Report and Recommendation.

On February 25, 2010, Judge Katz issued a Report recommending that Defendants' motion be granted in its entirety. Specifically, Judge Katz recommended (1) dismissing claims against the remaining John Doe defendants for lack of personal jurisdiction; (2) dismissing claims against the United States, the United States Marshals Service, and the individual defendants in their official capacities as barred by the doctrine of sovereign immunity; (3) dismissing as time-barred all claims against the individual defendants that are based on events that took place before January 2, 2006; and (4) dismissing the remaining timely claims for failure to state a claim on which relief can be granted. In the Report, Judge Katz advised the parties that failure to file timely objections within fourteen days from service of the Report would constitute a waiver of those objections. *See* 28 U.S.C. § 636(b) (1)(C); Fed.R.Civ.P. 72(b). No party has filed objections to the Report, and the time to do so has expired. *Cf. Frank v. Johnson,* 968 F.2d 298 (2d Cir.1993).

When no objections to a report and recommendation are made, the Court may adopt the report if there is no clear error on the face of the record. *Adee Motor Cars, LLC v. Amato,* 388 F.Supp.2d 250, 253 (S.D.N.Y.2005); *La Torres v. Walker,* 216 F.Supp.2d 157, 159 (S.D.N.Y.2000). After conducting a thorough review of the record, the Court finds that Judge Katz's well-reasoned and persuasive Report and Recommendation is not facially erroneous. Accordingly, the Court adopts the Report and Recommendation in its entirety. For the reasons set forth therein, IT IS HEREBY ORDERED THAT Defendants' motion to dismiss is granted. The clerk of the court is respectfully directed to terminate the motion found at Doc. No. 35 and to close this case.

**\*2** SO ORDERED.

S.D.N.Y.,2010.

Williams v. U.S.
Slip Copy, 2010 WL 963465 (S.D.N.Y.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 963465 (S.D.N.Y.)

(Cite as: 2010 WL 963465 (S.D.N.Y.))


END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Shawn MONCRIEFFE, Plaintiff,
v.
Linda WITBECK, Corrections Officer at Coxsackie
Correctional Facility; B. Schwebler; Dominic Mantello,
Superintendent; C.O. Weeks; C.O. Jensen; and C.O.
McFarlene, Defendants.
**No. 97-CV-253.**

June 29, 2000.

Shawn Moncrieffe, Auburn Correctional Facility, Auburn,
New York, Plaintiff, pro se.

Hon. Dennis C. Vacco, Attorney General for the State of
New York, Steven H. Schwartz, Assistant Attorney
General, Department of Law, the Capitol, Albany, New
York, for Defendants.

MEMORANDUM-DECISION AND ORDER

MORDUE, J.

*INTRODUCTION*

**\*1** Plaintiff moves and defendants cross-move for
summary judgment under Section 56(b) of the Federal
Rules of Civil Procedure in this *pro se* action pursuant to
42 U.S.C. § 1983 alleging violations of his rights under
the Fourth, Eighth and Fourteenth Amendments to the
United States Constitution.

Presently before the Court is the Report-Recommendation
of the Hon. Magistrate Judge David R. Homer dated

December 23, 1998, recommending that plaintiff's motion
be denied and defendants' cross-motion be granted in part
and denied in part.

Plaintiff filed timely objections to the
Report-Recommendation.

*FACTS*

In his complaint, plaintiff alleges that between August and
November, 1996, while he was housed in the Special
Housing Unit of Coxsackie Correctional Facility,
defendant Correctional Officer Linda Witbeck deprived
him of a food tray six times; that Witbeck deprived him of
things such as recreation and supplies six times; that
Witbeck laughed at him four times while he was in the
shower; that Witbeck sexually harassed plaintiff once
"when she felt [plaintiff's] genitals and rear end during a
regular recreation pat frisk;" that Witbeck ransacked his
cell; and that in some unspecified manner Witbeck gave
him a death threat. Plaintiff further alleges that during the
same period defendant Correctional Officer Weeks
sexually harassed him during a routine pat frisk when
Weeks "felt [plaintiff's] genitals a few times." Plaintiff
claims that on two occasions defendant Correctional
Officer McFarlene entered his cell and ransacked it while
plaintiff was in the shower and once confiscated "a few of
[plaintiff's] things." Plaintiff also claims that defendant
Correctional Officer Jensen threatened him once and
assaulted him once by kicking him in the back. Plaintiff
states that the grievance supervisor, defendant Schwebler,
did not log and number plaintiff's grievances as required
and that Superintendent Dominic J. Mantello disregarded
plaintiff's numerous complaints.

Magistrate Judge Homer recommended denial of plaintiff's
motion for summary judgment and dismissal of all of
plaintiff's claims except his Eighth Amendment claim
against Witbeck for denial of food.

*DISCUSSION*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

Pursuant to 28 USC § 636(b)(1)(C), this Court must make a de novo determination of those portions of the Magistrate Judge's Report-Recommendation to which plaintiff has specifically objected. Here, plaintiff objects to Magistrate Judge Homer's recommendations except with respect to the issues of verbal harassment, threats and denial of recreation. He erroneously states that the Report-Recommendation does not address the claim that Witbeck laughed at him while he was in the shower; however, this allegation amounts to a claim of verbal harassment, which is not actionable under 42 U.S.C. § 1983. *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998). Accordingly, the Court will address all issues de novo.

Summary Judgment is appropriate when the pleadings, affidavits, and any other supporting papers demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986). Facts, inferences therefrom and ambiguities must be examined in a context which is most favorable to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

**\*2** The movant bears the initial burden of showing that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). When the moving party has met this burden the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita* at 586. The moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P.56(e); *Liberty Lobby* at 250.

Where summary judgment is sought against a *pro se* litigant the Court must afford him special solicitude. *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

A. *Defendant Mantello*

Plaintiff alleges that defendant Mantello is liable because, as Superintendent of the Coxsackie Correctional Facility, he "disregarded" numerous complaints made to him by plaintiff. More specifically, plaintiff alleges that (1) Mantello failed to remedy a wrong after having learned of it and (2) that Mantello was negligent in his supervision of subordinate employees.

Magistrate Judge Homer concluded in his Report-Recommendation that plaintiff failed to demonstrate a claim against Mantello. With respect to plaintiff's first allegation that Mantello failed to remedy a wrong, the Magistrate Judge determined that either Mantello or his subordinates investigated plaintiff's grievances. Because plaintiff's complaints were investigated and it was concluded that the grievances were without merit, Mantello satisfied his obligations with respect to plaintiff's grievances.

The Magistrate Judge similarly rejected plaintiff's second claim that Mantello negligently supervised subordinate employees who were allegedly violating his constitutional rights. Magistrate Judge Homer concluded that no claim was stated because, whereas the law requires gross negligence to impose supervisor liability, plaintiff merely alleged negligence. In addition to determining that plaintiff's claim was without merit for failure to plead and prove gross negligence, Magistrate Judge Homer also concluded that plaintiff had failed to establish even ordinary negligence on the part of Mantello.

Plaintiff objects to Magistrate Judge Homer's conclusion that he failed to establish supervisor liability. Plaintiff argues that the record establishes gross negligence in that Mantello was aware that plaintiff's rights were being violated but chose to ignore them by failing to investigate or remedy same.

In order to establish a successful § 1983 claim, a plaintiff must establish that a defendant was personally involved in the alleged rights violation. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). An official is not liable in a section 1983 action under the doctrine of respondeat superior. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981). However, an individual who occupies a supervisory position may be found personally involved by: (1) direct participation; (2) failing to remedy a wrong after learning of the violation through a report or appeal; (3) creating a policy or custom under which unconstitutional practices occurred or

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

allowing the policy or custom to continue; or (4) gross negligence in managing subordinates whose conduct caused the unlawful condition or event. *See Wright,* 21 F .3d at 501.

**\*3** With respect to plaintiff's objection arguing that Mantello was grossly negligent, plaintiff simply reiterates his original arguments and relies on evidence already in the record and considered by the Magistrate Judge. Plaintiff merely reiterates in his objections to the Report-Recommendation that he has established a case

which includes gross negligence as evidence [sic] in plaintiff's motion. (See plt. motion for summary judgment, memo. Of law pg. 23 with annexed exibits [sic] and plt. Reply decl. Pg. 11 with attached exibits [sic] ). Moreover, the record is legally sufficient to establish and impose supervisory liability. (See exibits [sic] attached to plt. motion for summary judgment and Reply motion).

As Magistrate Judge Homer correctly stated, the record clearly reveals that Mantello or his subordinate employees investigated plaintiff's grievances and rejected them as being without merit. As such, there is nothing in the record indicating that Mantello either turned a blind eye to plaintiff's complaints. Simply stated, plaintiff's assertion that Mantello ignored his complaints is refuted by the investigations conducted regarding the complaints. Similarly, plaintiff's allegation that Mantello failed to remedy a wrong is without merit because the record reflects that the investigation of the complaints came to the conclusion that no wrongs were being committed.

Aside from reiterating his initial arguments, plaintiff has failed to provide the Court with anything further in his objection which would warrant disturbing the sound conclusion of the Magistrate Judge. Accordingly, this Court accepts Magistrate Judge Homer's determination to dismiss plaintiff's claim with respect to defendant Mantello.

B. *Verbal Threats and Harassment*

Plaintiff alleges that he was subjected to verbal threats and

harassment in that corrections officers laughed and insulted him while he showered. Plaintiff also maintains that he was subjected to threats of violence. Magistrate Judge Homer recomended that defendants were entitled to summary judgment because plaintiff failed to establish an actual injury resulting from the alleged threats or harassment.

A claim for verbal harassment is not actionable under 42 U.S.C. § 1983. *Aziz Zarif Shabazz v. Picco,* 994 F.Supp. 460, 474 (S.D.N.Y.1998); *Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995). As correctly noted by the Magistrate Judge, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Picco* 994 F.Supp. at 474. Similarly, "threats do not amount to violations of constitutional rights." *Malsh,* 901 F.Supp. at 763.

Even assuming that the alleged verbal harassment and threats occurred, plaintiff has failed to plead or prove that there were any accompanying actual injuries. Furthermore, plaintiff does not object to the findings of the Magistrate Judge with respect to verbal threats and harassment. After a thorough review of the Report-Recommendation the Court adopts the recommendation of the Magistrate Judge.

C. *Excessive Force*

**\*4** Plaintiff alleges that defendant Jensen kicked him once in the back on November 9, 1996. He states that he suffered pain but does not claim that he sought medical assistance. Plaintiff does not allege that Jensen acted maliciously or sadistically.

Magistrate Judge Homer found that plaintiff had failed to annunciate an actionable claim for excessive force. More particularly, he concluded that the alleged kick, even if true, was of limited duration and that there was no malicious intent on the part of the corrections officer.

It is well settled that "the unnecessary and wanton

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

infliction of pain ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Hudson v. McMillian,* 503 U.S. 1, 5 (1992) (quoting *Whitley v. Albers,* 475 U.S. 312 (1986))(internal quotation marks omitted). In reviewing a prisoner's claim a Court must consider whether the prison official acted with a sufficiently culpable state of mind and whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation. *Hudson* at 8. In considering whether the prison official possessed a culpable state of mind while engaging in the use of force, the inquiry is whether the prison official applied force maliciously and sadistically to cause harm. *Id.* at 7. The extent of an inmate's injuries is relevant to this inquiry, as is the nature and duration of the act. *James v. Coughlin,* 13 F.Supp.2d 403, 409 (W.D.N.Y.1998); *Reyes v. Koehler,* 815 F.Supp. 109, 113-14 (S.D.N.Y.1993). Important in considering the alleged wrongdoing is determining whether the force was applied in a good faith effort to maintain or restore prison discipline or maliciously and sadistically to cause harm. *Hudson* at 7.

With respect to the nature of the wrongdoing, a prisoner must demonstrate that the deprivation alleged is sufficiently serious or harmful enough to reach constitutional dimensions. *Romano v. Howarth,* 998 F.2d 101, 104-05 (2d Cir.1993). A prisoner is not required to demonstrate that he sustained a serious injury; *de minimis* use of force does not, however, give rise to an Eighth Amendment claim. *Hudson* at 9-10.

Plaintiff's allegations, even if true, do not support a determination that Jensen acted maliciously or sadistically. Interestingly, in his objections to the Report-Recommendation, plaintiff admits that the kick was of limited duration. In the balance of his objection plaintiff merely reiterates his opinion that the evidence submitted supports an inference of malice. The Court concludes that the conduct alleged is not sufficiently serious or harmful to reach constitutional dimensions. Accordingly, defendants are entitled to summary judgment dismissing plaintiff's excessive force claim.

D. *Access to the Courts*

Plaintiff alleges that he was denied access to the courts as a result of cell searches, confiscation of documents and denial of supplies between August and November 1996. Plaintiff alleges that these actions were motivated to frustrate his efforts to litigate.

**\*5** Magistrate Judge Homer recommended that the defendant's motion to dismiss this claim should be granted. The Magistrate Judge found that plaintiff's claim of denial of access to the courts was unsubstantiated with any evidence which demonstrated that plaintiff had suffered any actual injuries from any alleged wrongful conduct. To the contrary, Magistrate Judge Homer concluded that plaintiff's claims were supported by a thirty-five page memorandum of law containing both case and statutory authority as well as an exhibit related to state court proceedings-all of which demonstrated plaintiff's full and adequate ability to litigate his claims.

It is well established that prisoners have a constitutional right to access the courts. "To state a claim that his constitutional right to access the court was violated, plaintiff must allege facts demonstrating that defendants deliberately and maliciously interfered with his access to the courts, and that such conduct materially prejudiced a legal action he sought to pursue." *Smith v. O'Connor,* 901 F.Supp. 644, 649 (S.D.N.Y.1995); *see Morello v. James,* 810 F.2d 344, 347 (2d Cir.1987). In other words, in order to establish a violation of his right of access to the courts, an inmate must demonstrate that he has suffered or imminently will suffer actual harm in presenting a claim to the court. *Lewis v. Casey,* 518 U.S. 343 (1996).

In his objections to the Report-Recommendation, plaintiff restates arguments already considered by Magistrate Judge Homer. He states that "[p]laintiff further reiterates that he has incurred irreparable harm and injury as a result of the lack of legal services he received while confined in Coxsackie SHU." Plaintiff goes on to note that his complaints would not have been able to have been brought had he not been transferred to the Elmira Correctional Facility. Implicit in this statement is that plaintiff was in fact allowed to bring his claims. Assuming *arguendo* that plaintiff was not allowed to bring his claims until after transfer, the fact still remains that plaintiff did in fact have the ability to air his grievances. Therefore, at best, plaintiff's hardship was delay in bringing his claims. As plaintiff has not established how such an alleged delay has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

prejudiced his rights or amounted to an injury, he fails to make the requisite showing of actual injury for a successful claim. As such, the Court accepts Magistrate Judge Homer's recommendation and grants defendant's motion as to this claim.

E. *Sexual Harassment*

With respect to plaintiff's sexual harassment claim, Magistrate Judge Homer concluded that plaintiff failed to establish an actionable case. Magistrate Judge Homer found that the conduct involved was *de minimus* and, therefore, did not violate a constitutionally protected right.

Sexual abuse of an inmate by a corrections officer may reach constitutional dimensions and give rise to an Eighth Amendment claim. *Boddie v. Schnieder,* 105 F.3d 857, 859 (2d Cir.1997). When reviewing an Eighth Amendment claim stemming from an allegation of sexual abuse, a Court must consider whether the conduct alleged is sufficiently serious to violate contemporary standards of decency and cause severe physical and psychological harm. *Id* at 861. The Court must further consider whether the prison official involved possessed a sufficiently culpable state of mind. Where no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may be sufficient evidence of a culpable state of mind. *Id.* at 861.

**\*6** As set forth above, plaintiff claims that defendants Weeks and Witbeck, each on one occasion, conducted pat frisks in an improper manner. Assuming the truth of these allegations for the purposes of these motions, they are not sufficiently serious to violate contemporary standards of decency and cause severe physical and psychological harm. Plaintiff has failed to demonstrate any severe physical or psychological harm that he has suffered as a result of the alleged harassment. Thus, plaintiff's allegations of sexual abuse fail to state a claim cognizable under the Eighth Amendment. Defendants are therefore entitled to summary judgment dismissing this claim.

F. *Cell Searches*

Plaintiff alleges that he was subjected to cell searches which were designed to harass. Plaintiff's initial pleadings merely allege same with no evidence to support the claim. As a result, Magistrate Judge Homer concluded that plaintiff's claim was without merit and recommended that defendant's motion be granted.

"[T]he Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell," *Hudson v. Palmer,* 468 U.S. 517, 526 (1984), even where the search is retaliatory in nature. *Higgins v. Coombe,* 1997 WL 328623, at \*7 (S.D.N.Y.1997). Prisoners do, however, enjoy Eighth Amendment protection from searches that lack any legitimate penological interest and are intended solely to harass. *Nilsson v. Coughlin,* 1987 WL 129823, at \*4 (S.D.N.Y.1987), see also *Hudson* at 530.

Plaintiff fails to raise anything in his objections to the Magistrate Judge's Report-Recommendation which would warrant disturbing the sound conclusion and recommendation found therein. As Magistrate Judge Homer correctly stated the law with respect to plaintiff's claim, and since plaintiff fails to provide any evidence to support his argument that the alleged searches were improper, the Court concludes that this claim is without merit and grants defendant's motion.

G. *Deprivation of Food and Recreation*

Prison officials have a duty under the Eighth Amendment to provide humane conditions of confinement: adequate food, clothing, shelter and medical care. Denial of a minimal civilized measure of life's necessities violates the Eighth Amendment. *Farmer v. Brennan,* 511 U.S. 825 (1994). Depriving an inmate of food or serving him contaminated food may constitute a violation of the Eighth Amendment. *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983); *Odom v. Sielaff,* 1995 WL 625786, at \*5 (E.D.N.Y.1995); *see also Rhodes v. Chapman,* 452 U.S. 337, 348 (1981).

Plaintiff alleges that corrections officer Witbeck denied him food on six occasions and on at least two occasions contaminated his food with spit or perfume. In support of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

their motion to dismiss, defendants rely on an affidavit from Witbeck denying the allegations. Defendants also rely on copies of logbook entries for the SHU in which plaintiff was housed. Because these logbooks do not contain clear entries for some of the dates in issue and would not likely reflect the wrongful denial of meals to an inmate by a corrections officer, they do not establish as a matter of law that defendants never denied plaintiff food. Credibility assessments and choices between conflicting versions of events are matters for a fact-finder at trial, not for the Court on a summary judgment motion. *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997). Thus, plaintiff's motion and defendants' cross-motion for summary judgment are denied with respect to the issue of whether plaintiff's Eighth Amendment rights were violated by deprivation of food.

**\*7** Plaintiff further alleges that he was deprived of his Eighth Amendment rights where he was allegedly denied recreation on a single occasion. Magistrate Judge Homer concluded that denial of recreation on a single occasion was not sufficiently serious to support a constitutional claim. Plaintiff does not object to these recommendations.

Although prisoner's have a constitutional right to exercise, a claim alleging deprivation of this right requires a showing of a serious deprivation and deliberate indifference on the part of prison officials. *Williams v. Greifinger,* 97 F.3d 699, 704 (2d Cir.1996); *Barnham v. Meachum,* 77 F.3d 626, 630 (2d Cir.1996). As illustrated by the Report-Recommendation, denial of recreation for eighteen out of nineteen days has been upheld in the Second Circuit and denials of up to seventy-five days have been upheld elsewhere. *Arce v. Walker,* 907 F.Supp. 658 (W.D.N.Y.1995), *aff'd in part, vacated in part* 139 F.3d 329 (2d Cir.1998); *Green v. Ferrell,* 801 F.2d 765 (5th Cir.1986).

Based on the foregoing, the Court concludes that the alleged denial of recreation on a single occasion does not support a claim for deprivation of constitutional rights. Accordingly, defendant's motion is granted with respect to this element of plaintiff's claim.

*CONCLUSION*

After a careful review of the file, party submissions and applicable law, it is hereby

ORDERED that Magistrate Judge Homer's Report-Recommendation dated December 23, 1998 is ACCEPTED IN FULL; and it is further

ORDERED that plaintiff's motion for summary judgment is DENIED in all respects; and it is further

ORDERED that defendant's cross-motion for summary judgment be DENIED with respect to plaintiff's claim against defendant Witbeck regarding the alleged deprivation of food and GRANTED in all other respects.

IT IS SO ORDERED

N.D.N.Y.,2000.
Moncrieffe v. Witbeck
Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Robert del CARPIO, Plaintiff,
v.
Hans WALKER, Superintendent; Edward Dann, Deputy
Superintendent; Lt. Battle, Officer of the Adjustment
Committee; Officer York; Officer Kimak, Auburn Corr.
Facility, Defendants.
**No. Civ.A.95CV1502RSPGJD.**

Oct. 15, 1997.

Robert del Carpio, Federal Medical Center, Lexington,
Kentucky, pro se.

Dennis C. Vacco, New York State Attorney General, The
Capitol, Albany, New York, for defendants, Lisa Renee
Harris, Assistant Attorney General, of Counsel.

**ORDER**

POOLER, J.

**\*1** The above matter comes to me following a
Report-Recommendation by Magistrate Judge Gustave J.
Di Bianco, duly filed on the 18th day of September, 1997.
Following ten days from the service thereof, the Clerk has
sent me the entire file, including any and all objections
filed by the parties herein.

After careful review of all of the papers herein, including
the Magistrate Judge's Report-Recommendation, and no
party having submitted objections [FN1] thereto, it is

FN1. I note that the magistrate judge's report

recommendation was returned to the court
undelivered because the plaintiff is no longer at
the address listed in the court's file, which is the
last address plaintiff instructed the court to use.
By Order filed November 22, 1995, Magistrate
Judge Gustave Di Bianco ordered that plaintiff
"promptly notify the Clerk's Office of any change
in his address." Dkt. No. 3 at 4. The same order
provided that "failure to keep such office
apprised of [plaintiff's] current address will result
in the dismissal of the instant action." *Id.* I do not
rely on plaintiff's failure to notify the court of his
current address as a basis for dismissing the
action; I merely note that plaintiff cannot in the
future claim, in reliance on his failure to receive
a copy of the report-recommendation, that he
was deprived of the opportunity to file objections
due to any fault of the court.

ORDERED, that:

1. The Report-Recommendation is hereby approved.

2. The defendant's motion is granted and the action
dismissed for the reasons set forth in the Magistrate
Judge's Report.

3. The Clerk serve a copy of this Order on the parties by
regular mail.

IT IS SO ORDERED.
GUSTAVE J. DI BIANCO, Magistrate J.

**REPORT-RECOMMENDATION**

This matter has been referred to the undersigned for
Report and Recommendation by the Honorable Rosemary
S. Pooler, United States District Judge pursuant to 28
U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

In the instant civil rights complaint, the plaintiff alleges that while he was incarcerated, defendants York and Battle harassed plaintiff and filed false misbehavior reports against him in retaliation for the exercise of his right to redress grievances and the right to practice his religion in violation of the First and Fourteenth Amendments of the Constitution. Plaintiff also alleges Eighth Amendment violations as a result of defendants' actions.

The complaint seeks both injunctive and monetary relief.

Presently before the court is the defendants' motion for summary judgment pursuant to FED.R.CIV.P. 56. For the following reasons, the undersigned will recommend granting the defendants' motion and dismissing the complaint.

**DISCUSSION**

**1. Summary Judgment**

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED.R.CIV.P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). At that point, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.*

**2. Facts**

In his complaint, plaintiff alleges a chronology of events, commencing in May of 1995. Plaintiff states that he wrote

letters to Superintendent Walker about defendants York and Kimak. Plaintiff alleges that these two defendants constantly harassed plaintiff. Plaintiff then alleges that after he complained of their actions to prison officials, defendants York and Kimak participated in filing false misbehavior reports against plaintiff in retaliation for his complaints. Plaintiff also alleges that defendant York forced plaintiff to continue working when York knew that plaintiff's heart condition would not permit him to do as York asked. Plaintiff also claims that defendant York refused to feed the plaintiff. Plaintiff refers to three misbehavior reports that he alleges were fabricated.

**\*2** Plaintiff states that he has written to Superintendent Walker many times, but Walker has failed to remedy the situation. Plaintiff states that due to Walker's failure to remedy the problem, York and Kimak believe that they can continue to harass the plaintiff without adverse consequences. Plaintiff claims that Deputy Superintendent Dann failed to properly investigate plaintiff's allegations against York and Kimak. Plaintiff states that Lieutenant Battle was a hearing officer involved in the allegedly retaliatory misbehavior charges.[FN1] Plaintiff claims that defendant Battle did not properly evaluate or credit the plaintiff's testimony or the testimony of plaintiff's witnesses.

> FN1. The court notes that Lieutenant Battle was the hearing officer in only *one* of the plaintiff's disciplinary hearings. Lieutenant Perkins presided over the other two disciplinary hearings. Plaintiff did not sue Lieutenant Perkins.

**3. Respondeat Superior**

It is well settled that the personal involvement of a defendant is a prerequisite for the assessment of damages in a section 1983 action, *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978), and that the doctrine of respondeat superior is inapplicable to section 1983 claims. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

In *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation. A supervisory official is said to have been personally involved if that official directly participated in the infraction. *Id.* A supervisory official is said to have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement of a supervisory official is said to exist if he or she created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.*

Defendants Walker and Dann argue that the plaintiff has not alleged sufficient personal responsibility to survive a motion for summary judgment. Clearly, neither Walker nor Dann directly participated in the alleged violations. Plaintiff seeks to establish personal responsibility by claiming that these defendants failed to remedy the violations after learning of them through a report or appeal.

Plaintiff alleges that he began writing to defendant Walker in May of 1995 about harassment by defendant York. It is true that personal responsibility of a supervisory official may be established if the official learns of the violation through a report or appeal and fails to remedy the situation. *Williams, supra.* However, the letter or complaint must alert the supervisory official to the constitutional violation of which the plaintiff complains. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Watson v. McGinnis,* 964 F.Supp. 127, 129-30 (S.D.N.Y.1997).

**\*3** In the instant case, the plaintiff's complaints to defendant Walker about York and Kimak relate to the alleged harassment that the plaintiff was suffering. There is no evidence that the Superintendent or Deputy Superintendent Dann knew anything about the plaintiff's allegation of retaliatory misbehavior reports. Thus, they could not be held liable for any claims of retaliation. The grievances that the plaintiff submitted were all investigated as shown by the defendants' exhibits. One of the grievances dealt with an allegation of "false keeplock."

[FN2] Defendants' Exhibit C. A review of the documents relating to the grievance and all the appeals associated therewith, shows no evidence that defendants Walker or Dann were ever informed of the situation. In fact, the grievance is signed by an individual named Duncan in the space reserved for the Superintendent's signature. Defendants' Exhibit C at p. 6. Attached to the grievance papers are all the memoranda regarding the investigation of the issue.

> [FN2.](#) This was the June 6, 1995 grievance mentioned in plaintiff's complaint.

Defendants' Exhibit J contains plaintiff's June 11, 1995 letters [FN3] to defendant Walker. The letters stated that defendants York and Kimak were trying to cause the plaintiff to have a heart attack by their harassment. The harassment included not releasing the plaintiff for "chow" and preventing plaintiff from timely visits to the law library. Plaintiff mentioned a false misbehavior charge, but stated that this allegation was being handled in the Cayuga County Court.

> [FN3.](#) There are two letters in Exhibit J. Both are dated June 11, 1995. One is typed and one is handwritten.

One of plaintiff's June 11 letters was given to Deputy Superintendent Dann, who asked Lieutenant Jackson to investigate the issues raised. Defendants' Exhibit K includes documents relative to Lieutenant Jackson's investigation of the matter, including memoranda of interviews of the officers involved. Although the investigation did not achieve the result desired by the plaintiff, this does not constitute the requisite personal involvement by Walker or Dann in any alleged constitutional violations.

In fact, defendant Dann wrote plaintiff a memorandum stating the results of Lieutenant Jackson's investigation. Defendants' Exhibit K. The memorandum stated that although no merit had been found in plaintiff's claims, Sergeant Lupo was told to speak with the plaintiff to make sure his concerns were addressed. *Id.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

### 4. Due Process

The complaint in this action focuses upon defendant York and Kimak's retaliatory misbehavior reports, however, in passing, the plaintiff also states that Lieutenant Battle "closed his eyes to the evidence," did not properly evaluate the plaintiff's testimony, and "covered" for the officers. These claims could be interpreted as raising a procedural due process claim in addition to the substantive retaliation claim.

The court would first point out that there were three allegedly retaliatory misbehavior reports. Lieutenant Battle was the hearing officer only at *one* of the hearings. Lieutenant Perkins was the hearing officer for the other two hearings. Plaintiff does not mention Perkins in the complaint at all. Thus, the undersigned will consider a procedural due process claim on the one hearing over which defendant Battle presided which took place on July 17, 1995. Defendants' Exhibit S. The formal charge was served on plaintiff on July 13, 1995, and charged plaintiff with refusing a direct order and being out of place. *Id.* at p. 3 (transcript of disciplinary hearing). Officer Kimak was the individual signing the misbehavior report. Defendants' Exhibit R.

**\*4** In order for a plaintiff to be awarded damages under section 1983 for an alleged violation of procedural due process, the court must find that as a result of conduct performed under color of state law, plaintiff was deprived of life, liberty, or property without due process. *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). In the instant case, there is no dispute that the defendants acted under color of state law. In *Bedoya,* the Second Circuit indicated that "[w]hat remains is a two-pronged inquiry: (1) whether the plaintiff had a protected liberty interest in not being confined in keeplock ...; and, if so, (2) whether the deprivation of that liberty interest occurred without due process of law." *Id.* at 351-52 (citing *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460-61, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)).

In order to determine whether a liberty interest existed, courts, until recently, were relying on the Supreme Court decision in *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). In *Hewitt,* the Supreme Court

noted that a state could create a liberty interest through a statute or regulation by utilizing language of unmistakably mandatory character, limiting the discretion of the decision maker. *Id.* After the decision in *Hewitt,* lower courts, as well as the Supreme Court, focused more upon the language of the statute or regulation, rather than upon the character of the deprivation. *See e.g., Kentucky Dep't of Corrections, supra; Hernandez v. Coughlin,* 18 F.3d 133 (2d Cir.1994) (finding no liberty interest after examining regulations associated with the Family Reunion Program), *cert denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994); *Matiyn v. Henderson,* 841 F.2d 31 (2d Cir.1988) (finding liberty interest in remaining free from administrative segregation based on New York regulations); *Gittens v. LeFevre,* 891 F.2d 38, 41 (2d Cir.1989) (finding a liberty interest in remaining free from keeplock based on language of the regulations).

The Supreme Court has held that the *Hewitt* analysis is not applicable and has led to undesired results in prison cases. *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). Courts may no longer rely **solely** upon the language of the regulations when determining whether a liberty interest exists. *Id.* at 2300. The Court stated in Sandin that "the search for a negative implication from mandatory language in prison regulations has strayed far from the real concerns under-girding the liberty protected by the Due Process Clause." *Id.* The court also stated that it was **returning** to the principles established in *Wolff* and *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). *Id.* Ultimately, the court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.*

**\*5** *Sandin* rejected the notion that any action taken by prison personnel for punitive reasons encroaches on a liberty interest. *Id.* at 2301. The court referred to as "dicta" statements in other cases implying that solitary confinement automatically triggers due process protections. *Sandin,* 115 S.Ct. at 2301 (citing *Wolff,* 418 U.S. at 571 n. 19; *Baxter v. Palmigiano,* 425 U.S. 308, 323, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976)). Applying this

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

standard to the facts in *Sandin,* the court determined that Conner's discipline in segregated confinement for 30 days did *not* present the type of atypical, significant deprivation in which the state might create a liberty interest. *Id.*

In determining what constituted "atypical and significant" deprivations, the *Sandin* court compared disciplinary segregation with other forms of segregation; compared the plaintiff's confinement with conditions in general population to see whether the inmate had suffered a major disruption in his environment; and examined whether the *length* of the inmate's sentence was affected. *Id.*

The Second Circuit has not yet squarely addressed the issue of whether after *Sandin* an inmate facing a disciplinary hearing has a liberty interest, protected by due process. The Second Circuit has *implied* that whether a deprivation is atypical and significant involves fact finding. *See Frasier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996) ("[t]he extensive fact-finding of the district court permits us to measure Frasier's SHY claim by the standard of *Sandin* ); *Samuels v. Mockry,* 77 F.3d 34, 38 (2d Cir.1996) (assessment as to whether inmate had a protected liberty interest may require fact finding).

Some courts in New York have also read *Sandin* narrowly and have distinguished the holding when applying the *Sandin* factors and distinguishing the situation experienced by inmate Conner to that experienced by New York inmates who face Tier III disciplinary hearings. *See Campo v. Keane,* 913 F.Supp. 814, 820-21 (S.D.N.Y.1996); *see Moolenaar v. Finn,* No. 94 Civ. 6778 n. 4 (S.D.N.Y. March 14, 1996) (commenting that the case involved a Tier II hearing with no *possibility* of loss of good time and contrasting Tier III hearings where such loss is possible). As noted by the courts in *Campo* and *Moolenaar,* a recognized Second Circuit principle is that due process rights must be determined with respect to the "potential penalty". *Campo,* 913 F.Supp. at 821 (citing *McKinnon v. Patterson,* 568 F.2d 930, 939 (2d Cir.1977), *cert denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). Some courts, however, have squarely rejected the potential penalty theory, opting instead to examine the facts and length of each confinement to determine whether the confinement was atypical and significant. *See Marino v.. Klages,* No. 95-CV-1475 (N.D.N.Y. March 27, 1997) (declining to adopt the

potential penalty approach); *Delany v. Selsky,* 899 F.Supp. 923, 927-28 (N.D.N.Y.1995) (considering length of confinement together with plaintiff's unusual physical problems).

**\*6** In the instant case, the plaintiff was subjected only to a *Tier II* hearing, in which the maximum possible penalty he could receive was 30 days of segregated housing or keeplock. *See* N.Y.Comp.Codes R. & Reg. Tit. 7 § 254.7(a)(iii) and (vi). There is no possibility in a Tier II hearing of a loss or even a recommended loss of good time. Regardless of the disposition, the length of an inmate's sentence cannot be affected as a result of a Tier II hearing. Even under the potential penalty approach, this plaintiff, who was only sentenced to five days of keeplock for the hearing that he is challenging would not have a liberty interest in being free from that confinement. Thus, any procedural due process claim against Lieutenant Battle, based on the July 17, 1995 disciplinary hearing may be dismissed.

**5. Verbal Harassment**

Plaintiff states that defendants York and Kimak harassed him "to death." Verbal harassment alone, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not rise to the level of an Eighth Amendment violation. *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986); *Brown v. Croce,* 967 F.Supp. 101, 104 (S.D.N.Y.1997). Thus, any claims of general verbal harassment by either defendant may be dismissed.

**6. Retaliation**

Even after the Sandin decision, a claim that a false misbehavior report was filed in retaliation for the exercise of a constitutional right, is still actionable as a violation of *substantive due process.* The Second Circuit has made it clear that an inmate has a substantive due process right not to be subjected to false misbehavior charges or be harassed in retaliation for the exercise of a constitutional right such as petitioning the government for redress of grievances. *Jones v. Coughlin,* 45 F.3d 677, 679-80 (2d Cir.1995); *Franco v. Kelly,* 854 F.2d 584, 589-90 (2d

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

Cir.1988). In cases where the defendants' actions are taken for both retaliatory and legitimate reasons, ultimately the defendants must show that they would have taken the same action absent the retaliatory motive. *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir .1994). Courts recognize, however, that claims of retaliation may be prone to abuse. *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). The court in Flaherty described three situations where retaliation is claimed, each situation requiring a different approach by the court. *Id.* The court stated that a retaliation claim supported by specific and detailed allegations must be pursued with full discovery. *Id.* Whereas, a claim that contains "completely conclusory" allegations may be dismissed on the pleadings alone. *Id.* The third situation involves a complaint alleging facts that give rise to a "colorable suspicion of retaliation." *Id.* This third type of case will support at least documentary discovery. *Id.*

In the instant case, the plaintiff alleges that officers York and Kimak filed the false misbehavior reports in retaliation for plaintiff's complaints and grievances against them. Plaintiff also alleges that defendant York retaliated against plaintiff for the exercise of a First Amendment right to practice his religion. This latter claim is not explained by the plaintiff. He does not allege specifically what First Amendment right he was exercising or how the defendants' actions were in retaliation for the exercise of that right.

*7 Defendants have submitted all the records relating to the disciplinary hearings. With respect to the charges, a review of the transcripts of the disciplinary hearings shows that the plaintiff was given the opportunity to explain his behavior at the disciplinary hearing. *See e.g.* Defendants' Exhibit M at p. 4. Exhibit M is the transcript of the disciplinary hearing that took place on June 11, 1995 for a misbehavior that occurred on June 7, 1995. The misbehavior involved the plaintiff failing to obey an order to continue working. The plaintiff admitted that he did not continue working when defendant York told him to continue. *Id.* Plaintiff stated that his medical condition was preventing him from continuing. *Id.* Essentially, the plaintiff admitted his behavior, but alleged a defense that his medical condition prevented him from following the officer's order.

Thus, the misbehavior report was not *false.* Rather, the plaintiff had an explanation for his misbehavior that the hearing officer did not believe. In fact, hearing officer Perkins adjourned the hearing to "check into [[[plaintiff's] medical profile." *Id.* at p. 5. The hearing was reconvened on July 12, 1995, and Lieutenant Perkins had reviewed the plaintiff's medical record. *Id .* at p. 6. Perkins determined that although the plaintiff did have a health problem, there was no indication that he could not work. *Id.* Whether the hearing officer made the correct decision is not the issue. It is clear that at worst, there could have been a dual motivation for defendant York's misbehavior report, and plaintiff did admit failing to obey the officer's order, albeit with reason.

The misbehavior report of July 8, 1995 resulted in a hearing on July 12, 1995. First, the officer fling the misbehavior report was Officer Hoey. The misbehavior report involved unauthorized legal assistance and unauthorized legal exchange. Defendants' Exhibit P (transcript of July 12 hearing). A frisk of the plaintiff's cell resulted in finding 81 pages of legal work that belonged to other inmates. Plaintiff did not dispute that the legal papers were in his cell, but argued that he was using the other individuals' papers to work on his own legal matters. *Id.* at p. 3. The hearing officer simply did not believe the plaintiff's explanation. *Id.* at p. 5.

Neither defendant York nor defendant Kimak was directly involved in the search or the misbehavior report of July 7, 1995. Thus, there is no evidence that this misbehavior report was false and in retaliation for any constitutional right exercised by the plaintiff.

The final misbehavior report was authored by defendant Kimak and involved refusal to obey an order and being out of place. The disciplinary hearing was held on July 17, 1995. Defendants' Exhibit S (transcript of disciplinary hearing). The misbehavior report stated that when plaintiff was returning from his shower, he refused to obey Officer Kimak's order get back into plaintiff's cell. Defendant Kimak stated in the report that plaintiff had stopped at one of the cells and placed his hands inside. *Id.* at p. 3. Plaintiff alleged at the hearing that he was returning from the shower, but he did not stop at anyone's cell and did not disobey any orders. *Id.* at p. 4. Plaintiff also told the hearing officer that defendant Kimak's actions were in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

retaliation for plaintiff's complaints against Kimak. *Id.* at pp. 4-5. Plaintiff called two inmate witnesses to testify at the hearing. *Id.* at p. 7. His first witness was very unclear, but essentially testified that he did not hear the officer give plaintiff an order. *Id.* The second inmate was more articulate and stated that after plaintiff exited the I shower, he always went straight back to his cell. *Id.* at p. 12. Moore testified that he did not hear any order given. *Id.* However, Lieutenant Battle found the witnesses incredible and found plaintiff guilty of the misbehavior. It would appear that the only evidence of retaliation is the plaintiff's allegation of complaints against Kimak and York. A review of the documents I relating to the misbehavior reports shows that even if the plaintiff's statements are credited, the misbehavior reports could have been written for valid reasons as well as invalid reasons. Thus, the plaintiff cannot maintain an action for retaliation in the instant case.

**7. Eighth Amendment**

**\*8** Plaintiff makes some vague allegations that the defendants forced him to work when he was not capable. Plaintiff admitted at his disciplinary hearing that he wanted to work but needed to take a break. Lieutenant Perkins looked through the plaintiff's medical records and found no limitations with respect to the work he could do. The medical record did note a heart condition.

The Eighth Amendment prohibits the infliction of cruel and unusual punishments, including punishments that involve the unnecessary and wanton infliction of pain. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). In order to state a claim based on inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). A plaintiff must allege that his access to physicians for necessary medical care was unreasonably delayed or denied or that prescribed medical treatment was not administered. *Tomarkin v. Ward,* 534 F.Supp. 1224, 1230 (S.D.N.Y.1982) (citing *Todaro v. Ward,* 431 F.Supp. 1129, 1133 (S.D.N.Y.), *aff'd,* 565 F.2d 48 (2d Cir.1977)). Plaintiff's claims, although not specifically involving medical care, do involve allegations that the defendants violated the doctor's orders, and are governed by the same

deliberate indifference standard. Deliberate indifference, whether evidenced by medical staff or by officials who allegedly disregard the instructions of the medical staff requires more than negligence, but less than conduct taken for the very purpose of causing harm. *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 1978, 128 L.Ed.2d 811 (1994). In order for a prison official to act with deliberate indifference, the official must know of and disregard an excessive risk to inmate health and safety. *Id.* at 1979. The official must both be "aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* In the instant case, defendant York allegedly told the plaintiff to keep working when plaintiff stated that he needed a break. The defendant could not have been deliberately indifferent since there was no medical limitation on plaintiff's work in his medical file. Thus, York could not have known about and disregarded a serious risk to plaintiff. Additionally, according to the misbehavior report, the plaintiff had already taken a break when defendant York told plaintiff to keep working. Thus, based on the undisputed facts, there is no evidence that defendant York violated the plaintiff's Eighth Amendment rights relating to his medical condition. Plaintiff also indicated in his complaint that defendant York refused to let plaintiff out of his cell to be fed. Plaintiff wrote a grievance on June 29, 1995 regarding being released "for chow." Defendants' Exhibit D. However, it does not appear that Officer York was involved in the incident. In fact, the grievance was resolved informally. Thus, the plaintiff does not state any Eighth Amendment claim for a retaliatory denial of food or for any denial of food.

**\*9 WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that the defendants' motion for summary judgment (docket # 15) be **GRANTED,** and the complaint be **DISMISSED.**

Pursuant to 28 1 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R .Civ.P. 6(a),
6(e), 72.

N.D.N.Y.,1997.
Carpio v. Walker
Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 2154196 (S.D.N.Y.)

(Cite as: 2007 WL 2154196 (S.D.N.Y.))

**C**

Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Sean CLAYTON, Plaintiff,
v.
CITY OF POUGHKEEPSIE, Chief Ronald Knapp,
individually and in his capacity as Chief of the City of
Poughkeepsie Police Department, George Camacho,
Joseph Ciardi, Sean McCarthy, Anthony Morrone, Greg
McGinley, Michael Longbard, Sgt. Remsen, Edward
Freer, and Police Officer Doe, the fictitious name for the
City of Poughkeepsie Police Officer(s) who assisted in
the search and seizure of claimant on or about March
26, 2005, each individually and in their respective
capacities as members of the City of Poughkeepsie
Police Dept., Defendants.
No. 06 Civ.4881 SCR.

June 21, 2007.
DECISION AND ORDER

ROBINSON, J.
I. Background
A. Procedural history

*1 Sean Clayton (the "Plaintiff") brought suit on June
23, 2006 against the City of Poughkeepsie, nine named
members of the City of Poughkeepsie Police Department
in their official and individual capacities, and "Police
Officer Doe" (collectively "Defendants"). Plaintiff alleges
violations of 42 U.S.C. § 1983, as well as the Fourth and
Fourteenth Amendments of the United States Constitution;
he also makes several related state law claims, all of which
arise out of an incident on March 26, 2005 in the City of
Poughkeepsie. In accordance with this Court's Individual
Practice Rules, Defendants filed a partial motion to
dismiss many of the claims in the Complaint pursuant to
Fed.R.Civ.P. 12(b)(6), arguing that the Complaint fails to
state a claim upon which relief can be granted. For the
reasons discussed below, Defendants' motion to dismiss is

GRANTED IN PART and DENIED IN PART.

B. Facts

According to the facts set forth in the Complaint, on
March 26, 2005 at approximately 10:00 p.m., Plaintiff,
whose license to operate a motor vehicle in New York
State was suspended at the time, was driving in the City of
Poughkeepsie when his vehicle was stopped by
Defendants Camacho, Ciardi, McCarthy, Morrone,
McGinley and Longbard (hereinafter the "Officer
Defendants"). Compl. at ¶¶ 24, 27-28. The Officer
Defendants performed a search of the vehicle and of
Plaintiff's person, but did not immediately discover any
contraband at the scene of the vehicle stop; they then took
Plaintiff into custody and brought him to police
headquarters. *Id.* at ¶¶ 25-26. At the time, Plaintiff was
under the supervision of the New York State Division of
Parole, and did not have any outstanding warrants for his
arrest. *Id.* at ¶¶ 28-31.

At police headquarters, Defendants conducted a pat
frisk of Plaintiff, which did not immediately uncover any
contraband; Plaintiff was then instructed by Defendant
Camacho to remove his clothes, lift his scrotum, and
spread his buttocks for a cavity search. *Id.* at ¶¶ 33-34, 36.
At that time, the Officer Defendants, along with
Defendants Remsen and Freer, "reach[ed] through
[Plaintiff's] anus into his rectum" where they recovered a
quantity of cocaine. *Id.* at ¶¶ 37, 39. Plaintiff alleges that
he "suffered severe injuries, including but not limited to
bleeding, swelling, pain and suffering and related
sequelae, to his anus and rectum." *Id.* at ¶ 38.

Plaintiff was charged with criminal possession of a
controlled substance based on the cocaine recovered
incident to this search. *Id.* at ¶ 39. As part of pre-trial
proceedings in state court Plaintiff moved to suppress the
cocaine, but that motion was denied on or about December
19, 2005. *Id.* at ¶ 40. Plaintiff was convicted, upon a guilty
plea, of criminal possession of a controlled substance in
the fifth degree, and is currently serving a sentence of two
to four years incarceration in a New York State prison. *Id.*
at ¶ 10. During his plea allocution, Plaintiff's criminal

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2154196 (S.D.N.Y.)

(Cite as: 2007 WL 2154196 (S.D.N.Y.))

defense lawyer stated that the state court judge's decision on the motion to suppress the evidence recovered from the search now at issue here was "dispositive" of the criminal case. *See* Def. Ex. D at 2. According to Plaintiff's present (civil) counsel, Plaintiff's conviction is presently pending on appeal to the New York State Supreme Court Appellate Division, Second Department. Pl. Mem. of Law at 2.

   **\*2** While not all of the claims in the Complaint are stated with precision, this Court reads the Complaint as making the following claims: FN1

>    FN1. Despite the ambiguity of the Complaint in certain respects, this Court can state with certainty that the Complaint does not set forth any claim for false arrest or malicious prosecution-Plaintiff's brief in opposition to the motion to dismiss specifically disclaims such allegations. Pl. Mem. of Law at 3.

(1) unreasonable search and seizure and excessive use of force by government actors, pursuant to 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments of the United States Constitution;

(2) failure to protect Plaintiff from unreasonable search and seizure and excessive use of force by government actors, pursuant to 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments of the United States Constitution;

(3) conspiracy to violate Plaintiff's federal civil rights pursuant to 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments of the United States Constitution; FN2

>    FN2. Given that Plaintiff does not specify which federal civil rights this claim is meant to address, this Court views it as alleging a conspiracy to commit the two violations-unreasonable search and seizure and excessive use of force-alleged in the first claim.

(4) a federal claim of municipal liability for maintaining de facto policies, practices, and customs exhibiting deliberate indifference to the federal constitutional

rights of citizens;

(5) a state law claim of gross negligence and negligence in subjecting Plaintiff to unwanted and unwarranted physical contact and unlawful search and seizure, and failing to protect Plaintiff against the violation of his constitutional rights;

(6) a state law claim of negligent hiring, training and supervision;

(7) a state law claim of assault and battery;

(8) a state law claim of intentional infliction of emotional distress;

(9) a claim under the New York State Constitution for violation of Plaintiff's right to be free from unreasonable seizure of his person and property, to be free from the use of excessive force by government actors, and to equal protection under the law.

   The Complaint specifically alleges that the "subsequent prosecution and incarceration of Plaintiff were a direct and proximate result of the aforementioned violations of rights secured by the United States Constitution and of the wrongful acts and omissions perpetuated by all Defendants." *Id.* at ¶ 43.

II. Analysis

A. Standard of review

   In reviewing a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), a district court "must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994). At this stage, "the issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims." *Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998) (internal quotations omitted). When considering a motion to dismiss for failure to state a claim, a district court may consider the facts as set forth in the complaint, documents attached to the complaint, and any other documents

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2154196 (S.D.N.Y.)

(Cite as: 2007 WL 2154196 (S.D.N.Y.))

incorporated in the complaint by reference. *Kramer v. Time Warner,* Inc., 937 F.2d 767, 773 (2d Cir.1991).

In the interest of judicial economy, this Court will address all of Plaintiff's supplemental claims under New York State law. *See* 28 U.S.C. § 1367.

B. Claims that Defendants concede should remain

**\*3** As a threshold matter, Defendants in their motion papers concede that Plaintiff has articulated facts sufficient to support a claim for excessive use of force pursuant to 42 U.S.C. § 1983 and the Fourth Amendment of the United States Constitution. Def. Mem. of Law at 4. Defendants also do not contest the portion of Plaintiff's second claim that alleges a failure to protect him against the excessive use of force. Further, Defendants concede that Plaintiff has stated a claim for assault and battery under state law. Def. Mem. of Law at 6. Thus, the portions of Plaintiff's first and second causes of action that claim excessive use of force can be maintained; in addition, Plaintiff's seventh cause of action can also be maintained. C. Claims involving allegation of unreasonable search and seizure

At least five of Plaintiff's causes of action are predicated, in part, on Plaintiff's claim that the search and seizure of Plaintiff on March 26, 2005 was unreasonable and consequently that such search and seizure violated his civil rights.

The Supreme Court has held that in order to recover damages under 42 U.S.C. § 1983 for "harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Heck v. Humphrey,* 512 U.S. 477, 486-87 (1994). Indeed, a state prisoner in these circumstances "has no cause of action under § 1983 unless and until the conviction or sentence is reversed, expunged, invalidated, or impugned by the grant of a writ of habeas corpus." *Id.* at 489. The *Heck* rule only applies, however, in situations where "establishing the basis for the damages claim *necessarily demonstrates* the invalidity of the conviction."

*Id.* at 481-82 (emphasis added); *see McKithen v. Brown,* 481 F.3d 89, 102 (2d Cir.2007).

In a footnote, the *Heck* Court described a hypothetical 42 U.S.C. § 1983 suit based on an unreasonable search as an example of a suit that could potentially survive under the *Heck* rule:

"a suit for damages attributable to an allegedly unreasonable search may lie even if the challenged search produced evidence that was introduced in a state criminal trial resulting in the § 1983 plaintiff's still-outstanding conviction. Because of doctrines like independent source and inevitable discovery, and especially harmless error, such a § 1983 action, even if successful, would not necessarily imply that the plaintiff's conviction was unlawful."

*Heck,* 512 U.S. at 487 n. 7 (internal citations omitted). In a very recent interpretation of this exact language, the Second Circuit explained that "a § 1983 action that, at most, increases the *likelihood* that a plaintiff will eventually be able to overturn a still outstanding conviction, but which does not go so far as to *necessarily* demonstrate the conviction's validity" may still proceed. *McKithen,* 481 F.3d at 102 (emphasis in original).

**\*4** In the case at bar, we must apply the *Heck* rule and dismiss any of Plaintiff's allegations concerning the allegedly unreasonable search and seizure. First, it is undisputed that Plaintiff's conviction for criminal possession of a controlled substance has not been invalidated in any way by any state or federal court or other state or federal official. Second, it is this Court's view that any decision-by the Court or by a jury-in this case holding that the initial seizure of Plaintiff or the search of Plaintiff's person and the subsequent seizure of narcotics from him were unconstitutional would necessarily call into question the validity of Plaintiff's criminal conviction. This is precisely the type of result that *Heck* was designed to prevent. Plaintiff even appears to concede this point in his memorandum of law, where he argues that "the prohibition against the unlawful search and seizure branch of his § 1983 action shall be lifted" only if he succeeds on his criminal appeal. Pl. Mem. of Law at 3.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2154196 (S.D.N.Y.)

(Cite as: 2007 WL 2154196 (S.D.N.Y.))

While the above-cited footnote from *Heck* provides a clear roadmap for how a suit for damages attributable to an allegedly unreasonable search *may* be allowed to continue even in light of the *Heck* test, Plaintiff's claims here are distinguishable from the situation contemplated there. The doctrines of independent source, inevitable discovery, and harmless error discussed in *Heck* are not applicable, where, as here, the entire evidentiary basis for the charged offense derives from a single episode involving a single search that is now being questioned as part of a § 1983 action. Indeed, it was so patently obvious to Plaintiff's criminal defense attorney that the entire case turned on his motion to suppress evidence from the search at issue that he referred to that motion as "dispositive," and his client (the Plaintiff) pled guilty just weeks after that motion was denied. Without the search and seizure at issue, there would undoubtedly not have been any criminal charge filed against Plaintiff for possession of these narcotics. Accordingly, given that the exception described in *Heck* is not applicable here, Plaintiff's purported § 1983 claims based on the allegedly unreasonable search and seizure described above are hereby dismissed.

Plaintiff suggests that rather than dismiss these causes of action based on *Heck,* the Court should instead abstain from deciding these issues until the resolution of his criminal appeal in state court. Abstention, however, is not appropriate. As discussed above, *Heck* counsels that Plaintiff "has no cause of action under § 1983 unless and until the conviction or sentence is reversed, expunged, invalidated, or impugned by the grant of a writ of habeas corpus." *Heck,* 512 U.S. at 489. Thus, Plaintiff has no valid federal claim as to his allegations of unreasonable search and seizure at this point in time. For whatever reason, Plaintiff elected to attempt to bring these § 1983 claims while his state court criminal appeal was still pending; to allow abstention under these circumstances could potentially create a tremendous backlog of stayed § 1983 actions in the federal courts, all waiting to move forward or to be dismissed pending the resolution of state court criminal appeals. A refusal to abstain in cases like this does not prejudice plaintiffs from a statute of limitations standpoint, *see id.,* and is certainly in the best interests of judicial efficiency in the federal courts.

**\*5** Given that the *Heck* doctrine prevents a § 1983 cause of action premised on the allegedly unreasonable search and seizure at this point, it would frustrate the purposes of judicial economy, as well as the intent of *Heck,* to allow state claims based on the exact same allegations to proceed in federal court. Therefore, for the same reasons described above, this Court will also dismiss any state law claims that rely on Plaintiff's allegation of unreasonable search and seizure.

Accordingly, Defendants' motion to dismiss the portions of the first, second, fourth, fifth, and ninth causes of action that are predicated on Plaintiff's allegation of unreasonable search and seizure is hereby GRANTED.

D. Conspiracy

To state a claim for conspiracy to violate § 1983, a plaintiff must allege: "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999).

Plaintiff's Complaint here does not allege any agreement on the part of Defendants to act in concert to inflict an unconstitutional injury; this cause of action must therefore be dismissed in its entirety. In his third claim, Plaintiff states in conclusory fashion that Defendants are members of a conspiracy and that they engaged in activities in furtherance of advancing the conspiracy. Compl. at ¶ 60. At no point in the Complaint, however, does Plaintiff discuss any relevant agreement among the alleged conspirators, or which overt acts they allegedly took in furtherance of the conspiracy. Aside from the conclusory language described above, Plaintiff's only reference to the purported conspiracy in the Complaint indicates that *after* the events of March 26, 2005, the Officer Defendants "subsequently conspired to conceal the truth as to the circumstances of the incident." *Id.* at ¶ 2. Simply stated, Plaintiff's conspiracy claim fails even to "provide some details of time and place and the alleged effect of the conspiracy." *Jessamy v. City of New Rochelle,* 292 F.Supp.2d 498, 513 (S.D.N.Y.2003) (citing *Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993)). Accordingly, Defendants' motion to dismiss

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2154196 (S.D.N.Y.)

(Cite as: 2007 WL 2154196 (S.D.N.Y.))

the third cause of action is GRANTED.

E. Municipal liability

Plaintiff's fourth cause of action alleges that Defendant City of Poughkeepsie is liable because of certain *de facto* policies of its police department. Municipalities may be held liable under 42 U.S.C. § 1983 only when a constitutional deprivation is inflicted pursuant to a government's policy or custom. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690-91, 694 (1978); *DeCarlo v. Fry,* 141 F.3d 56, 61 (2d Cir.1998). To set forth a cognizable claim for municipal liability in such an action, a plaintiff must plead and prove "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983). While a plaintiff need not "show that the municipality had an explicitly stated rule or regulation, a single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." *DeCarlo,* 141 F.3d at 61 (internal citations omitted). The Second Circuit has held that "the inference that a policy existed may ... be drawn from circumstantial proof, such as evidence that the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction, or evidence that the municipality had notice of but repeatedly failed to make any meaningful investigation into charges that its agents were violating citizens' constitutional rights." *Id.* at 61-62.

**\*6** Defendants' only argument in favor of dismissing this cause of action is that there can be no claim for municipal liability for an unconstitutional policy or practice when there is no underlying claim for unconstitutional action. This position, however, is fundamentally flawed, given that Defendants' own submissions expressly concede that Plaintiff's 42 U.S.C. § 1983 claim for excessive force must be allowed to proceed. The Complaint does in fact allege that Defendants had knowledge of previous incidents of assault and brutality and acted with deliberate indifference by failing to address such incidents. Compl. at ¶ 3. Based on this Decision and Order, Plaintiff no longer has a constitutional claim regarding allegedly unreasonable searches and seizures; as such, Plaintiff cannot maintain a claim for municipal liability as it pertains to any alleged policies or procedures surrounding searches and seizures. To the extent that Plaintiff's fourth cause of action is directed toward issues pertaining to excessive force, however, Defendants' motion to dismiss is DENIED.

F. Gross negligence and negligence

The only remaining portion of Plaintiff's fifth cause of action for gross negligence and negligence relates to his allegation of unwarranted physical contact and Defendants' failure to protect him from such unwarranted contact. Various federal courts within this circuit have held, however, that under New York State law, "when a plaintiff brings excessive force and assault claims which are premised upon a defendant's allegedly intentional conduct, a negligence claim with respect to the same conduct will not lie." *Lalonde v. Bates,* 166 F.Supp.2d 713, 720 (N.D.N.Y.2001) (citing *Naccarato v. Scarselli,* 124 F.Supp.2d 36, 45 (N.D.N.Y.2000); *see also Oliver v. Cuttler,* 968 F.Supp. 83, 92 (E.D.N.Y.1997). Because Plaintiff here has asserted claims of excessive force and assault and battery and pled sufficient facts to support those claims, he cannot additionally argue that the same facts would give rise to a claim for either negligence or gross negligence. Accordingly, Defendants' fifth cause of action must be dismissed in its entirety.

G. Negligent hiring and intentional infliction of emotional distress

Defendants maintain that this Court should dismiss Plaintiff's sixth and eighth causes of action because they have "no nexus" to Plaintiff's claim for excessive force. This Court, however, views both of these claims as substantially related to the remaining federal excessive force claim, and therefore rejects Defendants' principal argument in support of dismissal.

i. Negligent hiring, training, and supervision

To state a claim under New York law for negligent hiring, supervision, and retention, the plaintiff must show that "the employer knew or should have known of the employee's propensity for the conduct which caused the injury." *Ehrens v. Lutheran Church-Missouri Synod,* 269 F.Supp.2d 328, 334 (S.D.N.Y.2003). As was the case with Plaintiff's claim for municipal liability, Defendants make

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2154196 (S.D.N.Y.)

(Cite as: 2007 WL 2154196 (S.D.N.Y.))

no argument in support of dismissing this cause of action other than to suggest there can be no claim here because there is no underlying claim for any civil rights violation. As discussed above, this argument is flawed, given that Plaintiff's claim for excessive force remains active. In the absence of any other stated basis for dismissal, this Court declines to dismiss this claim at this time.

ii. Intentional infliction of emotional distress

**\*7** Under New York law, a claim for IIED requires: "(1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the jury; and (4) severe emotional distress." *Conboy v. AT & T Corp.,* 241 F.3d 242, 258 (2d Cir.2001). Though the New York Court of Appeals has stated that the IIED standard is "rigorous, and difficult to satisfy." *Howell v. New York Post Co.,* 81 N.Y.2d 115, 122 (1993) (citations omitted), this Court cannot conclude, based on the facts alleged in the Complaint, that Plaintiff could not, as a matter of law, recover damages under this tort theory based on his allegations of excessive force. Despite the rigorous standard, dismissal is not warranted at this time.

H. State constitutional claims

Plaintiff's ninth and final cause of action purports to raise claims under the New York State Constitution for his right to be free from unreasonable seizure of his person and property and from the excessive use of force by government actors. He also claims a state constitutional right to equal protection under the law. To the extent that the New York State Constitution can be read to support a private right of action for a claim of unreasonable search and seizure, that claim has already been disposed of, as discussed in section II.C, *supra.* Further, even if the New York State Constitution could be read to support a private right of action for an equal protection claim, Plaintiff has set forth no facts whatsoever in this Complaint to suggest any equal protection violation of any sort. Accordingly, that claim is also dismissed.

As to Plaintiff's purported state constitutional claim based on excessive force, various federal courts in this circuit have held that "there is no private right of action under the New York State Constitution where, as here, remedies are available under § 1983." *Devito v. Barrant,*

No. 03-CV-1927 (DLI)(RLM), 2005 U.S. Dist. LEXIS 22444, \*24 (E.D.N.Y. Aug. 23, 2005) (citing *Flores v. City of Mount Vernon,* 41 F.Supp.2d 439, 446-47 (S.D.N.Y.1999)). Accordingly, because Plaintiff has stated a claim for excessive force pursuant to § 1983, his claim for excessive force under the New York State Constitution cannot lie. Defendants' motion to dismiss the ninth cause of action is GRANTED in its entirety.

III. Conclusion

For the reasons discussed above, Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART. It is hereby ordered that:

1. Plaintiff's first cause of action is dismissed as it pertains to his allegation of unreasonable search and seizure, but remains active as it pertains to his allegation of excessive use of force.

2. Plaintiff's second cause of action is dismissed as it pertains to his allegation of unreasonable search and seizure, but remains active as it pertains to his allegation of excessive use of force.

**\*8** 3. Plaintiff's third cause of action is dismissed in its entirety.

4. Plaintiff's fourth cause of action is dismissed as it pertains to his allegation of unreasonable search and seizure, but remains active as it pertains to his allegation of excessive use of force.

5. Plaintiff's fifth cause of action is dismissed in its entirety.

6. Plaintiff's sixth cause of action remains active.

7. Plaintiff's seventh cause of action remains active.

8. Plaintiff's eighth cause of action remains active.

9. Plaintiff's ninth cause of action is dismissed in its entirety.

The Clerk of the Court is directed to terminate docket number 15.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2154196 (S.D.N.Y.)

(Cite as: 2007 WL 2154196 (S.D.N.Y.))

IT IS SO ORDERED.

S.D.N.Y.,2007.

Clayton v. City of Poughkeepsie
Not Reported in F.Supp.2d, 2007 WL 2154196
(S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Gary GILLARD, Plaintiff,
v.
Michael ROVELLI, et al., Defendants.
No. 9:09-CV-0860 (NAM/GHL).

Sept. 29, 2010.
Gary Gillard, Attica, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Roger W. Kinsey, Esq., of Counsel, Albany, Ny, for Defendants.

***REPORT-RECOMMENDATION and ORDER***

GEORGE H. LOWE, United States Magistrate Judge.

**\*1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Norman A. Mordue, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Gary Gillard alleges that Defendants subjected him to excessive force, threatened to tamper with his food and interfered with the delivery of sealed meals, denied him adequate medical care, and failed to properly respond to his grievances. Currently pending before the Court are Defendants' motion to vacate the text order entered March 10, 2010, (Dkt. No. 52), Plaintiff's objection to that request (Dkt. No. 55), Defendants' motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) (Dkt. No. 42), and Plaintiff's cross-motion for summary judgment (Dkt. Nos. 72 and 77). For the reasons that follow, I order that Defendants' request to vacate the text order be granted, order that Plaintiff's objection to Defendants' request be denied, recommend that Defendants' motion to dismiss be granted in part and denied in part, and recommend that Plaintiff's

cross-motion for summary judgment be denied.
**I. BACKGROUND**

In broad terms, Plaintiff's complaint involves four issues: the use of excessive force against him by inmate Perez and several DOCS employees, the denial of medical care for ailments he suffered prior to the excessive force incident and injuries he sustained as a result of the excessive force incident, Defendants' threats to tamper with Plaintiff's food, and the handling of grievances Plaintiff filed as a result of these issues.
**A. Excessive Force, Associated Grievances, and Associated Medical Care.**

On December 24, 2008, Plaintiff wrote to Defendants David Rock (Superintendent of Great Meadow Correctional Facility), P. Heath (First Deputy Superintendent), and C.F. Kelly (Deputy of Security) advising them that there was a conspiracy between Defendant Correction Officer Michael Rovelli and other correctional officers to arrange a vigilante gang assault on or murder of Plaintiff. (Dkt. No. 1 ¶ 36.) On December 26, 2008, Plaintiff received a letter from a correctional facility specialist stating that his letter had been forwarded to Defendant David Rock. *Id.* ¶ 38. On January 3, 2009, Plaintiff received a letter from Captain Eastman acknowledging receipt of Plaintiff's complaint. (Dkt. No. 1 ¶ 40.)

On January 6, 2009, Plaintiff wrote a letter to Defendant Richard Roy of the Inspector General's office describing Defendant Rovelli's continued threats and harassment and expressing fear about what would happen to him when he was released from keeplock on January 10, 2009. *Id.* ¶ 41. On January 8, 2009, Vernon Fonda of the Inspector General's office informed Plaintiff that his grievance was being forwarded to Defendant David Rock for further action. *Id.* ¶ 42.

Plaintiff alleges that on February 4, 2009, an inmate "cut the plaintiff in the hearing room on behalf of Michael Rovelli." (Dkt. No. 1.¶ 43.)

**\*2** On February 5, 2009, Defendant Rovelli told

Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

Plaintiff that "it's not over yet mother fucker, go tell you rat bitch mother fucker remember it[']s not over." *Id.* Later that day, Defendant Rovelli shouted at Plaintiff "go rat [,] Gary you fuck[i]n' rat." *Id.* ¶ 44.

On February 11, 2009, Defendant Rovelli came to Plaintiff's cell and said "I have the power not you. I brought you back. It's not over yet and the next one will be better[,] you piece of shit." *Id.* ¶ 45. Thereafter, Defendant Rovelli had Defendant Correction Officer M. Rock assist him in denying food to Plaintiff in order to "keep him weak so he could not defend himself against the setup contract [h]it." *Id.* ¶ 46.

On April 25, 2009, Plaintiff went to the big recreation yard for the first time in about two months. *Id.* ¶ 47. Two inmates informed him that Defendant M. Rock had told Defendant Rovelli that Plaintiff was in the yard and that "today was a good day to get him ." *Id.* As Plaintiff walked around the yard, he noticed Defendant Rovelli glaring at him. *Id.* ¶ 48. Defendant Rovelli went to a table where Defendant inmate Eric Perez was sitting. *Id.* Shortly thereafter, Defendant Perez attacked Plaintiff without warning. *Id.* Plaintiff attempted to defend himself and hoped the officers would stop the attack. (Dkt. No. 1 ¶ 49.) Instead, Defendant Rovelli forced his knee into Plaintiff's head and said "I told you I would get you[.] You just got beat by a fagg[o]t[,] you can't fight." *Id.* Defendant Rovelli then instructed Defendant Corrections Officer Frank Flores to take Plaintiff "into beat up Room # 1[,] I'll be right there." *Id.* ¶ 50.

Once in the room, Plaintiff was placed with his toes and face to the wall. *Id.* ¶ 51. Defendant Sergeant Nicholas Deluca entered the room and said "Perez should have put [six] inches of ste[e]l into you, you piece of shit, but we will finish what he started." *Id.* ¶ 52. Then Defendant Rovelli came in, said "you can't fight, you got beat by a fagg[o]t," and slammed Plaintiff's face into the wall twice. *Id.* ¶ 53. Plaintiff's "lights went out" and he "could not see for a few seconds but heard [Defendant] Rovelli state his face was bleeding as well as the plaintiff[']s." *Id.* Plaintiff was then "beaten to the flo[or]" by Defendants Deluca and Flores and Defendant Correction Officer Shattuck as blood ran nonstop from two cuts around Plaintiff's right eye. *Id.* ¶ 54. Plaintiff tried to "cover up into the wall to

stop the blows from reaching [his] face," but Defendant Rovelli grabbed the hood of Plaintiff's sweat suit and exposed his face so that Defendant Rovelli and Defendants Deluca, Flores, and Shattuck could hit it. *Id.* ¶ 55. This continued for fifteen or twenty minutes. *Id.* Plaintiff's hands were cuffed behind his back the entire time. *Id.* Defendant Sergeant Colin Fraser, Defendant Sergeant Michael Hoy, and Defendant Correction Officer H. Foster joined in by kicking Plaintiff in the back, head, buttocks, legs, spine, and shoulders. *Id.* ¶ 56.

**\*3** Defendants Deluca and Shattuck forced Plaintiff onto his feet "due to the large amount of blood all over the floor and [P] laintiff s clothing" and took him to a different room. *Id.* ¶ 57. There, Defendant Shattuck pinned Plaintiff against a sink and punched Plaintiff in the ribs and back while Defendant Deluca hit Plaintiff in the face, eyes, nose, and jaw. (Dkt. No. 1 ¶ 57.)

Once the blood was cleaned up in the first room, Defendants Deluca and Shattuck returned Plaintiff there and punched him in the face, knocking him to the floor. *Id.* ¶ 58. Defendants Deluca and Shattuck continued to kick and stomp Plaintiff's legs, ankles, ribs, and chest. *Id.* As this was happening, Defendant Fisher Nesmith opened the door and said "[A]re you done yet[?] If not, take your time." *Id.* ¶ 59. Defendant Nesmith then slammed the steel door into Plaintiff's head as he lay "on the floor bloody and broken up." *Id.*

After the beating was over, Plaintiff was taken to an examination room. There, Defendant J. Leos "did a vis[ua]l inspection" of Plaintiff and documented some of Plaintiff's injuries. *Id.* ¶ 60. Plaintiff alleges that these injuries included broken ribs, broken left hand, and broken eardrum. *Id.* ¶ 62. Defendant Leos did not say anything or ask any questions. *Id.* ¶ 60. He did not give Plaintiff any medical assistance other than to wash the blood off of Plaintiff's face and head. *Id.* Defendant Leos entered a false time on his report to "cover up for beating." *Id.* Defendant Nesmith then attempted to stitch the cuts around Plaintiff's eye, but Plaintiff refused treatment because Defendant Nesmith had participated in the use of excessive force. *Id.* ¶ 61.

Pictures were taken of Plaintiff's injuries. *Id.* ¶ 63.

Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

Defendant Foster and Defendant Sergeant Nabozny then escorted Plaintiff to the Special Housing Unit ("SHU"). *Id.*

After the beating, Plaintiff saw Defendant Counselor Brian McAllister. *Id.* ¶ 65. Plaintiff asked Defendant McAllister to contact Plaintiff's family and inform them of his injuries. *Id.* Later, Plaintiff's family contacted the prison and Defendant McAllister refused to give them any information. *Id.* ¶ 66.

Sometime after the alleged use of excessive force, Plaintiff was taken to the medical unit, where he was seen by Defendant Janet Collins. (Dkt. No. 1 ¶ 70.) She informed him that his "left eardrum had a hole in it but it should heal in time" and gave him ibuprofen for pain. *Id.* Plaintiff asked for x-rays of his face, neck, back, and left hand and an H.I.V. test due to the "cutting" on February 4, 2009. *Id.* Defendant Collins told Plaintiff that the pain "was from getting old" and denied his request for x-rays. *Id.*

Plaintiff alleges that in order to cover up the use of excessive force, Defendant Lieutenant K.H. Smith, Defendant Lieutenant Peter Besson, and Defendants Kelly, Foster, Flores, Shattuck, Rovelli, Hoy, and Deluca filed false misbehavior reports charging Plaintiff with fighting, violent conduct, refusing a direct order, and assault on staff. *Id.* ¶ 67.

**\*4** Plaintiff filed three grievances regarding the use of excessive force and the medical care he received thereafter. *Id.* ¶ 68. No one responded. *Id.*

**B. Medical Issues Predating the Alleged Use of Excessive Force**

On October 20, 2008, Plaintiff filed a grievance because he was denied access to sick call. (Dkt. No. 1 ¶ 83.) Plaintiff alleges that his grievance was denied "at all levels of [a]ppeal." *Id.*

On March 26 and 29, 2009, Plaintiff submitted requests to be seen at sick call to receive medication and an AIDS/HIV test due to being cut by an inmate. *Id.* ¶¶ 84, 85.

On April 8, 2009 Plaintiff filed another grievance. *Id.*

¶ 86.

On April 10, 2009, Plaintiff was seen by Defendant Silverberg but was told it was a "[five] year physical" rather than an appointment to address Plaintiff's concerns. *Id.* ¶ 87. Plaintiff then refused treatment. *Id.* Afterward, Plaintiff filed another grievance regarding the denial of treatment for his medical concerns. (Dkt. No. 1 ¶ 88.)

On April 14, 2009, Plaintiff was seen by Defendant Lindemann who informed Plaintiff that because he refused the five year physical he would receive no more treatment. *Id.* ¶ 89. At Plaintiff's request Defendant Lindemann checked Plaintiff's throat but found nothing. *Id.* Plaintiff claims he had been "hacking all day every day" for "over [one] year." *Id.* Afterward, Plaintiff filed another grievance regarding medical care. *Id.* ¶ 90.

On April 17, 2009, Plaintiff received a response from the Superintendent's office stating that after a review of Plaintiff's medical records, Plaintiff had received the opportunity to address his concerns and had received "[a]dequate medical care as well as medication." *Id.* ¶ 93.

Plaintiff alleges that he was called to see Defendant Silverberg on April 24, 2009, but that he was "forced to sit 20 minutes" after the Defendant Nurse Labrum took his vitals by Defendant Silverberg, who "was in a room doing nothing just to make the plaintiff suffer." (Dkt. No. 1 ¶ 95.) When Defendant Silverberg "finally" called Plaintiff into the examination room, he said "so, we are going to look at your throat today." *Id.* ¶ 96. When Plaintiff asked "what about the ears, headaches, and HIV test," Defendant Silverberg said "only the throat[,] one thing at a time." *Id.* Plaintiff "objected and stated it's been over 1 year and every time is denied the review of issues and concern[ ]s of matters that are not getting check out ever." *Id.* Defendant Silverberg then looked into Plaintiff's throat and said he did not see anything. *Id.* ¶ 97. Plaintiff asked him to get "the stix" and look at the back of his throat. *Id.* Without putting on a glove, Defendant Silverberg grabbed a "stix," handled it from "one end to the other" and told Plaintiff to open his mouth. *Id .* When Plaintiff objected "to this unhygienic act," Defendant Silverberg "threw the stix to the floor and said do not come [b]ack ever to sick call." *Id.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

**\*5** Plaintiff alleges that Defendant David Rock was "continuously ... informed of the medical needs of the [P]laintiff and the deliberate black balling by [the] medical department, [but] has refused to stop, correct or grant any medical relief and continued to file false response[s] to all matters of concern thus causing the [P]laintiff to live in continued pain day and night without relief." (Dkt. No. 1 ¶ 98.)

**C. Issues with Plaintiff's Food**

After the use of excessive force, Defendant Deluca told Plaintiff that he should not eat prison food because "we control everything[,] even the inmates who make your food." *Id.* ¶ 64. Plaintiff went on a hunger strike because of this threat concerning his food. *Id.* ¶¶ 69, 78, 79. In response, Defendant Heath ordered that Plaintiff receive sealed kosher meals. *Id.* ¶ 69. On May 1, 2009, "the meals w[ ]ere stopped by someone overriding that order" and Plaintiff went back on hunger strike. *Id.* ¶ 71.

Defendant David Lindemann came to Plaintiff's cell on May 5, 2009, "threatening the plaintiff and demanding the plaintiff come to the gate or he will have the plaintiff [d]ragged to the [h]ospital to be force[ ] fe[ ]d." (Dkt. No. 1 ¶ 72.) A few minutes later, four officers and a sergeant ordered Plaintiff out of his cell and force-walked him to the medical unit. *Id.* Plaintiff was "force[d]" to see Defendant Doctor Howard Silverberg, who "has continued to file false information into plaintiff's medical file, refuse to give medical treatment or medication for [i]llness.... Silverberg ask[ed] [whether] I[was] going to eat the food I stated no he said Good we get to force feed you, you will not enjoy that I assure you and walked out ordering staff to place me in Isolation Room # 2." (Dkt. No. 1 ¶ 73.) Defendant Deluca came into the room. *Id.* ¶ 74. He said he hated Plaintiff and hoped that he would die. *Id.* He also informed Plaintiff that he "can't wait to start the force feeding as he will be there two times a day to put shit down the plaintiff's throat." (Dkt. No. 1 ¶ 74.) Defendant Heath came to the hospital "seeking to resolve the [h]unger [s]trike [i]ssue and state[d] what[ ]ever the doctor states will be the outcome if he orders medical meal when you will get it." *Id.* ¶ 75.

On "May 7, 2009, Doctor Carandy came to talk to

plaintiff with ... other officers [and] stated he would give [d]iet meal sealed exrays (sic) and medication for pain ... Carandy stated if we don[']t give him the meal it will only start the hunger strike all over again." (Dkt. No. 1 ¶ 76.)

On May 8, 2009, Defendant Nurse Terry "in retaliation stated the plaintiff refused [x-rays] and threatened him he would be out of there that day." *Id.* ¶ 77. Plaintiff was ultimately given sealed diet meals three times a day but was "forced to eat it with a tube of toothpaste due to officers refusing to give a spoon in [r]etaliation." *Id.* ¶ 78.

**\*6** On May 11, 2009, Plaintiff was returned to the SHU. *Id.* ¶ 79. Once Plaintiff was returned to the SHU, Defendant Deluca and Defendant Terry stopped deliveries of Plaintiff's special meals. *Id.* ¶ 76. Plaintiff "lived on water [,] milk[,] sugar and sealed [i]tems that came with different meals starving in fear of being poisoned." *Id.*

**II. DEFENDANTS' MOTION TO VACATE THE COURT'S MARCH 10, 2010, ORDER**

On February 5, 2010, Plaintiff requested the entry of default against Defendants Shattuck, Poirier, Fischer, Nesmith, Lindemann, Labrum, Kelly, Flores, and Aubin. (Dkt. No. 47.) On March 10, 2010, I granted Plaintiff's request in part and denied it in part. (Text Order of Mar. 10, 2010.) Noting that Defendants Kelly, Nesmith, Lindemann, Fischer, and Labrum are explicitly mentioned in Defendants' memorandum of law regarding motion to dismiss, I denied the request as to those Defendants. *Id.* However, I granted the request as to Defendants Flores, Shattuck, Aubin, and Poirier because they had not answered the complaint and were not mentioned in Defendants' notice of motion to dismiss (Dkt. No. 42), the proof of service of the motion to dismiss (Dkt. No. 42), or anywhere in Defendants' memorandum of law filed in support of the motion to dismiss (Dkt. No. 42-1). (Text Order of Mar. 10, 2010.) It was therefore "unclear whether [they] are included in the motion to dismiss." *Id.*

On March 12, 2010, Defendants filed a request to set aside the default. (Dkt. No. 52.) In that letter, defense counsel stated:

I had thought that by specifically indicating that the motion was being made on their behalf by expressly

Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

stating as much with the Court's electronic filing system, that it would be clear the motion was being made on behalf of all the persons I so designated ... I verily believed that by using the Court-supplied filing system and expressly indicating therein that I was filing the motion on behalf of all these 28 clients ... that those contemplating the motion would realize that the motion to dismiss was being made on behalf of all 28 of the individuals indicated. I did not realize that by expressly indicating that the motion was being filed on their behalf with the electric filing system that there could be confusion as to on whose behalf I was making the application.

*Id.* at 1.

The twenty-eight names that counsel listed in the entry on the Court's electronic filing system included two defendants (M. Rock [FN1] and Brian Fischer [FN2]) who have never been served. The list also included one Defendant (David Rock) for whom the Court did not receive an acknowledgment of service form until six weeks after the motion to dismiss was filed. (Dkt. No. 58.) Moreover, the list did not include one Defendant (Terry), who has not been served [FN3] but about whom defense counsel asserted arguments in the memorandum of law. (Dkt. No. 42-1 at 11.) Thus, the list that defense counsel cites as being "clear" was inaccurate and, thus, unreliable.

> **FN1.** When Plaintiff completed USM-285 forms for service of the complaint, he indicated that Defendant M. Rock's true name was Todd Martineau. (Dkt. No. 11.) The Clerk advised Plaintiff that he would need to amend his complaint to substitute Todd Martineau's name before he could be served with the complaint. *Id.* To date, Plaintiff has not amended his complaint to name "Todd Martineau" or filed any forms requesting service on "M. Rock." Therefore, Defendant "M. Rock" has not been served and has not appeared in the action.

> **FN2.** The summons for Defendant Fischer was returned unexecuted, accompanied by a note from the United States Marshal for the Northern District of New York indicating that Defendant

Fischer had not returned the Acknowledgment of Receipt of Summons and Complaint by Mail form within thirty days of the initial mailing of the summons. (Dkt. No. 62.) The note instructed Plaintiff to submit a new summons and complaint form to serve Defendant Fischer and warned that failure to do so could result in dismissal of the complaint against Defendant Fischer. *Id.*

> **FN3.** The summons for Defendant Terry was returned unexecuted, accompanied by a note from the Inmate Records Coordinator stating that she was unable to identify Nurse Terry and would need more information. (Dkt. No. 29.) On February 3, 2010, the Clerk forwarded a copy of the note to Plaintiff and asked him to provide any additional information about the defendant to the Court. (Dkt. No. 46.)

**\*7** In light of this ambiguity, before granting the request for entry of default, the Court thoroughly reviewed Defendants' memorandum of law and found no mention of Defendants Flores, Shattuck, Aubin, or Poirier. The Court found this omission particularly striking in the case of Defendants Aubin and Poirier, who easily could have been included (as discussed more fully below) in the section of the memorandum of law discussing lack of personal involvement. Further, it appeared to the Court that Defendants' motion, despite not being labeled as such, was only a partial motion to dismiss because it did not assert any reasons for dismissing Plaintiff's excessive force claims. Thus, it was reasonable to conclude that perhaps the motion had not been filed on behalf of every Defendant. Based on this ambiguity, and the apparent confusion it caused Plaintiff (a *pro se* civil rights litigant, to whom I must grant special solicitude), entry of default was appropriate as of March 10, 2010.

However, I now grant Defendants' motion to set aside the default. Pursuant to Rule 55(c) of the Federal Rules of Civil Procedure, "[t]he court may set aside an entry of default for good cause ..." [FN4] It is well-settled in the Second Circuit that defaults are not favored, and that there is a strong preference for resolving disputes on their merits. *See Brien v. Kullman Indus., Inc.,* 71 F.3d 1073, 1077 (2d Cir.1995); *Traguth v. Zuck,* 710 F.2d 90, 94 (2d

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

Cir.1983). In light of Defendants' clarification of their ambiguous motion, I find that they have established good cause to set aside the default, and I therefore order the Clerk to vacate the text order of March 10, 2010, and the entry of default (Dkt. No. 51).

> FN4. Rule 60(b) provides, *inter alia,* that in the case of "mistake, inadvertence, surprise or excusable neglect," a court may relieve a party from a final judgment, order or proceeding. Fed.R.Civ.P. 60(b).

## III. DEFENDANTS' MOTION TO DISMISS

## A. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U .S. 544, 570 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not shown-that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

**\*8** "In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as

true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

## B. Medical Care

Plaintiff alleges that Defendants Silverberg, Nesmith, Lindemann, Labrum, Leos, and Collins violated his Eighth Amendment rights by failing to provide him with adequate medical care.[FN5] (Dkt. No. 1 ¶¶ 60, 61, 68, 70, 72-73, 76-77, 87-89, 94-98.) Plaintiff's claims against Defendants Leos, Nesmith, and Collins relate to medical care for injuries sustained as a result of the alleged use of excessive force. Plaintiff's claims against Defendants Silverberg, Lindemann, and Labrum relate to medical care prior to the incident. Defendants argue that Plaintiff has failed to state an Eighth Amendment claim. [FN6] (Dkt. No. 42-1 at 5-11.)

> FN5. Defendants' motion to dismiss does not explicitly address the Eighth Amendment medical claims against Defendants Labrum or Nesmith.

> FN6. Defendants assert that the complaint also alleges that Defendants McAllister, Deluca, Heath, and Holland violated Plaintiff's Eighth Amendment right to adequate medical care. (Dkt. No. 42-1 at 11.) The complaint does not appear to allege that Defendant McAllister was involved in Plaintiff's medical care. Rather, it alleges that Defendant McAllister was a corrections counselor (Dkt. No. 1 ¶ 31) who failed to inform Plaintiff's family about his injuries. (Dkt. No. 1 ¶¶ 65-66.) The complaint does not appear to allege that Defendant Deluca was involved in Plaintiff's medical care. Although allegations about him appear in a section of the complaint titled "Statement of Facts, Misuse of Force, Denial of Medical Care," those allegations involve excessive force, threats, false misbehavior reports, and issues with Plaintiff's food. (Dkt. No. 1 ¶¶ 52, 54-55, 57-58, 64, 67, 69, 74, 76.) The complaint does not appear to allege that Defendant Heath was involved in Plaintiff's medical care. Rather it alleges that he

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

was informed about Defendant Rovelli's threats against Plaintiff and was involved in issues regarding Plaintiff's food. (Dkt. No. 1 ¶¶ 36, 39, 69, 75.) Regarding Defendant Holland, the complaint alleges only that he failed to investigate the "setup, [b]eating[,] and complaints." (Dkt. No. 1 ¶ 80.)

The Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). In fulfilling this duty, prison officials must ensure, among other things, that inmates receive adequate medical care. *Farmer,* 511 U.S. at 832 (citing *Hudson v. Palmer,* 468 U.S. 517, 526-27 (1984)). There are two elements to a prisoner's claim that prison officials violated his Eighth Amendment right to receive medical care: "the plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009) (citation and punctuation omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003). Defendants argue that Plaintiff has not stated a claim as to either element. (Dkt. No. 42-1 at 10-11.) I will address Plaintiff's pre-excessive force claims and post-excessive force claims separately.

*1. Medical Care for Injuries Sustained in Alleged Excessive Force Incident*

Plaintiff alleges that Defendants Leos, Nesmith, and Collins were deliberately indifferent to the following injuries that Plaintiff sustained in the alleged excessive force incident: (1) a loss of consciousness that lasted for a few seconds; (2) two cuts around his right eye, which bled profusely; (3) broken ribs; (4) broken hand; and (5) broken ear drum. (Dkt. No. 1 ¶¶ 53, 54, 62, 70.)
**\*9** Defendants argue that the complaint fails to satisfy the objective prong of the Eighth Amendment inquiry because Plaintiff "fails to articulate a serious medical need." (Dkt. No. 42-1 at 10.) A "serious medical condition" is "a condition of urgency, one that may

produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting) (citations omitted), *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702-03.

Defendants address only Plaintiff's allegation that he suffered two cuts around his eye, arguing without citation to authority that the allegation does not "present or describe a serious medical need ." (Dkt. No. 42-1 at 10.) I find that the complaint alleges facts plausibly suggesting that Plaintiff suffered injuries that could "produce death, degeneration, or extreme pain" as a result of the alleged use of excessive force. *See Jackson v. Johnson,* 118 F.Supp.2d 278, 291 (N.D.N.Y.2000) (loss of consciousness is a serious medical condition); *Ellis v. Guarino,* No. 03 Civ. 6562, 2004 U.S. Dist. LEXIS 16748, at\*33-34, 2004 WL 1879834, at \*11 (S.D.N.Y. Aug. 24, 2004) ("When Plaintiff arrived at the SHU followed the alleged attacks ... he allegedly had swelling on his face, contusions in both ears and on his forehead, abrasions on his shoulder, a one millimeter laceration in his right eye, and suffered from blurred vision, headaches, dizziness and ringing in his ears, the latter two of which continued for several days thereafter.... Such injuries clearly constitute a serious medical condition for Eighth Amendment purposes."); *Griffin v. Donelli,* No. 05-CV-1072 (TJM/DRH), 2010 U.S. Dist. LEXIS 125271, at \*22, 2010 WL 681394, at \*8 (N.D.N.Y. Feb. 24, 2010) (*citing Torres v. New York City Dep't of Corrs.,* No. 93-CV-6296 (MBM), 1995 U.S. Dist. LEXIS 1698, at \*4, 1995 WL 63159, at \*1 (S.D.N.Y. Feb. 15, 1995)) (stating that a broken rib "could present a serious medical need" if treatment was not properly administered); *Bryan v. Endell,* 141 F.3d 1290, 1291 (8th Cir.1998) (broken hand is a serious medical condition); *Odom v. Kerns,* No. 99-CV-10668, 2008 U.S. Dist. LEXIS 47336, at \*27-28,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

2008 WL 2463890, at * 8 (S.D.N.Y. June 18, 2008) (ruptured eardrum is a serious medical condition).

Defendants argue that Plaintiff's complaint does not state a claim as to the subjective Eighth Amendment prong because the "shear number of examinations, discussions and attempts to aid [P]laintiff forecloses any allegation of indifference, deliberate or otherwise...." (Dkt. No. 42-1 at 11.)

*10 Medical mistreatment rises to the level of deliberate indifference where it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " Chance, 143 F.3d at 703 (quoting Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir.1996)). Thus, to establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. Farmer, 511 U.S. at 837; Chance, 143 F.3d at 702-703. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. Farmer, 511 U.S. at 835; Ross v. Giambruno, 112 F.3d 505 (2d Cir.1997). An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." Estelle v. Gamble, 429 U.S. 97, 105-06 (1976). Moreover, a complaint that "a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." Id. at 106. Stated another way, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." Id.; Smith, 316 F.3d at 184 ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation.").

I find that Plaintiff has alleged facts plausibly suggesting that Defendant Leos was deliberately indifferent to his serious medical needs. Plaintiff alleges that "[a]fter the beating was over the plaintiff was ... taken to [an] exam room where J. Leos did a visual inspection of the plaintiff[']s body documenting some of the injur[ie]s

not saying anything of asking any questions and gave no medical assistance other than wash the blood off the face and head of the plaintiff." (Dkt. No. 1 ¶ 60.) Plaintiff alleges that Defendant Leos entered a false time on his medical note in order to cover up the beating. Id. Accepting Plaintiff's allegations that his ribs, hand, and eardrum were broken as a result of the alleged excessive force incident as true, as I must for the purposes of this motion, the complaint plausibly suggests that Defendant Leos was aware of facts from which he could have drawn the inference that Plaintiff had a serious medical need, actually drew that inference, and ignored that medical need. Therefore, I recommend that the Court deny Defendants' motion to dismiss the Eighth Amendment medical claim against Defendant Leos.

Plaintiff has not stated an Eighth Amendment medical claim against Defendant Nesmith or Defendant Collins. Plaintiff admits that he refused treatment when Defendant Nesmith attempted to stitch the cuts around Plaintiff's eye. (Dkt. No. 1 ¶ 61.) Given Plaintiff's allegations about Defendant Nesmith's earlier conduct, Plaintiff's refusal is understandable. However, it negates his allegation that Defendant Nesmith was deliberately indifferent to his serious medical needs. See Rivera v. Goord, 253 F.Supp.2d 735, 756 (S.D.N.Y.2003). Plaintiff's allegations regarding Defendant Collins amount to mere disagreement regarding proper treatment, which is insufficient to establish deliberate indifference. Estelle, 429 U.S. at 107 ("[T]he question of whether an X-ray-or additional diagnostic techniques or forms of treatment-is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice...."). Therefore, I recommend that the Court grant Defendants' motion to dismiss the Eighth Amendment medical claim against Collins and that the Court sua sponte dismiss the Eighth Amendment medical care claim against Defendant Nesmith.

*11 Where a pro se complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation

Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

omitted). However, an opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." *Cuoco,* 222 F.3d at 112 (citation omitted). Because Plaintiff has admitted that he refused care from Defendant Nesmith, I recommend that the Court dismiss the Eighth Amendment medical claim against Defendant Nesmith without leave to amend. However, I recommend that the medical claim against Defendant Collins be dismissed without prejudice.

### 2. *Medical Care For Conditions That Pre-Dated the Alleged Use of Excessive Force*

Plaintiff alleges that Defendants Silverberg, Lindemann, and Labrum were deliberately indifferent to medical conditions that predated the alleged use of excessive force. (Dkt. No. 1 ¶¶ 70, 87, 89, 95-97.) Those conditions were: (1) a need for H.I.V. testing "due to cutting on February 4, 2009"; (2) a need for asthma medication; (3) a "cough in throat due to bum[p]s growing in throat area" that lasted over a year; (4) a rash on his face; (5) a need for nose spray; (6) elbow pain that lasted for five years; (7) lower back and spine pain; (8) left ankle pain; and (9) a need for glasses. (Dkt. No. 1 ¶¶ 84-85, 89, 92.)

Defendants argue that these claims should be dismissed because Plaintiff has not sufficiently alleged any serious medical need or deliberate indifference. (Dkt. No. 42-1 at 5-11.) Defendants are correct. Plaintiff has not alleged facts plausibly suggesting that any of these conditions were injuries that a reasonable doctor or patient would find important and worthy of comment or treatment, that they affected his daily activities, or that they caused chronic and substantial pain. *Chance,* 143 F.3d at 702-03; *Sledge v. Kooi,* 564 F.3d 105, 107, 108 (2d Cir.2009) (asthma not a serious medical condition); *Lewal v. Wiley,* 29 Fed. App'x 26, 29 (2d Cir.2002) (persistent rash is not a serious medical condition); *Veloz v. New York,* 35 F.Supp.2d 305, 309, 312 (S.D.N.Y.1999) (prisoner's foot problem, which involved arthritis and pain, did not constitute a serious medical need); *Veloz v. New York,* 339 F.Supp.2d 505, 522-26 (S.D.N.Y.2004) (plaintiff's chronic back pain and mild to moderate degenerative arthritis of spinal vertebrae did not establish a serious medical need); *but see Sereika v. Patel,* 411 F.Supp.2d 397, 406

(S.D.N.Y.2006) (allegations of "severe pain ... [and] reduced mobility ..." in the shoulder are sufficient to raise a material issue of fact as to a serious medical need).

Even if Plaintiff had alleged facts plausibly suggesting the existence of a severe medical condition, I would recommend dismissing the claims against Defendants Lindemann, Labrum, and Silverberg because Plaintiff has not sufficiently alleged deliberate indifference. Plaintiff alleges merely that at his request, Defendant Lindemann checked his throat and found nothing. Although he told Plaintiff that Plaintiff could not receive further treatment, Plaintiff did in fact see a doctor again only ten days later. Regarding Defendant Labrum, Plaintiff alleges only that she took his vital signs and had him wait twenty minutes to see Defendant Silverberg. Although Plaintiff alleges that Defendant Silverberg behaved somewhat unprofessionally, these allegations as currently pleaded do not rise to the level of deliberate indifference. Therefore, I recommend that the Court dismiss the Eighth Amendment medical claims against Defendants Lindemann, Labrum, and Silverberg without prejudice.

### C. Personal Involvement

**\*12** Defendants argue that the complaint does not plausibly allege that Defendants Fischer [FN7], Roy, David Rock, Heath, Nabozny, or Kelly [FN8] were personally involved in any alleged constitutional violation. (Dkt. No. 42-1 at 12-14.) With the exception of Defendant Kelly, Defendants are correct.

> FN7. As noted above, according to the Court's records Defendant Fischer has not been served in this action. (Dkt. No. 62.)

> FN8. Defendants also argue that "Plaintiff has merely alleged *respondeat superior* liability" against Defendant Collins and that Plaintiff "names Defendant Labrum but makes no further allegation." (Dkt. No. 42-1 at 12-13.) This is inaccurate. As discussed above, Plaintiff claims that each of these Defendants violated his Eighth Amendment right to adequate medical care.

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In order to prevail on a cause of action under 42 U .S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985). In other words, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Rather, supervisory personnel may be considered "personally involved" if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). [FN9]

FN9. The Supreme Court's decision in *Ashcroft v. Iqbal,* ---U.S. ----, 129 S.Ct. 1937 (2009) arguably casts in doubt the continued viability of some of the categories set forth in *Colon. See Sash v. United States,* 674 F.Supp.2d 531 (S.D.N.Y.2009). Here, the Court will assume *arguendo* that all of the *Colon* categories apply.

The complaint does not include any allegations about Defendants Fischer, Aubin, or Poirier.[FN10] Therefore, I recommend that the claims against these Defendants be dismissed for lack of personal involvement.

FN10. As discussed above, Defendants did not explicitly argue that the action against Defendants Aubin and Poirier should be dismissed. Moreover, although Defendants

argue that Defendant Fischer was not personally involved, Defendant Fischer has not yet been served in this action. (Dkt. No. 62.) I recommend that the Court dismiss these Defendants *sua sponte* without prejudice.

Regarding Defendants Roy and Heath, the complaint alleges only that they failed to respond to Plaintiff's letters and grievances. (Dkt. No. 1 ¶¶ 36, 39, 41, 69, 75.) A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that the official "failed to remedy that violation after learning of it through a report or appeal" or "exhibited deliberate indifference ... by failing to act on information indicating that the violation was occurring." *Rivera v. Goord,* 119 F.Supp.2d 327, 344-45 (S.D.N.Y.2000). *See also Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997) ("The law is clear that allegations that an official ignored a prisoner's letter are insufficient to establish liability."). Similarly, "an allegation that an official ignored a prisoner's letter of protest and request for investigation of allegations made therein is insufficient to hold that official liable for the alleged violations ." *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002) (quoting *Greenwald v. Coughlin,* No. 93 Civ. 6551, 1995 U.S. Dist. LEXIS 5144, at *11, 1995 WL 232736, at * 4 (S.D.N.Y. Apr. 19, 1995)). Therefore, I recommend the claims against Defendants Roy and Heath be dismissed for lack of personal involvement.

**\*13** The complaint alleges that Defendant David Rock ignored several grievances (Dkt. No. 1 ¶¶ 36, 39) and that his response to a grievance regarding medical care pre-dating the excessive force incident was unsatisfactory (Dkt. No. 1 ¶ 93). As discussed in the previous paragraph, the allegation that Defendant David Rock failed to respond to grievances is insufficient to plausibly suggest that he was personally involved in any constitutional violation. As discussed above in Section III(B)(2), Plaintiff has not stated an Eighth Amendment claim regarding medical care pre-dating the excessive force incident. Thus, Defendant David Rock was not made aware of an Eighth Amendment medical violation and was not personally involved with any constitutional violation. Therefore, I recommend that the Court dismiss the claims against Defendant David Rock without prejudice.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

Regarding Defendant Nabozny, the complaint alleges, in full, that "Pictures were taken of the plaintiff's injuries with 2 different cameras as the visual inspection and pictures being take[n] w[ ]ere all on video the the (sic) video escorted the plaintiff to ... Special Housing Unit by Defendant Foster and Defendant Nabozny." (Dkt. No. 1 ¶ 63) (syntax in original). This is insufficient to allege Defendant Nabozny's personal involvement in any constitutional violation and I therefore recommend that Defendants' motion to dismiss the claim against Defendant Nabozny be granted. Defendants argue that "Plaintiff has merely alleged *respondeat superior* liability" against Defendant Kelly. (Dkt. No. 42-1 at 13.) This is not accurate. The complaint alleges that Defendant Kelly participated in writing false misbehavior reports to cover up the excessive force incident. (Dkt. No. 1 ¶ 67.) This allegation is potentially sufficient to state a claim against Defendant Kelly for retaliation. *See Snyder v. McGinnis, No. 03-CV-0909, 2004 U .S. Dist. LEXIS 17976, at *24-26, 2004 WL 1949472, at *8 (W.D.N.Y. Aug. 31, 2004).* Therefore, I recommend that the Court deny Defendants' motion to dismiss the claim against Defendant Kelly for lack of personal involvement.

**D. Claim Against Defendant McAllister**

Plaintiff alleges that Defendant McAllister violated his legal rights by failing to communicate with his family regarding his injuries. (Dkt. No. 1 ¶¶ 65-66.) Defendants move to dismiss this claim, arguing that "[v]iolations of state law or regulations in themselves do not state a viable section 1983 claim." (Dkt. No. 42-1 at 14.) Neither Plaintiff nor Defendants have identified what policy Defendant McAllister's actions may have violated. In any case, I find that the complaint does not plausibly suggest that Defendant McAllister violated any constitutional right and therefore recommend that the Court grant Defendants' motion to dismiss the claim.

**E. Threats**

Plaintiff alleges that, at various times, Defendants Rovelli, Deluca, Lindemann, and Silverberg threatened him. (Dkt. No. 1 ¶¶ 43-45, 64, 72-74.) Defendants argue that Plaintiff's allegations that Defendants Deluca, Lindemann, and Silverberg threatened him do not state a constitutional claim. [FN11] (Dkt. No. 42-1 at 14-16.)

Defendants' motion does not address the allegations that Defendant Rovelli threatened Plaintiff.

> FN11. Defendants also characterize the allegations in Paragraph 75 of the complaint regarding Defendant Heath's statement that "what ever the doctor states will be the outcome if he orders medical meal you will get it" as an allegation that Defendant Heath threatened Plaintiff. (Dkt. No. 42-1 at 15.) It does not appear to the undersigned that Plaintiff alleges that Defendant Heath threatened him. However, to the extent that the complaint can be read to assert such a claim, I recommend that it be dismissed with prejudice.

**\*14** "It is well established that mere threatening language and gestures of a custodial officer do not ... amount to constitutional violations." *Alnutt v. Cleary, 913 F.Supp. 160, 165 (W.D.N.Y.1996)* (punctuation omitted). Therefore, to the extent that Plaintiff alleges that Defendants Rovelli, Deluca, Lindemann, and Silverberg violated his constitutional rights simply by threatening him, I recommend that the Court dismiss those claims with prejudice.

**F. Claim Against Defendant Holland**

The complaint alleges that Defendant Holland [FN12] was "allegedly investigating the setup, [b]eating and complaints which was not the fact at all." (Dkt. No. 1 ¶ 80.) Prisoners do not have a due process right to a thorough investigation of grievances. *Torres v. Mazzuca, 246 F.Supp.2d 334, 341-42 (S.D.N.Y.2003).*

> FN12. Defendant Holland is listed in the complaint as "Hollin." Defendants note that "Holland" is the correct spelling. (Dkt. No. 42-1 at 13 n. 2.)

The First Amendment protects a prisoner's right to meaningful access to the courts and to petition the government for the redress of grievances. *See Bill Johnson's Rest., Inc. v. NLRB, 461 U.S. 731, 741, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983).* However, inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

procedures do[ ] not give rise to a cognizable § 1983 claim. *Cancel v. Goord,* No. 00 Civ.2042, 2001 WL 303713, *3 (S.D.N.Y. Mar. 29, 2001). If prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of that claim. *See Flick v. Alba,* 932 F.2d 728, 729 (8th Cir.1991). "Therefore, the refusal to process an inmate's grievance or failure to see to it that grievances are properly processed does not create a claim under § 1983." *Cancel,* 2001 WL 303713, at *3; *see also Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003); *Mahotep v. DeLuca,* 3 F.Supp.2d 385, 390 (W.D.N.Y.1998).

*Shell v. Brzezniak,* 365 F.Supp.2d 362, 369-370 (W.D.N.Y.2005). Therefore, I recommend that the Court dismiss the claim against Defendant Holland.

**G. Eleventh Amendment**

Plaintiff sues Defendants "in [their] individual and official capacities." (Dkt. No. 1 at 1-3.) Defendants move to dismiss the official-capacity claims, arguing that any claims for damages against them in their official capacities are barred by the Eleventh Amendment. (Dkt. No. 42-1 at 16-17.) Defendants are correct.

The Eleventh Amendment has long been construed as barring a citizen from bringing a suit against his or her own state in federal court, under the fundamental principle of "sovereign immunity." *See* U.S. Const. amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); *Hans v. Louisiana,* 134 U.S. 1, 10-21 (1890); *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 267 (1997); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984). State immunity extends not only to the states, but to state agencies and to state officers who act on behalf of the state. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf,* 506 U.S. 139, 142-47 (1993); *Pennhurst State Sch. & Hosp.,* 465 U.S. at 101-06.

**\*15** The Eleventh Amendment bars suits for damages against state officials acting in their official capacities.[FN13] All DOCS employees are state officials for the purposes

of the Eleventh Amendment. *See e.g. Davis v. New York,* 316 F.3d 93, 101 (2d Cir.2002); *Tolliver v. New York State Corr. Officers,* No. 99 CIV 9555, 2000 WL 1154311, at *2 (S.D.N.Y. Aug. 14, 2000) ("All of the defendants in this case are state officials because they are employees of the New York State Department of Correctional Services."). Therefore, I recommend that the Court dismiss the claims for damages against Defendants in their official capacities.

FN13. *See Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993) ("The immunity to which a state's official may be entitled in a § 1983 action depends initially on the capacity in which he is sued. To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."); *Severino v.. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993) ("[I]t is clear that the Eleventh Amendment does not permit suit [under Section 1983] for money damages against state officials in their official capacities."); *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) ("The eleventh amendment bars recovery against an employee who is sued in his official capacity, but does not protect him from personal liability if he is sued in his 'individual' or 'personal' capacity."); *see also Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71 (1989) ("Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.... As such, it is no different from a suit against the State itself.... We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983."); *Kentucky v. Graham,* 473 U.S. 159, 165-66 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is *not* a suit against the official personally, for the real party in interest is the entity."); *see also*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

*Holloway v. Selsky,* 05-CV-0501, 2007 WL 433375, at *4 (N.D.N.Y. Feb. 6, 2007) (Sharpe, J.) (citing cases).

**H. Conspiracy**

Plaintiff alleges that Defendants Rovelli, M. Rock, Perez, Flores, and Deluca conspired to use excessive force against him. (Dkt. No.1 ¶¶ 36, 41, 43-46, 48, 50, 52.) Defendants move to dismiss Plaintiff's conspiracy claims, arguing that they are barred by the intracorporate conspiracy doctrine. (Dkt. No. 42-1 at 19-20.) Defendants are correct.

The intracorporate conspiracy doctrine states that employees of a single corporate entity are legally incapable of conspiring together. *Bond v. Board of Educ. of City of New York,* 97-cv-1337, 1999 U .S. Dist. LEXIS 3164, at *5, 1999 WL 151702, at *2 (E.D.N.Y. Mar. 17, 1999). "This doctrine applies to public entities and their employees." *Lee v. City of Syracuse,* 603 F.Supp.2d 417, 442 (N.D.N.Y.2009) (citations omitted). There is an exception to the doctrine where "individuals pursue personal interests wholly separate and apart from the entity." *Orafan v. Goord,* 411 F.Supp.2d 153, 165 (N.D.N.Y.2006) (citation and quotation marks omitted), *vacated and remanded on other grounds, Orafan v. Rashid,* No. 06-2951, 249 Fed. App'x 217 (2d Cir. Sept. 28, 2007). "[P]ersonal bias does not constitute personal interest and is not sufficient to defeat the intracorporate conspiracy doctrine." *Everson v. New York City Transit Auth.,* 216 F.Supp.2d 71, 76 (E .D.N.Y.2002) (quoting *Bond,* 1999 WL 151702, at *2). However, in an unrelated action, I have found that a triable issue of fact exists regarding whether officers acted pursuant to their personal interests where a prisoner alleges that officers assaulted him in retaliation for participating in a federal lawsuit. *Medina v. Hunt,* No. 9:05-CV-1460, 2008 U.S. Dist. LEXIS 74205, 2008 WL 4426748 (N.D.N.Y. Sept. 25, 2008). Other courts have found that the personal interest exception applies, and thus allowed conspiracy claims to proceed, where it was alleged that officers conspired to cover up their use of excessive force. *Hill v. City of New York,* No.03 CV 1283, 2005 U.S. Dist. LEXIS 38926, 2005 WL 3591719, at *6 (E.D.N.Y. Dec. 30, 2005).

Here, Plaintiff has not alleged what motivated Defendants to conspire against him. "[A] complaint that

does not set forth factual allegations showing that any of the individual defendants acted with independent motives is subject to dismissal for failure to state a claim." *Freeman v. Santos,* No. 9:09-CV-0414, 2010 U .S. Dist. LEXIS 23742, at *8, 2010 WL 982893, at *3 (N.D.N.Y. Mar. 15, 2010) (quoting *Perrin v. Canandaigua City Sch. Dist.,* No. 09-CV-6153, 2008 U.S. Dist. LEXIS 95280, 2008 WL 5054241, at *2 (W.D .N.Y. Nov. 21, 2008)). [FN14] Therefore, I recommend that the Court dismiss Plaintiff's conspiracy claims without prejudice.

> **FN14.** The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

**I. Pendent State Claims**

**\*16** Defendants argue that Plaintiff's state law claims should be dismissed pursuant to Section 24 of New York's Correction Law. (Dkt. No. 42-1 at 21-22.) Defendants are correct. That section provides as follows:

1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against an officer or employee of the department, in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

N.Y. Correct. Law § 24(1)-(2). Effectively, this statute precludes inmates from bringing civil suits against "corrections officers in their personal capacities" in New York state courts. *Cepeda v. Coughlin,* 128 A.D.2d 995, 997 (N.Y.App.Div.3d Dept.1987). This bar also applies to pendent state law claims in federal court because "[i]n applying pendent jurisdiction, federal courts are bound to apply state substantive law to the state claim." *Baker v. Coughlin,* 77 F.3d 12, 15 (2d Cir.1996) (citations

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

omitted). "If a state would not recognize a plaintiff's right to bring a state claim in state court, a federal court exercising pendent jurisdiction ... must follow the state's jurisdictional determination and not allow that claim to be appended to a federal law claim in federal court." *Baker, 77 F.3d at 15.*

In 2009, the United States Supreme Court held that section 24 is unconstitutional to the extent that it precludes inmates from pursuing § 1983 claims. *Haywood v. Drown, --- U.S. ----, 129 S.Ct. 2108 (2009).* However, at least two judges in this District have observed that because *Haywood* 's focus is on civil rights claims, the decision "does not affect the question of whether this Court has proper jurisdiction to hear [a] pendent state law claim." *Crump v. Ekpe,* No. 9:07-CV-1331, 2010 U.S. Dist. LEXIS 10799, at *61, 2010 WL 502762, at * 18 (N.D.N.Y. Feb. 8, 2010) (Kahn, J. and Peebles, M.J.); *May v. Donneli,* No. 9:06-CV-437, 2009 U.S. Dist. LEXIS 85495, at *13, 2009 WL 3049613, at *5 (N.D.N.Y. Sept. 18, 2009) (Sharpe, J. and Treece, M.J.).FN15 Therefore, I recommend that the Court dismiss Plaintiff's pendent state law claims.

FN15. The Court will provide Plaintiff with a copy of these unpublished decisions in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

**J. Claims Not Addressed by Defendants**

Defendants' motion to dismiss does not address Plaintiff's excessive force claims, retaliation claims, or Eighth Amendment conditions of confinement claims regarding the provision of food. I find that those claims are sufficient to survive *sua sponte* review and therefore recommend that Defendants be directed to answer those claims.

**IV. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**\*17** In his opposition to Defendants' motion to dismiss, Plaintiff purports to move for summary judgment against both the State Defendants and Defendant inmate Perez. (Dkt. Nos. 72 and 77.) As the state Defendants note (Dkt. No. 75), Plaintiff's "motion" is not accompanied by a notice of motion, a statement of material facts, or a

memorandum of law. In addition, Plaintiff did not serve the exhibits to his "motion" on Defendants. Therefore, I recommend that Plaintiff's motion for summary judgment (Dkt. Nos. 72 and 77) be denied.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' request (Dkt. No. 52) to vacate the text order of March 10, 2010, is **GRANTED.** The Clerk is directed to vacate the text order and the entry of default (Dkt. No. 51); and it is further

**ORDERED** that Plaintiff's objection (Dkt. No. 55) to Defendants' request is **DENIED;** and it is further

**ORDERED** that the Clerk provide Plaintiff with copies of *Freeman v. Santos,* No. 9:09-CV-0414, 2010 U.S. Dist. LEXIS 23742, 2010 WL 982893, at *3 (N.D.N.Y. Mar. 15, 2010); *Crump v. Ekpe,* No. 9:07-CV-1331, 2010 U.S. Dist. LEXIS 10799, at *61, 2010 WL 502762, at* 18 (N.D.N.Y. Feb. 8, 2010); and *May v. Donneli,* No. 9:06-CV-437, 2009 U.S. Dist. LEXIS 85495, at *13, 2009 WL 3049613, at *5 (N.D.N.Y. Sept. 18, 2009) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009); and it is further

**RECOMMENDED** that Defendants' motion to dismiss for failure to state a claim (Dkt. No. 42) be *GRANTED IN PART AND DENIED IN PART.* I recommend that the following claims be dismissed with prejudice: (1) the Eighth Amendment medical claim against Defendant Nesmith; (2) the claim against Defendant McAllister; (3) any claim that Defendants Rovelli, Deluca, Lindemann, and Silverberg violated Plaintiff's constitutional rights simply by threatening him; (4) the claim against Defendant Holland; (5) any claims for damages against Defendants in their official capacities; and (6) the pendent state law claims. I recommend that the following claims be dismissed without prejudice: (1) the Eighth Amendment medical claims against Defendants Collins, Lindemann, Labrum, and Silverberg; (2) the claims against Defendants Fischer, Roy, David Rock, Heath, and Nabozny; and (3) the conspiracy claims. I recommend that Defendants be directed to answer the Eighth Amendment medical care claim against Defendant Leos; and it is further

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

**RECOMMENDED** that Defendants be directed to answer the following claims not addressed by their motion to dismiss: (1) the retaliation claims against Defendants Smith, Besson, Kelly, Foster, Flores, Shattuck, Rovelli, Hoy, and Deluca; (2) the excessive force claim against Defendants Rovelli, Deluca, Flores, Shattuck, Fraser, Hoy, Foster, and Nesmith; and (3) the Eighth Amendment conditions of confinement claims regarding issues with Plaintiff's food; and it is further

**RECOMMENDED** that Plaintiff's motion for summary judgment (Dkt. Nos. 72 and 77) be **DENIED.**

**\*18** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette, 984 F.2d 85 (2d Cir.1993)* (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2010.

Gillard v. Rovelli
Slip Copy, 2010 WL 4905240 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 5147258 (N.D.N.Y.)

(Cite as: 2010 WL 5147258 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff
and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
Gary GILLARD, Plaintiff,
v.
Michael ROVELLI, et al., Defendants.
No. 9:09-CV-0431 (TJM/DEP).

Dec. 13, 2010.

Gary Gillard, Attica, NY, pro se.

Michael G. McCartin, Office of Attorney General, The
Capitol Albany, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

  **\*1** This *pro se* action brought pursuant to 42 U.S.C.
§ 1983 was referred to the Hon. David E. Peebles, United
States Magistrate Judge, for a Report and
Recommendation pursuant to 28 U.S.C. § 636(b) and
Local Rule 72.3(c). No objections to the
Report-Recommendation and Order dated August 30,
2010 have been filed, and the time to do so has expired.
Furthermore, after examining the record, this Court has
determined that the Report-Recommendation and Order is
not subject to attack for plain error or manifest injustice.
Accordingly, the Court adopts the
Report-Recommendation and Order for the reasons stated
therein.

  It is therefore,

  **ORDERED** that Defendants' motion to dismiss
(Dkt.# 27) is **GRANTED,** and all claims in this action
with the exception of those against Hamel and McNally
are **DISMISSED** with leave to replead consistent with
Magistrate Judge Peebles' Report and Recommendation.

*See* Rep. Rec., p. 23, n. 7.

  **IT IS SO ORDERED.**

N.D.N.Y.,2010.

Gillard v. Rovelli
Slip Copy, 2010 WL 5147258 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1987 WL 10724 (S.D.N.Y.)
(Cite as: 1987 WL 10724 (S.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
EARL FRANCE, Plaintiff,
v.
THOMAS A. COUGHLIN, III, Commissioner; PHILIP
B. COOMBE, JR., Former Superintendent, R. HOKE,
Present Superintendent, HERBERT McLAUGHLIN,
1st Dept. Superintendent, CAPTAIN DEMSKY,
ROBERT FLEMING, Former Institutional Stewart,
SGT. THOMAS J. LUCAS, OFFICER CREGG
WILHELM, and JOSEPH WILHELM, Postmaster
General of Napanoch Post Office, Individually and in
their Official Capacities, Defendants.
**No. 85 Civ. 6347 (KBM).**

May 4, 1987.

EARL FRANCE, pro. se.

ROBERT ABRAMS Attorney General of State of New
York By Eugene Murphy, for State Defendants.

RUDOLPH GIULIANI, United States Attorney for
Southern District of New York By Beth Kaswan, for
Defendant Joseph Wilhelm, Postmaster for the Napanoch,
New York Post Office.

OPINION

MOTLEY, District Judge.

**\*1** Plaintiff pro se, a prisoner in the New York State
prison system has brought this complaint under 42 U.S.C.
section 1983 alleging violations of his rights under the
First, Fourth, and Fourteenth Amendments. Plaintiff
alleges as well violations of certain federal and state laws
and regulations. Plaintiff's complaint arises out of a cell
search by prison authorities, a subsequent seizure and
opening of several pieces of plaintiff's outgoing non-legal
mail, and the disciplinary proceedings and action that
resulted. Plaintiff has requested appointment of counsel.
In addition, he has applied for preliminary relief in the
form of an injunction barring prison officials from
instituting tier two and tier three disciplinary proceedings
against him during the pendency of this lawsuit.

The state defendants, all consisting of prison personnel
and Department of Correction officials, have moved for
summary judgment on each of plaintiff's claims and have
also opposed his application for preliminary injunctive
relief. The one remaining defendant, a federal postal
employee, has also moved for summary judgment. For the
reasons that follow, defendants' motions for summary
judgment are granted in their entirety and plaintiff's
applications for appointment of counsel and preliminary
relief are accordingly denied.

Background

From plaintiff's voluminous complaint, his amended
complaint, his assorted affidavits and exhibits, and from
four prison documents submitted by defendants, the
following undisputed material facts emerge. Prior to the
incidents complained of in this lawsuit, defendant
Correction Officer Cregg [sic] Wilhelm, whom plaintiff
assisted as a clerk, had permitted the typing and copying
of certain chain mail letters. Correction Officer Wilhelm's
brother, Joseph Wilhelm, was Postmaster of the
Napanoch, New York Post Office. In January 1985 a
search of plaintiff's cell was conducted which uncovered
certain items, including a portion of a chain letter, some
money, and a facility letterhead, all of which violated
prison rules. Around the same time, defendant Demskie
(misspelled 'Demsky' in plaintiff's complaint) sent
defendant Lucas to the Napanoch Post Office to retrieve
plaintiff's letters from the prison mail bag. Lucas returned
with the letters sent by plaintiff. They included four chain
letters requesting money, as well as several other letters
involving separate violations of prison mail rules,
including the existence of incorrect return addresses,
unclear addressees, and misuse of state property.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1987 WL 10724 (S.D.N.Y.)
(Cite as: 1987 WL 10724 (S.D.N.Y.))

Plaintiff was served with notice of the charges arising out of the cell search and the mail inspection and was permitted to select an assistant to aid him in defending himself. According to the legal assistant's report signed by plaintiff at the time, plaintiff did not request any witnesses to appear at his hearing. At the ensuing disciplinary hearing a few days later, plaintiff requested the name of the officer who was responsible for authorizing the cell search and mail retrieval. This request was denied as was plaintiff's request for the names of witnesses or their testimony if any. At the disciplinary hearing, defendant Fleming, who was conducting the session, opened four of the retrieved letters, read them each and showed them to defendant Lucas. The other five letters had been opened prior to the hearing. At the hearing plaintiff signed a form confirming he had requested no witnesses to appear on his behalf.

*2 On February 5, 1985, plaintiff received a disposition of 'not guilty of smuggling.' He was found guilty, however, of the various other charges including misuse of government property, solicitation of funds, possession of money, and abuse of mail privileges. Plaintiff's punishment was 90 days keeplock, loss of telephone, package, and commissary privileges while keeplocked, and a $25 restitution fee. Subsequent to the hearing plaintiff lost his paid position as a prison clerk.

Discussion

Summary judgment is appropriate when, resolving all factual disputes and drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S. Ct. 2505, 2509-11, 91 L.Ed.2d 202 (1986); Knight v. U.S. Fire Insurance Co., 804 F.2d 9 (2d Cir. 1986); Golden v. Coombe, 508 F. Supp. 156, 158 (S.D.N.Y. 1981). Although pro se complaints must be liberally construed, Haines v. Kerner, 404 U.S. 519, 520-21 (1972) (per curiam); Washington v. James, 782 F.2d 1134, 1138 (2d Cir. 1986), 'the solicitousness with which pro se pleadings are accepted is not without limits.' Golden v. Coombe,

508 F. Supp. 156, 158 (S.D.N.Y. 1981). Thus, where as a matter of law defendants are entitled to dismissal either on the undisputed material facts, or even taking all of plaintiff's allegations as true, summary judgment may frequently be proper even in pro se actions. Id. See also Wolfe v. Carlson, 583 F. Supp. 977 (S.D.N.Y. 1984).

Fourth Amendment Cell Search Claim

Turning to the merits of plaintiff's complaint, and beginning with the claim that defendants' search of his prison cell constituted a violation of plaintiff's Fourth Amendment rights, there can be no question that defendants are entitled to summary judgment. The Supreme Court has stated unequivocally that the 'Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell.' Hudson v. Palmer, 468 U.S. 517, 526 (1984); Christman v. Skinner, 468 F.2d 723 (2d Cir. 1972). Since plaintiff's claim with regard to the cell search-which even in plaintiff's account was neither dramatic nor violent-is simply that it violated his Fourth Amendment right to be free from unreasonable searches and seizures, it clearly must be dismissed.

First Amendment Mail Obstruction Claim

Plaintiff's claim that the retrieval and inspection of his outgoing mail violated his First Amendment rights has more foundation but is ultimately without merit. Prisoners' well established First Amendment right in the free flow of their mail, both incoming and outgoing, requires that prison restrictions on inmate mail must be reasonably related to prison interests in security and order. Procunier v. Martinez, 416 U.S. 396 (1974); Heimerle v. Attorney General, 753 F.2d 10 (2d Cir. 1985); Davidson v. Scully, 694 F.2d 50 (2d Cir. 1982); Wolfish v. Levi, 573 F.2d 118 (2d Cir. 1978), rev'd in part on other grounds sub nom. Bell v. Wolfish, 441 U.S. 520 (1979). Permissible restrictions on a prisoner's legal mail, a category which implicates the right of access to the courts, are extremely limited. Washington v. James, 782 F.2d 1134 (2d Cir. 1986). As to other sorts of outgoing mail, prison officials may open or read it but only if there is 'good cause.' Heimerle v. Attorney General, 753 F.2d 10 (1985); Wolfish v. Levi, 573 F.2d 118 (2d Cir. 1978);

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1987 WL 10724 (S.D.N.Y.)
(Cite as: 1987 WL 10724 (S.D.N.Y.))

Golden v. Coombe, 508 F. Supp. 156 (S.D.N.Y. 1981).
See also Wolff v. McDonnell, 418 U.S. 539, 576 (1974)
( 'freedom from censorship is not equivalent to freedom
from inspection or perusal' of prisoner mail).

**3** In the present case, plaintiff's outgoing, non-legal mail
was inspected and opened (some of it in plaintiff's
presence) under the authority of New York Department of
Correctional Services Directive #4422 which governs
correspondence between an inmate and another person and
delineates the prison's authority to inspect such mail. The
constitutionality of Directive #4422 has been upheld by
this court.    Golden v. Coombe, 508 F. Supp. 156
(S.D.N.Y. 1981).  Indeed, the regulation has been held to
provide inmates greater protection than the constitution
requires.  Id. at 160. Directive #4422 provides that certain
outgoing correspondence, excluding inmate business mail,
may be sealed by prisoners, and that it shall not be opened
or inspected unless there is authorization from the
Superintendent and the inspection is justified by a
reasonable suspicion that the mail threatens the security of
the prison or a third person.

The inspection and opening of plaintiff's mail here, even
taking plaintiff's account of the incident as entirely true,
was within constitutional bounds. Defendants had good
cause, in the interest of prison order and security, and in
the interest of ensuring compliance with legitimate prison
and other regulations regarding chain letters and mail
solicitations, to inspect and open plaintiff's mail.
According to plaintiff himself, prior to the mail incident
the prison authorities had been notified of plaintiff's chain
mail scheme by a corrections officer in whom plaintiff had
confided. A search of plaintiff's cell had provided
additional evidence of this scheme. Thus, because there
was good cause to inspect and open this non-legal mail,
defendants' action passes constitutional muster.

Even if this court had found that defendants' conduct with
regard to plaintiff's mail was in fact unconstitutional,
nonetheless, the state of the law at the time the incident
occurred was such that defendants would be entitled to
qualified immunity. State officials, including prison
officials, have a right to qualified immunity for actions
taken in their official capacity if they act in good faith and
on the basis of a reasonable belief that their actions are
lawful.  Procunier v. Navarette, 434 U.S. 555 (1978);

Bolden v. Alston, No. 86-2219 (2d Cir. Jan. 26, 1987).
See also Harlow v. Fitzgerald, 457 U.S. 800 (1982)
(granting federal officials qualified immunity from suit
where their actions did not violate 'clearly established
constitutional rights').

Although by 1985 the holding of Sostre v. McGinnis, 442
F.2d 178, 201 (2d Cir. 1971) (en banc), cert. denied, 405
U.S. 978 (1972) that 'prison officials may open and read
all outgoing and incoming correspondence to and from
prisoners' had been considerably eroded, see Heimerle v.
Attorney General, 753 F.2d 10, 12 (2d Cir. 1985), the law
was, and remains, that prison officials may permissibly
inspect or read outgoing mail, especially non-legal mail,
if there is 'good cause.'  Id. at 13 n. 5;  Golden v.
Coombe, 508 F. Supp. 156, 158-160 (S.D.N.Y. 1981).
Thus, at the time the mail incident complained of
occurred, defendants, at the very least, could reasonably
have believed that their seizure and inspection of plaintiff's
nine letters were well within constitutional bounds because
of the established 'good cause' rationale for the action.
Accordingly, they would be entitled to qualified immunity
for the incident even were this court to find that plaintiff's
constitutional rights had been violated.

**4** Finally, with respect to the mail incident, plaintiff
alleges that defendants violated state rules for inspection
of prisoner mail by failing to obtain proper authorization
from the superintendent. This apparently disputed issue of
fact is of no concern here. Whether or not defendants
complied with all aspects of Directive #4422, which as
noted above gives more protection than constitutionally
required, the seizure of plaintiff's mail did not constitute a
violation of plaintiff's constitutional rights. Thus, this is
not the proper forum for litigating any alleged
non-compliance with the Directive during the January
1985 incident. See Golden v. Coombe, 508 F. Supp. 156,
158-59 (S.D.N.Y. 1981).

Plaintiff also alleges that the seizure of his mail violated
the federal criminal statutes against obstruction of mails.
18 U.S.C. section 1701 et seq. Because there is no private
right of action under this statute, see Contemporary
Mission, Inc. v. U.S. Postal Service, 648 F.2d 97, 103 (2d
Cir. 1981) (no private cause of action against either the
Postal Service or its officials for alleged violations of
rights in connection with investigation of mail-order

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1987 WL 10724 (S.D.N.Y.)
(Cite as: 1987 WL 10724 (S.D.N.Y.))

business), defendants' violation of it, even if proved, could supply no basis for liability under Section 1983. See Middlesex City Sewerage Authority v. National Sea Clammers Assn., 453 U.S. 1, 19-21 (1981); Pennhurst State School and Hospital v. Halderman, 451 U.S. 1, 27-28 (1981) (while section 1983 encompasses violations of rights secured by the 'laws' of the United States, it is available only to remedy violations of those federal statutes which create rights within the meaning of section 1983).

Fourteenth Amendment Due Process Claims

Plaintiff's third set of claims concern the disciplinary hearing that resulted pursuant to the cell search and the mail inspection. Plaintiff contends that the disciplinary proceedings violated his due process rights in various ways. To begin with, plaintiff argues that defendants should have provided the names of his accusers and of the person who authorized the cell search and the mail inspection. Plaintiff also claims that his request to call witnesses at the hearing was denied. In addition, plaintiff appears to claim that the disposition was against the weight and sufficiency of the evidence and that the punishment imposed was disproportionate to the offense.

It is without question, due to the seriousness of the potential punishment here, that the disciplinary proceedings at issue in this case implicated plaintiff's due process rights. McCann v. Coughlin, 698 F.2d 112, 121 (2d Cir. 1983) (potential punishment of fourteen days in keeplock is a sufficiently serious liberty deprivation to trigger prisoner's due process rights). The Supreme Court has delineated the scope of the due process rights that must be accorded a prisoner in disciplinary hearings. While prison disciplinary committees are not required to grant full procedural protections such as those afforded at a criminal trial, an inmate clearly has a right to at least 24 hours advance notice of the charges against him, and must also be informed of the reasons for the action taken, and the evidence relied upon by the Committee in reaching its decision. Wolff v. McDonnell, 418 U.S. 539 (1974); McCann v. Coughlin, 698 F.2d 112 (2d Cir. 1983). An inmate also has a right to call witnesses and present evidence in his defense when permitting him to do so would not be unduly hazardous to institutional safety or correctional goals. Wolff v. McDonnell, supra; Bolden v.

Alston, No. 86-2219 (2d Cir. Jan. 26, 1987) (dismissing claim of due process violation at prison disciplinary hearing); McCann v. Coughlin, supra. See also Ponte v. Real, 471 U.S. 491, 105 S. Ct. 2192, 85 L. Ed.2d 553 (1985) (prison official's reasons for refusing to call requested witness need not be in writing; irrelevance of requested witness is a legitimate ground for refusal).

*5 The most meritorious of plaintiff's due process claims-since clearly this is an established right-is that he was denied his right to call witnesses at the hearing. Plaintiff's conclusory allegation that he was denied this right, however, is belied by contemporaneous documents submitted by defendants in connection with this motion. Plaintiff signed two forms, one prior to the hearing, and another at the hearing, stating that he had requested no witnesses. Thus, because the absence of witnesses at plaintiff's hearing was attributable to plaintiff's own lack of diligence in excercising his rights rather than to any denial of rights on the part of defendants, there is no basis for finding liability under section 1983. See Wolfe v. Carlson, 583 F. Supp. 977, 983 (S.D.N.Y. 1984). [FN1]

Plaintiff's remaining due process claims are clearly without merit. A prisoner has no due process right to know the identity of those inmates or corrections officers who have participated in an investigation or who have furnished evidence against him. Wolff v. McDonnell, 418 U.S. 539, 567-68 (1974). See also Wolfe v. Carlson, 583 F. Supp. 977, 980-82 (S.D.N.Y. 1984). As to plaintiff's claim that there was insufficient evidence to support the disposition made by the hearing officer, as long as there was some evidence to support the determination it will pass constitutional muster. Wolfe v. Carlson, 583 F. Supp. 977, 981 (S.D.N.Y. 1984). See also Superintendent v. Hill, 472 U.S. 445, 105 S.Ct. 2768, 86 L. Ed.2d 356 (1985) (to comport with due process, a prison disciplinary board's decision to revoke prisoner's good time credits must be supported merely by 'some evidence'). The guilty dispositions handed down by the prison authorities were plainly supported by 'some evidence.' Even without more, the chain letters presented at the hearing and plaintiff's own admissions support the determination that plaintiff was guilty of violating the various prison rules as charged.

Finally, plaintiff's allegation that the extensive keeplock

Not Reported in F.Supp., 1987 WL 10724 (S.D.N.Y.)
(Cite as: 1987 WL 10724 (S.D.N.Y.))

time imposed, as well as the other penalties, constituted an excessive punishment in violation of his due process right, is insufficient to make out a claim under section 1983. Absent a clear showing of gross abuse, a prison authority's judgment in ordering confinement should prevail and will not give rise to a cause of action under section 1983 action. Anderson v. Coughlin, 700 F.2d 37, 44 (2d Cir. 1982). Where, as here, there was ample evidence of the prisoner's guilt and, as indicated on the disposition form, a substantial history of rule infraction, there is no basis for this court to find that the punishment imposed, though apparently quite harsh, was in any manner grossly abusive.

Conclusion

In conclusion, each of plaintiff's claims as to both the state [FN2] and federal [FN3] defendants, including his due process, his First Amendment, and his Fourth Amendment claims, is without merit, [FN4] and presents no disputed issue of material fact to warrant further consideration of this action. Accordingly, defendants' motion for summary judgment are granted and this case is dismissed in its entirety.

> FN1 In a submission filed after this motion was ripe, and that would not have been considered by this court absent the generous treatment to which pro se litigants are entitled, plaintiff appears to contend that the two documents signed by plaintiff and indicating that he had not requested the presence of any witnesses at the disciplinary hearing were in fact fraudulent. Plaintiff offers absolutely no support for this conclusory allegation; thus it is insufficient to withstand a motion for summary judgment. See Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed.2d 265 (1986).
>
> Furthermore, since the alleged witness denial would have been a violation of procedural rather than of substantive due process, and because plaintiff could have sought redress under state law-for example, in the form of an Article 78 proceeding, or by raising this putative fraud in his appeal to the Commissioner (which apparently was not done)-the alleged witness

denial would not be actionable as a denial of due process under section 1983 since adequate state remedies existed. See Parratt v. Taylor, 451 U.S. 527 (1981); Morello v. Nowakawski, No. 86-2106 (2d Cir. Jan 26, 1987).

> FN2 A further ground for the dismissal of this action as against state defendants Coughlin, Coombe, and Hoke is that plaintiff has failed to allege personal involvement on the part of any of these individuals in the various occurrences claimed to have violated his constitutional rights. It is well settled that the doctrine of respondeat superior provides no basis for liability under 42 U.S.C. section 1983. See, e.g., McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir. 1977). Thus, even if this court had found merit in any of plaintiff's constitutional claims arising out of either his cell search, the mail inspection, or the disciplinary proceedings, there could be no liability against Coughlin, Coombe or Hoke because plaintiff alleges no direct involvement on their part. Plaintiff also makes no claim that these individuals had either actual or constructive notice of the alleged violations such as to impose liability on any of them under the theory that they were guilty of 'gross negligence' and 'deliberate indifference' with regard to plaintiff's constitutional rights. McCann v. Coughlin, 698 F.2d 112, 125 (2d Cir. 1983). Indeed, at least as to the mail inspection, plaintiff implicitly alleges the contrary as to the state of the Superintendent's knowledge by claiming that the mail search violated of state directives precisely in that there was no authorization by the Superintendent as required.
>
> FN3 A further ground for the dismissal of this action as against the federal defendant, Joseph Wilhelm, Postmaster of the Napanoch, New York Post Office, lies in the lack of any substantiated allegation of personal involvement on his part in the asserted constitutional violations involving plaintiff's mail. As stated above in footnote 2, personal responsibility-whether it be grounded in active participation in a constitutional deprivation, or knowing and culpable indifference to it-is a

Not Reported in F.Supp., 1987 WL 10724 (S.D.N.Y.)
(Cite as: 1987 WL 10724 (S.D.N.Y.))

prerequisite to any finding of liability under 42 U.S.C. section 1983. The rules of liability for state officials under section 1983 are generally also applicable to the federal defendants in a Bivens action. See Butz v. Economou, 438 U.S. 478, 500-504 (1978); Ellis v. Blum, 643 F.2d, 68, 84 (2d Cir. 1981). Plaintiff's vague and conclusory suggestion that Joseph Wilhelm, who was the brother of Correction Officer Craig Wilhelm, conspired with the state defendants to effect an improper tampering of plaintiff's mail, is insufficient to raise any issue of material fact as to Joseph Wilhelm's personal involvement in the alleged abuses, and accordingly is insufficient as well to defeat the Government's motion for summary judgment. See Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). See also Wyler v. United States, 725 F.2d 156, 160 (2d Cir. 1983); Markowitz v. Republic National Bank, 651 F.2d 825, 828 (2d Cir. 1981).

FN4 Because, as discussed herein, this court has found as a threshold matter that plaintiff's complaint is clearly lacking in merit, his application for appointment of counsel is denied. See Hodge v. Police Officers, 802 F.2d 58, 60-61 (2d Cir. 1986).

Similarly, plaintiff's complaint having been dismissed on the merits, there is no need to consider plaintiff's application for preliminary injunctive relief pending the outcome of this litigation.

S.D.N.Y., 1987.
France v. Coughlin
Not Reported in F.Supp., 1987 WL 10724 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 758615 (W.D.N.Y.)

(Cite as: 2006 WL 758615 (W.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

W.D. New York.
Luis NIEVES and Maya Jones Nieves,[FN1] Plaintiffs,
FN1. Because Luis Nieves filed this lawsuit subsequent to Maya Jones Nieves' October 12, 2004 request that she be placed on Luis Nieves' negative correspondence and telephone list and subsequent to the October 16, 2004 filing of a complaint against Luis Nieves with the New York City Police Department after receipt of a threatening letter and because the Complaint does not appear to assert a separate cause of action on behalf of Maya Jones Nieves, the Court will refer to Luis Nieves as the sole plaintiff in this action for purposes of this Report, Recommendation and Order. Dkt. # 10, pp. 24 & 39; Dkt. # 17, Exh. H.

v.

Frances GONZALEZ, et al., Defendants.
No. 05-CV-00017S(SR).

March 2, 2006.
Luis Nieves, Auburn, NY, pro se.

Maya Jones Nieves, Brooklyn, NY, pro se.

*REPORT, RECOMMENDATION AND ORDER*

SCHROEDER, Magistrate J.
**\*1** This case was referred to the undersigned by the Hon. William M. Skretny, pursuant to 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report upon dispositive motions. Dkt. # 13.

Currently before the Court is plaintiff's motion for summary judgment (Dkt. # 10); defendant Frances Gonzalez' motion for summary judgment (Dkt.# 17); and plaintiff's motions for default judgment against defendants

J. Johnson (Dkt. # 20), Booker (Dkt.# 21), and John Doe. Dkt. # 22. For the following reasons, it is recommended that plaintiff's motion for summary judgment be denied; defendant Gonzales' motion for summary judgment be granted; and plaintiff's motions for default judgment be denied.

*BACKGROUND*

Plaintiff, Luis Nieves, an inmate at Auburn Correctional Facility, paid the filing fee and commenced this action, *pro se,* pursuant to 42 U.S.C. § 1983, in the Eastern District of New York on November 12, 2004. Dkt.1 & 3. The Clerk of the Court issued Summons' for all four of the defendants, *to wit,* Frances Gonzalez; C.O. Booker; C.O. J. Johnson; and John Doe, on November 12, 2004. Dkt. # 1. Plaintiff filed a Return of Service form[FN2] for each defendant with the Clerk of the Court on December 3, 2004. Dkt. # 2. Each form indicates that plaintiff executed service by mail from his address at P.O. Box 618, 135 State Street, Auburn, New York.[FN3] Dkt. # 2. Receipts from the United States Postal Service, Express Mail, are attached to these forms. Dkt. # 2. Three of these forms were addressed to defendants at the Attica Correctional Facility, P.O. Box 149, Attica, New York 14011 and the fourth was addressed to Frances Gonzalez, New York Police Department, 480 Knickerbocker Avenue, Brooklyn, N.Y. 11237. Dkt. # 2.

FN2. The Return of Service form contains a footnote stating, "As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure."

FN3. This is the address for inmate mail at the Auburn Correctional Facility.

Plaintiff's Complaint alleges that on June 28, 2004, while in protective custody at the Attica Correctional Facility ("Attica"), Corrections Officer ("C.O.") J. Johnson conducted a random search of plaintiff's cell. Dkt. # 3. During this search, C.O. Johnson and the porter accompanying him, a gang leader named Billy, stole plaintiff's property, including "addresses, phone numbers,

Not Reported in F.Supp.2d, 2006 WL 758615 (W.D.N.Y.)

(Cite as: 2006 WL 758615 (W.D.N.Y.))

bank notes, non legal and legal letters...." Dkt. # 3. Billy was subsequently observed passing these addresses and phone numbers to other members of his gang. Dkt. # 3. C.O. Johnson and Billy then began "to steal" all plaintiff's incoming and outgoing mail with his wife, family, friends, attorneys, and law enforcement agencies. Dkt. # 3. Billy impersonated plaintiff and responded to his mail. Dkt. # 3.

On August 4, 2004, plaintiff alleges that he handed a sealed letter of complaint addressed to the Superintendent or Sergeant of Attica to a correctional counselor for the Special Housing Unit named as defendant John Doe. Dkt. # 3. This individual allegedly diverted the grievance to C.O. Booker, who gave it to Billy. Dkt. # 3.

Plaintiff also alleges that on August 5, 2004, plaintiff gave C.O. Booker a letter addressed to the New York City Police Department, which contained the address of his wife and family members, and thereafter observed C.O. Booker, C.O. Johnson and Billy passing xeroxed copies of the letter to other inmates, who wrote letters to his wife, family members and the New York City Police Department, thereby misleading the New York Police Department's investigations and endangering lives. Dkt. # 3.

*2 On August 7, 2004, plaintiff states that New York City Police Officer Frances Gonzalez signed for a letter sent by plaintiff and then returned the letter to sender without investigating the allegations contained within the letter. Dkt. # 3. Plaintiff also complains that Officer Gonzalez' failure to investigate caused the Superintendent of Attica to restrict plaintiff's communication with his wife. Dkt. # 3.

In a Memorandum and Order filed January 7, 2005, United States District Judge Gershon transferred this matter, *sua sponte,* to the Western District of New York. Dkt. # 3.

In support of his motion for summary judgment, plaintiff attached a copy of his August 5, 2004 letter to the 83rd Precinct of the New York City Police Department, which requested that the police send undercover officers to the home of his wife and family members to remove them before they were kidnaped and murdered by gang

members. Dkt. # 10, pp. 16-17. Plaintiff also attached a copy of a memorandum from the Superintendent of Auburn, dated October 12, 2004, informing plaintiff that Maya Jones Nieves [FN4] had informed the facility that she did not wish to receive any communication from him, either in writing or by telephone, and warning plaintiff that disciplinary action would be taken against him if he attempted any further contact with her. Dkt. # 10, pp. 24 & 39. Plaintiff also submitted a copy of a misbehavior report arising from plaintiff's violation of an order [FN5] preventing him from any communication with Officer Gonzalez after plaintiff sent her mail on January 27, 2004. Dkt. # 10, p. 29. Plaintiff was found not guilty of harassment, but was sentenced to 75 days in the Special Housing Unit ("SHU"), for refusing a direct order. Dkt. # 10, p. 30.

> FN4. On October 16, 2004, Maya Jones Nieves filed a complaint with the 83[rd] Precinct alleging that plaintiff sent her threatening letters. Dkt. # 17, Exh. H.

> FN5. According to the misbehavior report, plaintiff received notice of the inclusion of Officer Gonzalez on his negative correspondence list on December 10, 2004. Dkt. # 10, p. 29.

In support of her motion for summary judgment, defendant Gonzales affirms that she is a New York City Police Officer assigned to the 83rd Precinct. Dkt. # 17, Exh. B, ¶ 2. On August 7, 2004, Officer Gonzalez was assigned to the reception area of the 83rd Precinct, where her job duties included signing for incoming mail. Dkt. # 17, Exh. B, ¶ 3. She did not open or distribute such mail, but placed it in a basket for a Police Administrative Assistant to open and distribute. Dkt. # 17, Exh. B, ¶ 3. She did not open or read plaintiff's letter dated August 5, 2004. Dkt. # 17, Exh. B, ¶ 4.

Officer Gonzalez received and opened letters from plaintiff dated September 19, 2004 [FN6] and October 20, 2004 [FN7] which were addressed to her personally. Dkt. # 17, Exh. B, ¶ 5. Because she did not understand the meaning of the letters, which contained cryptic references to gang activity and violence, and did not know plaintiff or understand why he was writing to her, Officer Gonzalez

Not Reported in F.Supp.2d, 2006 WL 758615 (W.D.N.Y.)

(Cite as: 2006 WL 758615 (W.D.N.Y.))

brought these letters to the attention of her supervisors and filed a complaint with the 83rd Precinct. Dkt. # 17, Exh. B, ¶¶ 6-9.

FN6. The September 19, 2004 letter states, in part,

On Aug. 5th 2004 I sent a certified mail w/ return receipt and haven't had a response regards [sic] my calls of emergencies. I sent a letter to have undercover officers to response [sic] to a possible on-going: extortion, kidnapping, hostage or any kind of illegal activities that would endangered [sic] a child's welfare. I came to find out that it was all true ... and as a results [sic] of officers going into the apartment gunfire erupted and 2 of my children were murdered by suspects and wounding my wife by a gun shot.

Dkt. # 17, Exh. E.

FN7. The October 20, 2004 letter states, in part,

On August 5th, 2004 I sent your station house a certified mail with return receipt it was return [sic]-sign by Frances Gonzales.

My mail were [sic] tamper with, and possibly or not sent to your station house with a letter complaint or not. No response was made regarding the matter.

I am still investigating this matter about the certified mail of August 5 th, 2004.

Without your assistance, I'm obligated to sue this Police Department to obtain what I'm looking into regarding the certified mail of August 5th, 2004.

* * *

Also, shortly thereafter, other prisoners wrote letters to your precinct house regarding Maya Jones....

Dkt. # 17, Exh. F.

On November 1, 2004, Officer Gonzalez obtained the general number for the New York State Inspector General's Office and informed Inspector Frank Biggit that she was receiving unwanted personal correspondence from a prison inmate. Dkt. # 17, Exh. B, ¶ 10. On November 15, 2004, Officer Gonzalez received a copy of the complaint in this action, by, mail, at the 83rd Precinct. Dkt. # 17, Exh. B, ¶ 11.

*3 On December 22, 2004, Officer Gonzales received a letter from officials at Auburn stating that plaintiff would not be allowed to write to her. Dkt.17, Exh. B, ¶ 12 & Exh. G. On January 24, 2005, Officer Gonzalez received a copy of four documents labeled, "Interrogatories," from plaintiff. Dkt. # 17, Exh. B, ¶ 15. She contacted Inspector Biggit, who subsequently asked Officer Gonzalez to testify at plaintiff's disciplinary hearing. Dkt. # 17, Exh. B, ¶ 16. Officer Gonzalez declined to participate in plaintiff's disciplinary hearing. Dkt. # 17, Exh. B, ¶ 16.

*DISCUSSION AND ANALYSIS*

*Motion for Summary Judgment*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party, and must give extra latitude to a pro se plaintiff." *Thomas v. Irvin,* 981 F.Supp. 794, 799 (W.D.N.Y.1997) (internal citations omitted).

A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Catanzaro v. Weiden,* 140 F.3d 91, 93 (2d Cir.1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248; *see Bryant v. Maffucci,* 923 F.2d 979 (2d Cir.), *cert.*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 758615 (W.D.N.Y.)

(Cite as: 2006 WL 758615 (W.D.N.Y.))

denied, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise." Bryant, 923 F.2d at 982. A party seeking to defeat a motion for summary judgment

must do more than make broad factual allegations and invoke the appropriate statute. The [party] must also show, by affidavits or as otherwise provided in Rule 56 of the Federal Rules of Civil Procedure, that there are specific factual issues that can only be resolved at trial.

Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir.1995).

Pursuant to Fed.R.Civ.P. 56(e), affidavits in support of or in opposition to a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Thus, affidavits "must be admissible themselves or must contain evidence that will be presented in an admissible form at trial." Santos v. Murdock, 243 F.3d 681, 683 (2d Cir.2001), citing Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); see also H. Sand & Co. v. Airtemp Corp., 934 F.2d 450, 454-55 (2d Cir.1991) (hearsay testimony that would not be admissible if testified to at trial may not properly be set forth in an affidavit).

Duty to Investigate

*4 Defendant Frances Gonzalez seeks summary judgment on the ground that she had no duty to investigate plaintiff's complaint. Dkt. # 18, pp. 8-12.

As the Supreme Court of the United States has repeatedly noted, " § 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." Graham v. Connor, 490 U.S. 386, 393-94, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (internal quotations omitted). "To

state a claim for relief in an action brought under § 1983, [plaintiffs] must establish that they were deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999). The Court must determine the specific constitutional right allegedly infringed before it can assess whether the defendant violated that right. Graham, 490 U.S. at 394.

The Supreme Court of the United States has "recognized that the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." DeShaney v. Winnebago Soc. Servs., 489 U.S. 189, 196, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). As a result, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." Id. at 197; see also Castle Rock v. Gonzales, --- U.S. ----, 125 S.Ct. 2796, 162 L.Ed.2d 658 (2005) (no property interest in police enforcement of a restraining order).

More specifically, courts within the Second Circuit have determined that "[t]here is ... no constitutional right to an investigation by government officials." Bal v. City of New York, 1995 WL 46700, at *2 (S.D.N.Y. Feb.7, 1995), quoting Dep't of Investigation of the City of New York v. Stone, 1992 WL 23202, at *2 (S.D.N.Y. Feb 4, 1992), aff'd 99 F.3d 402 (1995), cert. denied, 517 U.S. 1225, 116 S.Ct. 1859, 134 L.Ed.2d 958 (1996). In Lewis v. Gallivan, for example, the Hon. David G. Larimer determined that plaintiff, an inmate at the Wende Correctional Facility, had "no cognizable claim" that the Erie County Sheriff and Erie County District Attorney, inter alia, "were under an obligation to investigate or prosecute" plaintiff's claims that correctional officers had threatened him. 315 F.Supp.2d 313, 317 (W.D.N.Y.2004).

Reading the pro se complaint liberally, plaintiff alleges that Officer Frances Gonzalez failed to discharge her duty to investigate plaintiff's allegations of threats against his wife and family members and that, as a result of this failure, plaintiff's relationship with his wife was

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 758615 (W.D.N.Y.)

(Cite as: 2006 WL 758615 (W.D.N.Y.))

damaged. Dkt. # 3. Since Officer Gonzalez was under no duty to investigate these claims, it is recommended that her motion for summary judgment dismissing plaintiff's complaint be granted.

*Retaliation*

In his motion for summary judgment, plaintiff claims that he was subjected to 75 days in SHU in retaliation for filing this lawsuit. Dkt. # 10, p. 2. Officer Gonzalez asserts that she would be entitled to summary judgment on any claim of retaliation because her complaint to the Inspector General was not made under color of law and was not motivated by plaintiff's lawsuit. Dkt. # 18, pp. 12-18.

**\*5** Since the alleged retaliation followed the filing of the complaint, the complaint does not include a claim of retaliation. Accordingly, there is no such claim upon which the Court can grant or deny summary judgment. Thus, the appropriate question is whether plaintiff should be permitted to amend his complaint to assert a cause of action for retaliation. *See Beckman v. United States Postal Serv.,* 79 F.Supp.2d 394, 407 (S.D.N.Y.2000) (Although it is inappropriate to raise new claims in submissions in opposition to a summary judgment motion, the court may grant leave to amend the complaint to incorporate such claims).

Fed.R.Civ.P. 15(a) provides that a party may amend a pleading by leave of court or by written consent of the adverse party. Leave to amend is to be "freely granted" unless the party seeking leave has acted in bad faith, there has been an undue delay in seeking leave, there will be unfair prejudice to the opposing party if leave is granted, or the proposed amendment would be futile. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *State Teachers Retirement Bd. v. Fluor Corp.,* 654 F.2d 843, 856 (2d Cir.1981); Fed.R.Civ.P. 15(a). The decision to grant or deny a motion for leave to amend a pleading is within the discretion of the district court. *Foman,* 371 U.S. at 182.

To establish a *prima facie* case of First Amendment retaliation, a plaintiff must establish: (1) that the speech or conduct at issue was protected; (2) that the defendant took adverse action against the plaintiff; and (3) that there was a causal connection between the protected speech and the adverse action. *Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003).

A prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. *Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 125, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977). However, prisoners do not have a right to unrestricted correspondence nor do they have a right to be free from reasonable punishment for violation of prison rules. *Malsh v. Garcia,* 971 F.Supp. 133, 137 (S.D.N.Y.1997). DOCS Directive No. 4422, which permits disciplinary action against inmates who submit mail to individuals on their negative correspondence list, is a permissible restriction of an inmate First Amendment rights. *See Hall v. Curran,* 818 F.2d 1040, 1044 (2d Cir.1987) ( "Directive 4422 conforms to the *Martinez* requirement that the substantial government interest advanced must be unrelated to the suppression of expression"), *citing Procunier v. Martinez,* 416 U.S. 396, 413, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Marsh,* 971 F.Supp. at 137-38 (same); *see also, Grant v. Hollins,* 65 Fed. Appx., 351 (2003) (unpublished summary order). In addition, although prisoners retain the constitutional right to meaningful access to the courts, prisoners alleging violation of this right in the context of a § 1983 action must demonstrate actual harm, *e.g.,* that a "nonfrivolous legal claim had been frustrated or was being impeded." *Lewis v. Casey,* 518 U.S. 343, 353, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (footnotes omitted); *see Bounds v. Smith,* 430 U.S. 817, 823, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977).

**\*6** In the instant case, plaintiff successfully filed his lawsuit and mailed the summons and complaint to Officer Gonzalez prior to the inclusion of Officer Gonzalez on his negative correspondence list. Thus, his ability to access the Court to file his Complaint was not impeded in any way. Plaintiff's decision to serve interrogatories upon Officer Gonzalez subsequent to her inclusion on his negative correspondence list does not impact his right to meaningful access to the courts, as plaintiff does not need to communicate directly with Officer Gonzalez in order to prosecute his claim. *See Malsh,* 971 F.Supp. at 137 (plaintiff's First Amendment rights were not violated by

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 758615 (W.D.N.Y.)

(Cite as: 2006 WL 758615 (W.D.N.Y.))

disciplinary action taken against plaintiff who attempted to send documents regarding pending paternity suit to a woman on his negative correspondence list). Plaintiff could have simply waited for appearance of counsel on behalf of Officer Gonzalez before serving discovery demands or, if he felt there was an immediate need for such discovery, he could have advised the Court as to his inability to serve discovery demands upon Officer Gonzalez directly. Since the inclusion of Officer Gonzalez on plaintiff's negative correspondence list had no adverse effect upon the status of this action, and plaintiff had no independent constitutional right to correspond with her, it is recommended that plaintiff not be permitted to amend his complaint to assert a claim of retaliation.

*Motions for Default Judgment*

Plaintiff moves for default judgment against defendants J. Johnson, Booker, and John Doe. Dkt.20-22.

"The procedural steps contemplated by the Federal Rules of Civil Procedure following a defendant's failure to plead or defend as required by the Rules begin with the entry of a default by the clerk upon a plaintiff's request." *Meehan v. Snow,* 652 F.2d 274, 276 (2d Cir.1981); *see* Fed.R.Civ.P. 55(a) ( "When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules and that fact is made to appear by affidavit or otherwise, the clerk shall enter the party's default."). "Then, pursuant to Rule 55(c), the defendant has an opportunity to seek to have the default set aside." *Id.; see* Fed.R.Civ.P. 55(c) ("For good cause shown the court may set aside an entry of default ..."). "If that motion is not made or is unsuccessful, and if no hearing is needed to ascertain damages, judgment by default may be entered by the court or, if the defendant has not appeared, by the clerk." *Id.; see* Fed.R.Civ.P. 55(b).

Since the plaintiff has not moved for entry of default, the motion for default judgment is premature. *See Multani v. United States Dep't of Justice,* 1998 WL 951813, No. 97-CV-628A, at * (W.D.N.Y.1998) (plaintiff not entitled to a default judgment where the initial step of securing the entry of default was omitted). Moreover, entry of default would not be warranted because it is clear that plaintiff's attempted service of the complaint was insufficient to obtain personal jurisdiction over the defendants. *See*

*Multani,* 1998 WL 951813, at *3; *Kearney v. New York State Legislature,* 103 F.R.D. 625, 628-29 (E.D.N.Y.1984).

**\*7** The Return of Service form provided to the plaintiff by the court specifically advises plaintiff to see Rule 4 of the Federal Rules of Civil Procedure with respect to who may serve a summons. Dkt. # 2. Fed.R.Civ.P. 4(c)(2) provides that service of a summons and complaint "may be effected by any person who is not a party and who is at least 18 years of age." However, the Return of Service forms indicate that plaintiff attempted to serve the summons and complaint himself. Dkt. # 2. In addition, although plaintiff checked the box indicating that the summons and complaints were served personally upon the defendants, the attached receipts from the United States Postal Service, Express Mail, indicate that they were sent by mail to the Attica Correctional Facility. Dkt. # 2. This is insufficient. *See* Fed.R.Civ.P. 4)(d) & (e); N.Y. C.P.L.R. 308.

"Where service of process is insufficient, the courts have broad discretion to dismiss the action or to retain the case but quash the service that has been made on defendant." *Overhoff v. Health Care Plan,* No. 99-CV-152A, 1999 WL 605706, at *2 (W.D.N.Y. June 22, 1999), quoting *Montalbano v. Easco Hand Tools,* 766 F.2d 737, 740 (2d Cir.1985). "Where there is a strong probability that process can be properly effectuated, the service should be quashed and the action preserved." *Id., quoting Montalbano,* 766 F.2d at 740. Here, there is a reason to believe that plaintiff will be able to properly serve defendants Johnson and Booker and that he will be able to discern the identity of the correctional counselor for the Special Housing Unit on duty on August 24, 2004 through discovery so as to obtain proper service over the John Doe defendant. Accordingly, it is recommended that service upon these defendants be quashed and plaintiff afforded 120 days to file proof of service with the court in accordance with Fed.R.Civ.P. 4(l) & (m).[FN8] *See id.*

> **FN8.** Inasmuch as it does not appear that plaintiff's complaint was screened in accordance with 28 U.S.C. § 1915A by the Eastern District of New York, the Court notes that plaintiff's remaining allegations withstand such criteria.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 758615 (W.D.N.Y.)

(Cite as: 2006 WL 758615 (W.D.N.Y.))

*CONCLUSION*

For the foregoing reasons, it is RECOMMENDED that plaintiff's motion for summary judgment (Dkt.# 10), be DENIED; defendant Gonzalez' motion for summary judgment (Dkt.# 17), be GRANTED; plaintiff's motion for default judgment against defendant J. Johnson (Dkt.# 20), be DENIED; plaintiff's motion for default judgment against defendant Booker (Dkt.# 21), be DENIED; and plaintiff's motion for default judgment against defendant John Doe (Dkt.# 22), be DENIED.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

ORDERED, that this Report, Recommendation and Order be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report, Recommendation and Order must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Civ.P. 72(b) and Local Rule 72.3(a)(3).

The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but was not presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co. v. Massachusetts Mun. Wholesale Electric Co., 840 F.2d 985 (1st Cir.1988).*

**\*8** *Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.* *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir.1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." *Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Report, Recommendation and Order), may result in the*

*District Judge's refusal to consider the objection.*

The Clerk is hereby directed to send a copy of this Report, Recommendation and Order to the plaintiff and to the attorney for the defendant Frances Gonzales.

If the district judge accepts the recommendation to permit service, the Clerk of the Court should be directed to issue to summons for defendants Booker and Johnson to plaintiff. Because plaintiff paid the filing fee, he is responsible for service of the summons and complaint. However, as an inmate of a correctional facility proceeding *pro se,* he may request service by the United States Marshal at a nominal cost, as explained in the attached *Notice Regarding Service of Summons and Complaint with Attached Request for U.S. Marshal Service.*

W.D.N.Y.,2006.

Nieves v. Gonzalez
Not Reported in F.Supp.2d, 2006 WL 758615 (W.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 2819651 (S.D.N.Y.)

(Cite as: 2006 WL 2819651 (S.D.N.Y.))

C

Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Nurideen ISLAM Plaintiff,
v.
Glenn S. GOORD, Commissioner of New York State
Department of Correctional Services, William Mazzuca,
Superintendent of Fishkill Correctional Facility, W.
Schaller, Captain at Fishkill Correctional Facility, D.
Michaels, Lieutenant at Fishkill Correctional Facility,
M. Blaine, Sergeant at Fishkill Correctional Facility,
Guarino, Sergeant at Fishkill Correctional Facility, and
Riel, Corrections Officer at Fishkill Correctional
Facility, Defendants.
No. 05 Civ. 7502(RJH).

Sept. 29, 2006.
*MEMORANDUM OPINION AND ORDER*

HOLWELL, J.

*1 Plaintiff Nurideen Islam, currently incarcerated in
Fishkill Correctional Facility ("Fishkill"), brings a *pro se*
complaint under 42 U.S.C. § 1983, seeking monetary
damages and injunctive relief. He brings this complaint
against defendants Glenn S. Goord, the Commissioner of
the New York State Department of Correctional Services
("DOCS"), William Mazzuca, Superintendent of Fishkill,
Captain W. Schaller, Lieutenant D. Michaels, Sergeant M.
Blaine, Sergeant Guarino, and Corrections Officer Riel,
alleging violations of his constitutional rights. According
to a liberal reading of plaintiff's *pro se* pleadings, plaintiff
alleges (1) cruel and unusual punishment in violation of
the Eighth Amendment, (2) retaliation in violation of the
First Amendment, (3) tampering with his family and legal
mail in violation of the First and Fourteenth Amendments,
and (4) inadequate investigation of complaints in violation
of his Fourteenth Amendment due process rights.[FN1] Now
before the Court is defendants' motion [12] to dismiss the
complaint in its entirety. For the reasons set forth below,
defendants' motion is GRANTED.

FN1. Plaintiff, in his opposition papers, has
expressly stated that he does not bring a claim
for inadequate investigation of his grievances in
violation of his Fourteenth Amendment rights.
Therefore the Court will not address this claim.

BACKGROUND

Plaintiff is, and has been at all relevant times,
incarcerated at Fishkill Correctional Facility ("Fishkill").
In his complaint, filed August 24, 2005, plaintiff has set
forth factual allegations that the Court shall accept as true
for the purposes of this 12(b)(6) motion.[FN2]

FN2. In an affidavit submitted in opposition to
defendants' motion, plaintiff has offered
allegations pertaining to post-complaint events.
Specifically, plaintiff alleges that on November
3, 2005, Riel allegedly assaulted plaintiff by
colliding into him on a walkway and injuring his
shoulder. (Pl.'s Aff. ¶ 20.) Plaintiff also alleges
an additional instance of tampering with legal
mail. (*Id.* ¶ 25.) He alleged that legal mail
received from the New York Correctional
Association was opened outside of his presence
and given to him thirteen days later. (*Id.*) Since
it "is axiomatic that the Complaint cannot be
amended by the briefs in opposition to a motion
to dismiss," *O'Brien v. Nat'l Prop. Analysts
Partners,* 719 F.Supp. 222, 229 (S.D.N.Y.1989),
the Court will not consider allegations not made
in the complaint. *See also, e.g., Brown v. Wright,*
04 Civ. 0462(RWS), 2005 WL 3305015, at *7
(S.D.N.Y.2005) ("To the extent that
[prisoner-plaintiff's] opposition seeks to amend
the complaint by adding new and mostly
unexhausted categories of claims, it is
inappropriate."); *Connolly v. Havens,* 763
F.Supp. 6, 8 n. 2 (S.D.N.Y.1991) ("The Court
will not consider the numerous factual
allegations set forth for the first time in plaintiff's
memorandum opposing the instant motions. It is
a basic principle that a complaint may not be
amended by the plaintiff's brief filed in

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2819651 (S.D.N.Y.)

(Cite as: 2006 WL 2819651 (S.D.N.Y.))

opposition to a motion to dismiss."); *Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc., 723 F.Supp. 976, 987 (S.D.N.Y.1989)* ("A claim for relief may not be amended by the briefs in opposition to a motion to dismiss.") (citation omitted). This is, of course, without prejudice to plaintiff to fully exhaust these grievances and pursue relief in the federal courts in a separate action, if he believes he has a colorable claim under § 1983.

On November 18, 2004, defendant Corrections Officer Riel allegedly affixed a magazine advertisement for a video game with the words "Kill Zone" and "Kneel Before Us" behind a desk in plaintiff's housing unit. (Compl.¶¶ 12, 31.) According to plaintiff, the display caused him and other inmates to become "terrorized and visibly upset." (Compl.¶ 12.) On November 21, 2004, plaintiff filed an employee misconduct report (the "November 21 Misconduct Report") against Riel for displaying the advertisement and allegedly repeatedly threatening and harassing him in the past. (*Id.*)

Defendant Corrections Sergeant Blaine was assigned to investigate the matter on November 22, 2004. (Compl.¶ 13.) Plaintiff alleges that Blaine retaliated against him for filing the November 21 Misconduct Report by threatening to place him in involuntary protective custody and improperly conducting the investigation by not summoning most of his witnesses, treating the two witnesses summoned in an unprofessional manner, and distorting and omitting material facts. (*Id.* ¶ 14.) Soon after, on or about November 23, 2005, plaintiff filed a grievance against Blaine for retaliation (the "November 23 Grievance").[FN3] (*Id.*) Plaintiff appealed the denial of his November 23 Grievance to the Central Office's Review Committee, which denied his claim in January 2005. (*Id.* ¶ 20.)

> FN3. In addition to filing this grievance, plaintiff also filed a report with the Inspector General's office regarding Blaine's alleged "obstruction of an investigation" and sent a letter to the Bureau of Criminal Investigation regarding Riel and Blaine's misconduct. (Compl.¶¶ 15-16.) The Inspector General's Office responded by

memorandum on December 28, 2004. (Compl.¶ 19.) The memorandum advised plaintiff to file his complaint with defendant Superintendent Mazzuca (*id.*), which plaintiff had already done by way of filing the November 23 Grievance (*id.* ¶¶ 14, 18). Plaintiff alleges that the Inspector General's Office's response to his complaint was inadequate because it ignored "the unparalleled level of nepotism [at Fishkill]" plaintiff had complained of. (*Id* . ¶ 19.)

On December 2, 2004, plaintiff complained to the mail room with respect to missing family mail. (*Id.* ¶ 17.) Plaintiff believes that Riel was responsible for the incident because Riel has been "observed on several occasions tampering with inmates['] mail." (*Id.*)

**\*2** On December 9, 2004, plaintiff received a letter from defendant Superintendent Mazzuca, evidently in response to his November 23 Grievance against Blaine.[FN4] (*Id.* ¶ 18.) It informed plaintiff that defendant Lieutenant Michaels had been assigned to replace Blaine as investigator of plaintiff's complaints about Riel. (*Id.*) Plaintiff informed Michaels that Riel "possessed ... animosity toward his fellow officer Ms. C. Bean" and defamed Bean's character. (*Id.*) However, plaintiff also found Michaels' investigation unsatisfactory, and alleges that he distorted and omitted facts. (*Id.*)

> FN4. In his complaint, plaintiff states that he "received a response from the Superintendent," but does not specifically identify the superintendent as Mazzuca. However, the Court presumes plaintiff intends to refer to Mazzuca.

In January 2005, plaintiff alleges that Riel, defendant Sergeant Guarino, and an unidentified sergeant conspired to frame Officer Bean, inmate Anthony Ellison, and him in retaliation for filing complaints complaining about conditions in the housing unit. (Compl.¶ 21.) Plaintiff states that Riel, Guarino, and the unidentified person conspired to frame Bean and Ellison by recruiting inmate Antonio Smith to plant a weapon in Ellison's room. (*Id.* ¶¶ 21-22.) Smith allegedly placed a weapon in Ellison's room on January 19, 2005. (*Id.* ¶ 22.) Ellison found the weapon approximately five minutes before Riel, Guarino, and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2819651 (S.D.N.Y.)

(Cite as: 2006 WL 2819651 (S.D.N.Y.))

other officers searched Ellison's room. (*Id.*) After Ellison's room was searched, Riel allegedly told plaintiff, "[Y]ou're next Islam." (*Id.*) On January 30, 2005, plaintiff sent a letter to the Dutchess County District Attorney's Office to inform them of this alleged conspiracy. (*Id.* ¶ 21.) Although plaintiff states that Guarino, Riel, and the unidentified sergeant intended similarly to frame him at some future time (*id.* ¶ 22), he does not allege that any such event ultimately took place.

Plaintiff sent additional letters to Mazzuca on February 2, 2005, lodging complaints on behalf of himself and his fellow inmates. (*Id.* ¶ 23.) Plaintiff also filed a grievance on February 24, 2005 that concerned "aforementioned violations"-presumably Ellison's alleged framing-and complained that Schaller had failed to investigate "approximately a dozen complaints [that plaintiff] filed two months earlier." [FN5] (*Id.* ¶ 25.)

> FN5. The complaint does not specify what conduct the "dozen complaints" complained of. (Compl.¶ 25.)

On March 21, 2005, Riel personally delivered plaintiff's "legal mail" to his cell. (*Id.* ¶ 27.) The correspondence in question allegedly concerned an ongoing investigation against Riel, and was sent by the New York State Police, postmarked March 17, 2005, and stamped "OFFICIAL BUSINESS." (*Id.*) Officer Riel indicated to plaintiff "that he was familiar with the contents of the correspondence." (*Id.*) In response, plaintiff filed a grievance on March 23, 2005 against Riel for "harassment, mail tampering, and spreading rumors about Plaintiff to other inmates and corrections officers, jeopardizing Plaintiff's safety." (*Id.*)

On or about April 1, 2005, a hearing was conducted to investigate plaintiff's grievances about the November 2004 poster incident and March 2005 mail tampering. (*Id.* ¶ 28.) The investigation, conducted by defendant Captain Schaller, established that: (1) Officer Bean (working the 6:30 a.m. to 2:30 p.m. shift) and Officer Antunovic (working the 10:30 p.m. to 6:30 a.m. shift) observed the poster with the language "Kill Zone" and "Kneel Before Us"; (2) Officer Riel (working the intervening 2:30 p.m. to 10:30 p.m. shift) denied any knowledge of the poster,;

(3) Officer Bean removed the poster; (4) the poster was an advertisement for a PlayStation video game taken from an ESPN magazine; and (5) Captain Schaller found that the treatment of plaintiff's letter from the New York State Police was the result of oversight. (Compl.¶¶ 28-29, 31.) Plaintiff's grievances about the poster incident and mail tampering were denied. (Compl.¶ 32.)

**\*3** Plaintiff appealed the findings of the April 1, 2005 hearing to the Central Office Review Committee (CORC) on or about April 6, 2005. (Compl.¶ 32.) On April 27, 2005, plaintiff received CORC's response. (Compl.¶ 33.) Plaintiff found CORC's response "fell well short of the resolution requested." (*Id.*)

STANDARD OF REVIEW

In ruling on a motion to dismiss under Rule 12(b)(6), the court is required to read a complaint generously, accepting all the alleged facts as true and drawing all reasonable inferences in favor of the plaintiff. *See LaBounty v. Adler,* 933 F.2d 121, 123 (2d Cir.1991); *Frasier v. Gen. Elec. Co.,* 930 F.2d 1004, 1007 (2d Cir.1991). The court must deny the motion unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *See Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). Additionally, "the review of such a motion is limited, and '[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.' " *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996) (citations omitted). Moreover, pro se complaints must be liberally construed and courts must apply a "less stringent standard[ ] than when a plaintiff is represented by counsel." *Branham v. Meachum,* 77 F.3d 626, 628-29 (2d Cir.1996) (internal quotes and citation omitted).

Defendants have submitted material outside the pleadings to support their argument that plaintiff has not exhausted administrative remedies regarding the claim of confiscation of family mail. (Alderstein Decl. Ex. B.) Federal Rule of Civil Procedure 12(b) mandates that if "matters outside the pleadings are presented to and not excluded by the court, the motion [to dismiss] shall be treated as one for summary judgment." Fed.R.Civ.P. 12(b). Converting defendants' motion to dismiss into one

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2819651 (S.D.N.Y.)

(Cite as: 2006 WL 2819651 (S.D.N.Y.))

for summary judgment requires a court to provide notice to the parties prior to conversion. *See* Fed.R.Civ.P. 12(b). Defendants have served on plaintiff a Notice to Pro Se Litigant Opposing Summary Judgment, as required by Local Civil Rules 12.1 and 56.2. However, because the Court dismisses plaintiff's claim regarding family mail for failure to state a claim for which relief may be granted under Rule 12(b)(6), *see discussion infra,* the exhaustion inquiry is unnecessary, and the Court declines to convert any part of this motion to one for summary judgment and excludes all matters outside the pleadings presented by both parties.

DISCUSSION

1. Eighth Amendment Claim

Plaintiff claims that Riel's alleged posting of the video game advertisement that stated "Kill Zone" and "Kneel Before Us" constituted harassment and "psychological warfare." (Compl. ¶ 12 .) Construed liberally, these allegations may be interpreted as a claim that the advertisement violated the Eighth Amendment's prohibition on cruel and unusual punishment.

**\*4** Although inappropriate and unprofessional, the display of the poster (apparently for approximately twenty-four hours) did not rise to the level of a constitutional violation. A violation of a prisoner's federal rights under § 1983 requires an injury that involves more than mental or emotional pain. *See* 42 U.S.C. § 1997e(e) (providing that "[n]o Federal civil action may be brought by a prisoner confined in a ... correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury"). "[V]erbal harassment or profanity alone, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998); *see Brown v. Croce,* 967 F.Supp. 101, 104 (S.D.N.Y.1997) (holding that as a matter of law, a corrections officer's calling plaintiff a racial epithet and slapping him did not constitute a violation of the Eighth Amendment).

Furthermore, it is established that "[i]n order to establish a violation of his Eighth Amendment rights, an inmate must show (1) a deprivation that 'is objectively, sufficiently serious' that he was denied 'the minimal civilized measure of life's necessities,' and (2) a 'sufficiently culpable state of mind' on the part of the defendant official, such as deliberate indifference to inmate health or safety." *Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001) (quoting *Farmer v. Brennan,* 511 U.S. 825, 834 (1994)).

Since the poster constituted a form of verbal harassment unaccompanied by physical injury, and did not deny plaintiff the necessities of life, plaintiff does not have a constitutional claim under the Eighth Amendment. Defendants' motion to dismiss this claim is therefore granted.

2. Retaliation

Plaintiff alleges claims against Blaine, Riel, and Guarino for retaliation. It is well established that prison officials may not retaliate against inmates for exercising their constitutional rights. *See, e.g., Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002); *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988). To sustain a First Amendment retaliation claim, a prisoner must demonstrate the following: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Gill v. Pidlypchack,* 389 F.3d 379, 380 (2d Cir.2004) (citing *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)). Courts "must approach prisoner claims of retaliation with skepticism and particular care" because such claims are easily fabricated and may cause unwarranted judicial interference with prison administration. *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), overruled on other grounds by *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *see also Gill,* 389 F.3d at 385.

a. Claim of Retaliation against Blaine

**\*5** Plaintiff alleges that Blaine retaliated against him for filing the November 21, 2004 grievance against Riel for displaying the "Kill Zone" poster by threatening to place him in involuntary protective custody and

Not Reported in F.Supp.2d, 2006 WL 2819651 (S.D.N.Y.)

(Cite as: 2006 WL 2819651 (S.D.N.Y.))

improperly conducting the investigation of plaintiff's complaint. (Compl.¶ 14.)

It is undisputed that plaintiff has satisfied the first prong of the retaliation cause of action because the filing of prison grievances is a constitutionally protected activity. *See Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002); *Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir.1988); *Bartley v. Collins,* 95 Civ. 10161(RJH), 2006 WL 1289256, at *4 (S.D.N.Y. May 10, 2006).

However, plaintiff's allegations regarding Blaine's threat and inadequate investigation of plaintiff's complaint fail to meet the adverse action requirement. For the purposes of retaliation, an adverse action is defined as one "that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill,* 389 F.3d at 380 (citing *Davis v.. Goord,* 320 F.3d 346, 353 (2d Cir.2003)). The test is an objective one that applies even if the plaintiff in question was not himself subjectively deterred. *Id.* (citing *Davis,* 320 F.3d at 353-54). "This objective inquiry is 'not static across contexts,' but rather must be 'tailored to the different circumstances in which retaliation claims arise.' ' *Davis,* 239 F.3d at 493 (quoting *Thaddeus-X v. Blatter,* 175 F.3d 378, 398 (6th Cir.1999) (en banc) (per curiam)). Moreover, in considering what constitutes adverse action, a court should be mindful that " '[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a [retaliatory] action taken against them is considered adverse." ' *Id.* (quoting same) (bracketed language in original). If the action would not deter an individual of ordinary firmness the retaliatory act "is simply de minimis and therefore outside the ambit of constitutional protection." *Davis,* 320 F.3d at 353.

The threat to place plaintiff in protective custody is de minimis and does not constitute an adverse action. "Threats made to an inmate, without more, do not rise to the level of a constitutional violation." *Pledger v. Hudson,* No. 99 Civ. 2167, 2005 WL 736228, at *5 (S.D.N.Y. Mar. 31, 2005); *see also Bartley,* 2006 WL 1289256, at *6 ("[V]erbal threats such as 'we going to get you, you better drop the suit,' do not rise to the level of adverse action." (citing *Dawes,* 239 F.3d at 493 ("Not every unnecessary statement of a prison guard regarding an inmate's exercise

of free speech violates the First Amendment"); *Alicea v. Howell,* 387 F.Supp.2d 227, 237 (W.D.N.Y.2005) ("[Defendant's] alleged statements to plaintiff about there being 'no secrets in prison' and that plaintiff would 'have to pay the consequences' for filing a grievance against [defendant] do not give rise to a First Amendment retaliation claim."); *Williams v. Muller,* No. 98 Civ. 5204, 2001 WL 936297, at *4 (S.D.N.Y. Aug. 17, 2001) (defendant's "alleged spreading of rumors [that] plaintiff claims ... were intended to incite the inmates to harm plaintiff ... do not give rise to a retaliation claim"); *Cruz v. Hillman,* No. 01 Civ. 4169, 2002 WL 31045864, at *7 (S.D.N.Y. May 16, 2002) (allegation that corrections counselor expressed his dislike for inmates who file civil lawsuits, and later came to plaintiff's cell and said "Green Haven is an open battlefield, so be careful" insufficient to state a retaliation claim) (parenthetical language in original)). Plaintiff's retaliation claim with respect to Blaine's threat, therefore, must be dismissed.

**\*6** Blaine's alleged improper investigation of plaintiff's complaint against Riel (e.g., by failing to summon most of his witnesses, treating the two witnesses summoned in an unprofessional manner, and distorting and omitting material facts) similarly fails to satisfy the adverse action standard. This type of alleged conduct is not, in the Court's view, likely to "chill a person of ordinary firmness from continuing to engage" in the protected activity at issue here-the filing of grievances. While plaintiff does not have to plead a separate cognizable constitutional injury to establish an adverse action, it is worth noting that "inmate grievance programs created by state law are not required by the Constitution," and "[i]f prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of that claim." *Shell v. Brzezniak,* 365 F.Supp.2d 362, 370 (W.D.N.Y.2005). Because a prisoner would likely still choose to resort to the prison grievance procedures in order to exhaust his claims prior to seeking relief in federal court, irrespective of how seriously or professionally those grievances are treated, a lack of professionalism and failure to obtain relief at the first stage of the grievance process is unlikely to prevent a person of ordinary firmness from persisting in filing grievances. Furthermore, the conduct alleged here is qualitatively different in kind from the types of harms that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2819651 (S.D.N.Y.)

(Cite as: 2006 WL 2819651 (S.D.N.Y.))

courts in this circuit have typically considered significant enough to constitute "adverse actions." *See, e. g., Morales v. Mackalm,* 278 F.3d 126, 131-32 (2d Cir.2002) (transfer to a psychiatric facility); *Graham v. Henderson,* 89 F.3d 75, 80-81 (2d Cir.1996) (false misbehavior reports against plaintiff); *Colon v. Coughlin,* 58 F.3d 865, 872-73 (2d Cir.1995) (planted-contraband in plaintiff's cell); *Jones v. Coughlin,* 45 F.3d 677, 680 (2d Cir.1995) (false misbehavior report resulting in 120 days of punitive segregation); *Gill v. Hoadley,* 261 F.Supp.2d 113, 124 (N.D.N.Y.2003) (false misbehavior reports resulting in keeplock confinement for almost fifty days); *Van Pelt v. Finn,* 92 Civ. 2977, 1993 WL 465297, at *4-*5 (S.D.N.Y. Nov. 12, 1993) (reassignment to less desirable job with lower pay). Plaintiff's claim that Blaine retaliated against him for filing grievances by improperly investigating those grievances therefore fails to state a claim for which relief may be granted. Furthermore, to the extent plaintiff purports to allege a claim of retaliation against Schaller for failure to adequately investigate complaints (*see* Compl. ¶¶ 25, 28-32), any such claim must be dismissed for the same reasons.

*b. Claim of Retaliation against Riel and Guarino*

Plaintiff alleges that Riel, Guarino, and an unidentified sergeant allegedly conspired to frame Officer Bean, inmate Anthony Ellison, and him, in retaliation for complaints filed about conditions in the housing unit. (Compl.¶ 21.) Plaintiff states that Riel, Guarino, and the unidentified person conspired to frame Bean and Ellison by recruiting inmate Antonio Smith to plant a weapon in Ellison's room. (*Id.* ¶¶ 21-22.) After Ellison's room was searched, Riel allegedly told plaintiff, "[Y]ou're next Islam." (*Id.* ¶ 22.) It is unclear from plaintiff's allegations, though ultimately unimportant, how the alleged set-up may have harmed Bean. Plaintiff states that Guarino, Riel, and the unidentified sergeant intended similarly to frame him at some future time (*id.* ¶ 22), but he does not allege that any such event ultimately took place.

*7 Plaintiff does not have standing to bring a claim of retaliation arising out of the alleged set-up on behalf of Bean and Ellison. "In every federal case, the party bringing the suit must establish standing to prosecute the action." *Elk Grove Unified School District v. Newdow,* 542 U.S. 1, 11 (2004). "The Article III limitations [of

standing jurisprudence] are familiar: The plaintiff must show that the conduct of which he complains has caused him to suffer an "injury in fact" that a favorable judgment will redress." *Id.* (citing *Lujan v. Defenders of Wildlife,* 504 U .S. 555, 560-61 (1992)). Since plaintiff does not demonstrate that Riel and Guarino's alleged conspiracy and effort to frame Bean and Ellison caused him to suffer an injury in fact, he does not have standing to bring this claim.

To the extent plaintiff is alleging that Riel retaliated against him for filing grievances by threatening to frame him at some future time-"[Y]ou're next Islam"-as discussed in greater detail above, a mere threat without more will not satisfy the adverse action requirement of a First Amendment retaliation claim. *See Pledger,* 2005 WL 736228, at *5.

Plaintiff also suggests that Riel's alleged tampering with his family and legal mail was retaliatory. However, this is not the type of conduct that would deter an ordinary individual from exercising his constitutional rights. Plaintiff does not allege that he suffered any injury as a result of the alleged tampering, and therefore these isolated instances of mail tampering are not "adverse actions" supporting a cause of action for First Amendment retaliation. *See Battice v. Phillip,* 04 Civ. 0669(FB), 2006 WL 2190565, at *6 (E.D.N.Y. Aug. 2, 2006) ("Even if intentional, [defendant's failure to deliver plaintiff's mail] is 'simply de minimis and therefore outside the ambit of constitutional protection .' '); *Rivera v. Pataki,* 04 Civ. 1286(MBM), 2005 WL 407710, at *19 (S.D.N.Y. Feb. 7, 2005) (dismissing prisoner's claim that correction officers actively prevented him from sending legal mail in retaliation for a pending lawsuit because the alleged conduct did not constitute "adverse action").

3. Mail Tampering Claim

Plaintiff's claim that Riel tampered with his family correspondence and opened his legal mail outside his presence potentially alleges an actionable constitutional violation apart from his claim of retaliation.

"Interference with legal mail implicates a prison inmates rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2819651 (S.D.N.Y.)

(Cite as: 2006 WL 2819651 (S.D.N.Y.))

Constitution. To state a claim for denial to access to the courts-in this case due to interference with legal mail-a plaintiff must allege that the defendant took or was responsible for actions that hindered a plaintiff's to pursue a legal claim." *Davis,* 320 F.3d at 351 (internal quotation marks, citations, and brackets omitted). Furthermore, while a prisoner has a right to be present when his legal mail is opened, *Wolff,* 418 U.S. at 574-76, "an isolated incident of mail tampering is usually insufficient to establish a constitutional violation, *Davis,* 320 F.3d at 351 (citations omitted). "Rather, the inmate must show that prison officials 'regularly and unjustifiably interfered with the incoming legal mail." ' *Id.* (citations omitted). Two incidents of legal mail tampering might establish a constitutional violation if (1) the incidents suggested an ongoing practice of censorship unjustified by a substantial government interest, or (2) the tampering unjustifiably chilled the prisoner's right of access to the courts or impaired the legal representation received. *Id.* (citing *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986)). Where the incidents of tampering are few, district courts require specific allegations of invidious intent or of actual harm. *See Cancel,* 2001 WL 303713, at *6 (citing *Lewis v. Casey,* 518 U.S. 343, 353 (1996) for the proposition that "in order to survive a motion to dismiss a plaintiff must allege not only that the defendant's alleged conduct was deliberate and malicious, but also that the defendant's actions resulted in actual injury to the plaintiff such as the dismissal of an otherwise meritorious legal claim.").

**\*8** In this case, plaintiff alleges only one instance in which his legal mail was tampered with, and one instance in which his family correspondence disappeared. There is a question whether the correspondence from the State Police is in fact "legal" mail because it did not involve attorney-client communications or litigation documents, *see Wolff,* 418 U.S. at 576; *Standley v. Lyder,* 2001 WL225035, at *2 (S.D.N.Y. Mar. 7, 2001), but assuming arguendo that the letter sent to plaintiff by the New York State Police is legal mail, plaintiff still fails to state a cognizable cause of action for interference with legal mail. Plaintiff does not allege that Riel's opening of the letter from the New York State Police in any way hindered him from pursuing a legal claim. Furthermore, taken together, and liberally construed, these alleged instances of

interference with plaintiff's mail <u>FN6</u> do not demonstrate a continuing practice or pattern of interference or an actual legal injury. Nor does plaintiff make specific allegations of invidious intent or of actual harm. Therefore plaintiff's claim of mail tampering is dismissed for failure to state a cognizable constitutional injury.

> <u>FN6.</u> It is worth noting here that plaintiff does, for the first time in his opposition to the pending motion, allege an additional instance of legal mail tampering, which the Court has declined to consider. *See supra* note 2. However, even if the Court treated this additional allegation as a motion to amend the complaint, it would have been denied as futile. In the Second Circuit, a party is generally afforded leave to amend a pleading under Rule 15(a) "unless the movant has acted in bad faith, the amendment will prejudice the nonmovant, or the amendment is futile." *Neshewat v. Salem,* 365 F.Supp.2d 508, 515 (S.D.N.Y.2005) (citing *Richardson Greenshields Sec., Inc. v. Lau,* 825 F.2d 647, 653 n. 6 (2d Cir.1987); *Posadas de Mexico, S.A. de C.V. v. Dukes,* 757 F.Supp. 297, 300) (S.D.N.Y.1991)); *see also Foman v. Davis,* 371 U.S. 178, 182 (1962). In reviewing futility under a 12(b)(6) standard, "Second Circuit caselaw makes clear ... that a district court addressing the futility of proposed amendments to a complaint should consider whether the amendments are sufficient on the merits." *Fezzani v. Bear, Stearns & Co.,* No. 99 Civ. 0793, 2005 WL 500377, *3 (S.D.N.Y. Mar. 2, 2005) (citations omitted). An amendment to a pleading is futile if it could not withstand a motion to dismiss under Rule 12(b)(6). *Lucente v. Int'l Bus. Machs. Corp.,* 310 F.3d 243, 258 (2d Cir.2002) (citing *Dougherty v. North Hempstead Bd. of Zoning Appeals,* 282 F.3d 83, 88 (2d Cir.2002)). In this case, the amendment of the complaint to include this additional instance of mail tampering would not alter the insufficiency of the allegations to support a constitutional claim for mail tampering, because plaintiff cannot show that the tampering in any way prevented him from pursuing his legal claims or otherwise harmed him. Nor, taken

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2819651 (S.D.N.Y.)

(Cite as: 2006 WL 2819651 (S.D.N.Y.))

together, would the three alleged instances of tampering suggest an ongoing practice of censorship. *See Davis,* 320 F.3d at 351 (citing *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986)).

### CONCLUSION

For the foregoing reasons, defendants' 12(b)(6) motion is hereby GRANTED. The Clerk of the Court is directed to close this case.

SO ORDERED.

S.D.N.Y.,2006.

Islam v. Goord
Not Reported in F.Supp.2d, 2006 WL 2819651 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 2190565 (E.D.N.Y.)

(Cite as: 2006 WL 2190565 (E.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

E.D. New York.
Lester BATTICE, Plaintiff,
v.
R. PHILLIP, Correction Officer at Arthur Kill
Correctional Facility assigned to the 3:00 p.m. to 11
p.m. tour and Dennis Breslin, Superintendent at Arthur
Kill Correctional Facility, Defendants.
No. CV-04-669 (FB)(LB).

Aug. 2, 2006.
Lester Battice, Auburn, NY, pro se.

Eliot Spitzer, Attorney General of the State of New York,
by Julia Lee, Assistant Attorney General, New York, NY,
for Defendants.

### *MEMORANDUM AND ORDER*

BLOCK, Senior District Judge.

**\*1** Plaintiff Lester Battice ("Battice"), proceeding *pro se,* filed suit against defendants R. Phillip ("Phillip"), a corrections officer at Arthur Kill Correctional Facility ("Arthur Kill"), and Dennis Breslin ("Breslin"), the Superintendent of Arthur Kill (collectively "defendants"), in their individual and official capacities pursuant to 42 U.S.C. §§ 1983 and 1985. Battice's complaint alleges that while he was incarcerated at Arthur Kill, Phillip violated his First Amendment rights by opening and reading Battice's legal mail, and by taking various actions in retaliation for grievances filed by Battice against Phillip. In particular, Battice alleges that Phillip retaliated against him by (1) making fun of his disability "in violation of Title II of the Americans with Disabilities Act" ("ADA"), Compl. ¶ 16; (2) endangering his life by informing other prisoners that he had filed grievances against Phillip; (3) searching Battice's cell and filing a misbehavior report against him; (4) withholding Battice's mail; and (5) altering Battice's work assignment. Battice's complaint

also alleges that Breslin was deliberately indifferent to Phillip's violation of Battice's constitutional rights, and violated state law and Department of Correctional Services ("DOCS") regulations by making fun of Battice's hearing disability. Battice seeks compensatory and punitive damages and an injunction preventing defendants from taking further retaliatory actions against him.

On July 26, 2005, following completion of discovery, Magistrate Judge Bloom held a telephone conference in which Battice refused to participate. Defendants subsequently moved for summary judgment and served Battice with the notice to *pro se* litigants required by Local Rule 56.2. Following Battice's failure to submit a response to defendants' summary judgment motion, the Court issued an order on January 4, 2006, affording him an opportunity to serve his responsive papers by January 13, 2006. After Battice failed to do so, Magistrate Judge Bloom issued a second order, on June 30, 2006, stating that Battice would be given a final opportunity to file his response by July 31, 2006, and that failure to comply would result in the motion being considered unopposed; no response from Battice was received.[FN1] For the reasons set forth below, defendants' motion for summary judgment is granted in its entirety.

> **FN1.** Although Battice has failed to respond to defendants' motion, he has continued to submit letters to the Court complaining of continuing harassment at Auburn Correctional Facility, where Battice is currently incarcerated. Despite Magistrate Judge Bloom's issuance of an order on August 30, 2005, directing Battice that he should not be submitting such documents to the Court, and that discipline imposed upon him at the Auburn Correctional Facility is irrelevant to the present case, the Court received another such letter from Battice on April 13, 2006.

### I.

The following background is taken from Battice's complaint and documents attached thereto; defendants' Statement of Undisputed Material Facts, *see* Local Rule

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2190565 (E.D.N.Y.)

(Cite as: 2006 WL 2190565 (E.D.N.Y.))

56.1(a); sworn deposition testimony; defendants' affidavits; and other supporting documents. In all material respects they are undisputed.

Battice was an inmate at Arthur Kill Correctional Facility at all relevant times. While incarcerated at Arthur Kill, Battice, who suffers from a hearing impairment, was housed for a period of time in unit F-2, where he was assigned work as a porter. During this period, Battice filed a number of administrative grievances against Phillip, the corrections officer ("CO") assigned to the 3 to 11 p.m. shift in Battice's unit, which Battice's complaint alleges precipitated various retaliatory actions by Phillip.

**2** Battice filed his initial grievance against Phillip on August 15, 2002, alleging that Phillip, without authorization, read certain court documents mailed to Battice that were marked "confidential." On October 18, 2002, following an investigation, this grievance was accepted and the prison's Deputy Superintent of Security, Robert Morton ("Morton"), instructed Phillip regarding proper search procedures for inmate mail. On September 17, 2002, Battice filed a second grievance against Phillip, alleging that as a result of his initial grievance, Phillip had informed Battice and two other inmates that he was placing the F-2 housing unit on the "burn" [FN2] during this conversation Phillip also allegedly mocked Battice's disability and stated that he intended to inform the unit's other inmates that he was placing the unit on the "burn" in retaliation for grievances filed by the three inmates. A September 16, 2002 memo from the Inmate Liaison Committee Executive Board to Morton contains similar allegations. Battice's second grievance was denied on October 25, 2002, on the ground that the allegations of alleged misconduct could not be substantiated.

> FN2. According to Battice's deposition, this meant that "there [wouldn't] be [any] rec[reation] or things of that nature." Aff. of Julia H. Lee, Ex. B at 45-6. However, Battice also testified that he was not aware that any of the inmates' privileges were ever suspended by Phillip.

On the same day that Battice filed his second grievance, Battice's cell was one of three in his unit selected for a search. [FN3] According to Breslin's affidavit and supporting documents, Arthur Kill conducts a daily

search of the living quarters of a certain number of inmates in each housing unit in order to confiscate contraband. The list of cells to be searched each day is randomly generated by computer, and the searches are generally conducted by the unit's corrections officer during the 3 to 11 p.m. shift. According to the affidavits of Phillip and Morton, on September 17, 2002, pursuant to this procedure, Phillip received an order from Lieutenant Sweetman to search three cubicles, one of which belonged to Battice. Battice testified during his deposition that another inmate's cell had been selected for the search but that Phillip searched his cell instead; however, Battice did not explain how he knew which cells had been selected for search or how he would have become aware of which inmates' cells had been selected prior to the search.

> FN3. Although Phillip's affidavit states that the search occurred on September 19, 2002, this appears to be erroneous; the administrative form completed by Phillip in connection with the search is dated September 17, 2002.

During the search of Battice's cell, Phillip discovered several items of contraband, including a bottle of glass cleaner, which prison regulations classified as a flammable substance. [FN4] Phillip issued a misbehavior report alleging that in addition to possessing contraband, Battice had been uncooperative during the search. A disciplinary hearing was held on September 25, 2002, during which Battice admitted to possession of the contraband, but explained that they had been given to him by other inmates. Battice was found guilty of possession of the contraband but not guilty of the allegations of uncooperative conduct during the search; although Battice appealed the hearing officer's decision on the ground that glass cleaner did not qualify as a flammable substance, his appeal was denied. Battice was not punished nor did he suffer a loss of any privileges as a result of the infraction; however, the hearing officer counseled him against keeping flammable materials in his cell.

> FN4. In addition to the glass cleaner, the following items of contraband were discovered in Battice's cell: excess paper towels, excess toilet paper, excess toothpaste, and excess shirts and gloves.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2190565 (E.D.N.Y.)

(Cite as: 2006 WL 2190565 (E.D.N.Y.))

**\*3** On March 5, 2003, Battice filed a third grievance against Phillip, alleging that Phillip had failed to distribute a piece of incoming mail addressed to Battice. According to Phillip's grievance, a second CO discovered the mail in a desk drawer on February 28, 2003, two days after it had been delivered to Battice's unit, and turned it over to Battice. Battice's grievance was accepted in part after investigation revealed that the mail was found in the desk at the beginning of the following shift, but Phillip's actions in failing to deliver the mail were determined to be unintentional.

Approximately five months after filing this last grievance, Battice, along with a number of other inmates, who are not identified by Battice, were transferred from the F-2 unit to a different housing unit of the same level of security. Battice was given a different assignment as a porter in his new unit and allegedly received less pay in this new assignment. Following this transfer, Battice filed a fourth grievance against Phillip, alleging that Phillip had secured the transfer and associated change in work assignment and pay in retaliation for the grievances he had filed against Phillip. In support of this allegation, Battice's administrative complaint states that on July 30, 2003, Phillip

had a[l]ist of [n]ames that I had observed. This [l]ist ... contained [a]ll [t]he [n]ames [o]f [t]he [i]nmates [i]n [t]he [d]orm [t]hat [h]ad [f]iled [g]rievances [a]gainst [h]im. I then observed that ... Phillip[ ] had a [s]econd [l]ist of [i]nmates['][n]ames that were [b]eing [m]oved [o]ff [o]f Housing Unit F-2, I was one of those inmates included in this [m]ove [o]ff [o]f [unit] F-2.

Aff. of Dennis Breslin, Ex. D at 2. Battice's grievance also alleged that other inmates who had filed grievances against Phillip had been the target of assaults and the subjects of misbehavior reports, but did not allege that any other inmates were transferred out of the housing unit as a result of having filed grievances against Phillip.

Battice's fourth grievance was denied on the ground that the allegations of misconduct could not be substantiated; it was "also noted that it was an administrative decision to move grievant off unit." Aff. of Dennis Breslin, Ex. D at 6. Defendants do not dispute that Battice was transferred and given a new work assignment that resulted in a reduction in pay, but provide no particular explanation for why these actions were taken. However, according to Breslin's affidavit and supporting documentation, corrections officers such as Phillip have "no discretion in the removal or transfer of inmates from their assigned programs," and the prison's Program Committee Chairperson, under the direction of the Deputy Superintendent of Programs, is responsible for coordinating program placements, including "acting upon all program assignment and change requests submitted by staff members." Aff. of Dennis Breslin, ¶ 11.

Breslin's affidavit further explains that his office receives hundreds of letters every year from inmates; one of Breslin's secretaries, or sometimes Breslin himself, will read the letters and determine the appropriate official to whom they should be forwarded for proper resolution. *Id.* ¶ 4. Breslin's affidavit also states that he has been advised by his staff that Battice had filed a number of grievances, but that those grievances were forwarded to other officials for proper resolution, and that Breslin did not personally respond to or investigate any grievances from Battice. *Id.* ¶ 6.

**\*4** Although Battice's complaint alleges that Breslin violated the ADA by making fun of his hearing disability, Battice does not explain when or where this event allegedly occurred, or provide any detail regarding this allegation.

## II.

### A. Summary Judgment Standard

A Court may grant a motion for summary judgment when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *Andersen v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Where, as here, the non-moving party bears the burden of proof at trial, the moving party need only "show[ ]-that is, point[ ] out to the district court-that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986) (citation omitted). Upon such a showing, "the non-moving party must respond with 'specific facts showing that there is a genuine issue for trial,' " *Golden Pac Bancorp v.*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2190565 (E.D.N.Y.)

(Cite as: 2006 WL 2190565 (E.D.N.Y.))

*FDIC, 375 F.3d 196, 200 (2d Cir.2004)* (quoting Fed.R.Civ.P. 56(e)); conclusory statements, conjecture and other types of unsupported assertions are not sufficient. See *Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir.1995).*

On a motion for summary judgment, the Court draws all justifiable inferences in the nonmoving party's favor. See *Graham v. Hendersen, 89 F.3d 75, 79 (2d Cir.1996)* (citing *Andersen, 477 U.S. at 255).* However, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.... If the evidence is merely colorable, ... or is not sufficiently probative ... summary judgment may be granted." *Andersen, 477 U.S. at 249-50* (citations omitted). Finally, because Battice did not file any response to defendants' motion, the assertions contained in defendants' Statement of Material Facts and buttressed by defendants' sworn affidavits will be accepted as true, *see* Local Rule 56.1 [FN5]; however, where a motion for summary judgment is unopposed, the Court "may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial." *Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir.2004)* (citation and quotation marks omitted).

FN5. Although a verified complaint may be treated as an affidavit if it meets the requirements of Fed.R.Civ.P. 56(e) and is of sufficient factual specificity, *see Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir.1995),* Battice's complaint is not verified and the Court will not give any evidentiary weight to its allegations.

**B. Section 1983 Claims**

**1. Interference with Mail**

Defendants are entitled to summary judgment on Battice's claim that Phillip interfered with Battice's right to receive mail when on one occasion he opened legal documents marked "confidential." Interference with legal mail implicates a prisoner's right of access to the courts and right of free speech under the First and Fourteenth Amendments. See *Davis v. Goord, 320 F.3d 346, 351 (2d Cir.2003).* "To state a claim for denial of access to the

courts [through interference with legal mail] a plaintiff must allege that the defendant 'took or was responsible for actions that hindered [a plaintiff's] efforts to pursue a legal claim' "; the plaintiff must demonstrate that the actions resulted in actual injury. *Id.* In order to state a claim for violation of a prisoner's First Amendment right to send and receive mail, "the inmate must show that prison officials 'regularly and unjustifiably interfered with ... [a prisoner's] mail.' " *Id.*

*5 Battice has failed to state a claim under either theory. With respect to Battice's first theory, that Phillip's opening of his legal correspondence denied his access to the courts, Battice has not alleged, must less presented evidence to demonstrate, that he suffered any actual injury as a result of Phillip opening his legal correspondence. "Mere delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." *Id.* (citations and quotation marks omitted). Battice also fails to state a claim under his second theory, that defendants violated his rights to send and receive legal mail, because he cites to only one instance of mail tampering, which did not result in any actual harm, and does not allege-nor present any evidence in support of such an allegation-that Arthur Kill officials established an ongoing practice of interfering with his mail.

**2. First Amendment Retaliation**

Phillip is also entitled to summary judgment on Battice's First Amendment retaliation claims. In order to sustain such claim, a prisoner must demonstrate " '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " *Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir.2004)* (quoting *Dawes v. Walker, 239 F.3d 489, 492 (2d Cir.2001)).* "The causal connection must be sufficient to support the inference 'that the speech played a substantial part' " in the adverse action. *Diesel v. Town of Lewisboro, 232 F.3d 92, 107 (2d Cir.2000)* (quoting *Ezekwo v. NYC Health & Hosps. Corps., 940 F.2d 775, 780-81 (2d Cir.1991).* Evidence that can lead to an inference of a causal connection includes (1) the temporal proximity between the protected conduct and the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2190565 (E.D.N.Y.)

(Cite as: 2006 WL 2190565 (E.D.N.Y.))

alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant regarding his motives. *See Colon v. Coughlin,* 58 F.3d 865, 872-73 (2d Cir.1995). The Second Circuit has been willing to draw an inference of causation where circumstantial evidence, such as temporal proximity, is combined with allegations that a defendant expressed an intent to retaliate. *See, e.g., Colon,* 58 F.3d at 872-73 (noting that if circumstantial evidence of temporal proximity between an inmate's lawsuit and disciplinary action and evidence of plaintiff's past good behavior "represented the sum total of [plaintiff's] proof, we might be inclined to affirm the grant of summary judgment based on the weakness of [plaintiff's] case," but concluding that this circumstantial evidence, in combination with direct evidence in the form of allegations regarding defendant's admission of a retaliatory scheme, would be sufficient to defeat a motion for summary judgment).

Nonetheless, prisoner retaliation claims are generally viewed "with skepticism and particular care" because "virtually any adverse action taken against a prisoner by a prison official-even those not otherwise rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." *Dawes,* 239 F.3d at 492. The Second Circuit has established a "presumption that a prison official's acts to maintain order are done for a proper purpose," explaining that "the conclusion that the state action would have been taken in the absence of improper motives is readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority over the institutions they manage." *Hynes v. Squillace,* 143 F.3d 653, 657 (2d Cir.1998). A "[p]laintiff has the initial burden of showing that an improper motive played a substantial part in the defendant's action. The burden then shifts to the defendant to show it would have taken exactly the same action absent the improper motive." *Scott v. Coughlin,* 344 F.3d 282, 288 (2d Cir.2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977)). If the defendant meets this burden, summary judgment is appropriate. *See Davidson v. Chestnut,* 193 F.3d 144, 149 (2d Cir.1999). *See also Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("[I]f the production of all relevant documents fails to add substance to the allegations and if the relevant officials submit affidavits explaining their reasons for the challenged actions, summary judgment dismissing the complaint may be granted ....").

**a. Withholding Mail, Making Fun of Battice's Hearing Disability, and Informing Other Inmates of Battice's Grievance**

**\*6** Defendants do not dispute that Battice's filing of a grievance qualifies as a constitutionally protected activity, and Battice has therefore satisfied the first element of a First Amendment retaliation claim. *See Graham,* 89 F.3d at 80 ("a retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments"). However, Battice's allegations that Phillip withheld his mail, made fun of his disability, and informed other inmates that he was placing the housing unit on "the burn" because of Battice's grievance, even if true, do not constitute adverse actions. "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003) (citing *Dawes,* 239 F.3d at 493). Furthermore, "[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before [retaliatory] action taken against them is considered adverse." *Thaddeus-X v. Blatter,* 175 F.3d 378, 394 (2d Cir.1999).

Phillip's failure to deliver Battice's mail on one occasion does not constitute the type of conduct that would deter an ordinary individual from exercising his constitutional rights. Phillip does not allege, much less present any evidence to show, that he suffered any injury as a result of the minor delay in receiving one piece of mail. Even if intentional, this isolated incident is "simply *de minimis* and therefore outside the ambit of constitutional protection." *Dawes,* 239 F.3d at 493. As the present suit demonstrates, the incident did not deter Battice from continuing to use the mails to correspond with the Court, nor did it deter him from filing additional grievances against Phillip. Not only was this action not sufficiently serious enough to deter an individual of ordinary firmness from exercising his constitutional rights, but it clearly did not deter Battice from doing so.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2190565 (E.D.N.Y.)

(Cite as: 2006 WL 2190565 (E.D.N.Y.))

Phillip's statement to Battice that he intended to inform other prisoners that he had filed a grievance also does not constitute an adverse action. The Second Circuit has held that a prisoner alleging that a prison official's comments incited other inmates must make some "factual showing that the comments ... actually risked inciting other inmates against" the prisoner, and has been "unwilling simply to assume that prison inmates would be incited, without more, to attack 'one of their own' who was labeled an 'informant' and a 'rat.' " *Dawes,* 239 F.3d at 493 (holding that prisoner's allegation that prison official referred to prisoner as an "informant" and a "rat" in discussions with other inmates, and that this opened him up to assault by fellow inmates, did not amount to an adverse action). *See also Morales v. Mackalm,* 278 F .3d 126, 131 (2d Cir.2002) (holding that plaintiff's allegation that defendant called him a "stoolie" in front of other inmates did not sufficiently plead an adverse action). Even if the Court could take the allegations of Battice's unverified complaint as true for purposes of the present motion, the complaint alleges only that Phillip threatened to tell other inmates about the grievance, and then conclusorily states that this created resentment against Battice and "endanger[ed][his] life." Compl. ¶ 11. However, Battice does not allege that he ever suffered any adverse reactions from other inmates, and he admitted at his deposition that he was not aware that his unit ever suffered any loss of privileges. Because Battice has failed to make any factual showing that Phillip actually made any inflammatory comments to other inmates, or that those comments actually risked inciting other inmates against him, Phillip is entitled to summary judgment on this claim.

*7 Finally, the allegation that Phillip retaliated against Battice by making fun of his disability on one occasion, even if true, also does not amount to an adverse action. The Second Circuit has held that "[i]nsulting or disrespectful comments directed at an inmate" generally do not rise to the level of conduct that would deter an individual from exercising his or her constitutional rights. *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003). *See also Dawes,* 239 F.3d 489 (" 'Certain means of 'retaliation' may be so de minimis as not to inhibit or punish an inmate's right of free speech. Many verbal responses by officials of resentment or even ridicule would fall into this safe harbor of permitted responses.' " (citing *Riley v. Coutu,* 172 F.R.D. 228, 235 (E.D.Mich.1997)); *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (per curiam) (affirming dismissal of retaliation claim based on allegations that prison guard called inmate names). Phillip is therefore entitled to summary judgment on this claim.[FN6]

FN6. In addition to alleging that Phillip retaliated against him by making fun of his hearing disability "in violation of the Americans with Disabilities Act," Compl. ¶ 19, Battice's complaint also appears to assert a separate claim for violation of Title II of the ADA based upon the same alleged incident. *See* Compl. ¶ 16 (alleging that Phillip "mocked the plaintiff's disability in violation of Title II of the Americans with Disabilities Act"). To the extent that Battice is suing defendants in their personal capacities for violations of the ADA, this claim is not cognizable. *See Gill v. Calescibetta,* 157 Fed. Appx. 395, 396 n. 2 (2d Cir.2005) (unpublished) (citing *S.U.N.Y. Health Sci. Ctr. of Brooklyn,* 280 F.3d 98, 107 (2d Cir.2001) (affirming grant of summary judgment in suit filed by prisoner against prison official alleging violations of the ADA because "while state prisons fall squarely within the definition of a public entity for ADA purposes, ... the ADA does not protect [plaintiffs] from the actions of state officials undertaken in their individual capacities"). Furthermore, although suits against state officials in their official capacity are deemed to be suits against the state, *see Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993), there is no liability against the state for this particular claim because Battice does not allege that he was denied the benefit of any public services, programs, or activities by reason of his disability, *see* 42 U.S.C. § 12132, but alleges only that state officials made fun of his disability.

**b. Cell Search and Misbehavior Report**

Defendants are also entitled to summary judgment on Battice's allegation that Phillip searched his cell and filed a false misbehavior report against Battice in retaliation for

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2190565 (E.D.N.Y.)

(Cite as: 2006 WL 2190565 (E.D.N.Y.))

filing grievances against him. The Second Circuit has not addressed whether a cell search can constitute an adverse action for purposes of a First Amendment retaliation claim;[FN7] however, many district courts in this circuit have concluded that it does not. *See, e.g., Rodriguez v. McClenning,* 399 F.Supp.2d 228, 239 (S.D.N.Y.2005); *Freeman v. Goord,* 2005 WL 3333465 at *5 (S.D.N.Y. Dec. 7, 2005); *Salahuddin v. Mead,* 2002 WL 1968329 at * 5 (S.D.N.Y. Aug. 26, 2002); *Walker v. Keyser,* 2001 WL 1160588, at *9 (S.D.N.Y. Oct. 2, 2001); *Walker v. Goord,* 2000 WL 297249 at *4 (S.D.N.Y. Mar. 22, 2000); *Bey v. Eggleton,* 1998 WL 118158 at *4 (S.D.N.Y. Mar. 17, 1998); *Gadson v. Goord,* 1997 WL 714878 at *7 (S.D.N.Y. Nov. 17, 1997). They have reasoned that under *Hudson v. Palmer,* 468 U.S. 517 (1984), a prisoner has no reasonable expectation of privacy in his or her prison cell; therefore, a search of an inmate's cell, even for retaliatory reasons, therefore does not implicate a constitutional right.

FN7. In *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996), the Second Circuit upheld the dismissal of a retaliatory cell search claim on the ground that the defendant was not personally involved in the search; however, the court did not address whether a cell search can constitute a retaliatory action.

Even assuming that a retaliatory cell search may form the basis for a retaliation claim, Battice does not provide any evidentiary support for his conclusory allegation that his cell was searched in place of a third cell selected at random by prison administrators. Moreover, although the search occurred on the same day or soon after Battice filed his second grievance against Phillip, and such close temporal proximity between a prisoner's exercise of a constitutional right and an adverse action may present circumstantial evidence of a causal connection between the two, *see, e.g., Bennett v. Goord,* 343 F.3d 133, 138 (2d Cir.2003) (finding circumstantial evidence of retaliation where adverse actions occurred within days of protected activity), defendants have submitted undisputed affidavits explaining that pursuant to established prison practice, Battice's cell was selected at random. Because defendants have carried their burden of demonstrating that the search would have been conducted in the absence of any retaliatory motive, and Battice has failed to put forth any evidence to dispute those assertions, summary judgment

with respect to this claim is proper. *See Flaherty* 713 F.2d at 13 ("[I]f the production of all relevant documents fails to add substance to the allegations and if the relevant officials submit affidavits explaining their reasons for the challenged actions, summary judgment dismissing the complaint may be granted....").

**8** As for the misbehavior report, although the filing of a false misbehavior report can constitute an adverse action, *see Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996); *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988), and while the close temporal proximity between Battice's grievance and the filing of the misbehavior report might be sufficient, standing alone, to justify an inference of causal connection, defendants have put forth uncontradicted evidence that the misbehavior report would have been filed in the absence of any alleged retaliatory motive because Battice admittedly violated prison policy by storing contraband in his cell. *See Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994) (holding that defendants had met their burden of showing that they would have disciplined the plaintiff even in the absence of the protected conduct because "it was undisputed that [plaintiff] had in fact committed the prohibited conduct" which led to issuance of a misbehavior report); *Hynes,* 143 F.3d at 657 (holding that defendants met their burden of proof that they would have taken disciplinary action on valid basis alone where the evidence demonstrated that plaintiff had committed the "most serious, if not all, of the prohibited conduct").

**c. Transfer and Change in Work Assignment**

Prisoners in New York have no liberty interest in being housed at a particular facility or maintaining a particular work assignment. *See Gill v. Mooney,* 824 F.2d 192, 194 (2d Cir.1987) ("New York law does not give a prisoner 'any statutory, regulatory or precedential right to his prison job."); however, they do have a right not to be subject to retaliatory job transfers intended to "punish and harass." *Gill v. Mooney,* 824 F.2d 192, 194 (2d Cir.1987).

Although Battice was transferred to a unit of the same level of security, and his conditions of confinement do not appear to have been altered by the transfer, if he earned less in his new assignment this would constitute an adverse action. *See Walker v. Pataro,* 2002 WL 664040 at *8

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2190565 (E.D.N.Y.)

(Cite as: 2006 WL 2190565 (E.D.N.Y.))

(S.D.N.Y. Apr. 23, 2002) (finding adverse action where, "[a]s a result of his transfer out of [one building, prisoner] lost a job that paid twenty-five cents an hour and was given a job that paid ten cents an hour"); Van Pelt v. Finn, 1993 WL 265297 at *4-5 (S.D.N.Y. Nov. 12, 1993) (denying summary judgment where prisoner was "transfer[red] from porter to clerk to recreational supervisor, and [suffered] ... corresponding decreases in pay"); cf. Baker v. Zlochowon, 741 F.Supp. 436, 439-40 (S.D.N.Y.1990) (denying summary judgment where plaintiff alleged that he was transferred to a lower-paying job after filing an Article 78 proceeding challenging prison officials' actions).

However, Battice's transfer and claimed loss of salary took place nearly five months after Battice had filed his most recent grievance against Phillip. Courts have held that "a time lapse of over four months ... standing alone, is insufficient to justify an inference of causal connection." See, e.g., Freeman v. Goord, 2005 WL 3333465 at *7 (S.D.N.Y. Dec. 7, 2005) (citing Cobian v. New York City, 2000 WL 1782744 at *18 (S.D.N.Y. Dec. 6, 2000) (collecting cases). See also Conner v. Schnuck Mkts., Inc., 121 F.3d 1390, 1395 (10th Cir.1997) ("the four month time lag between [plaintiff's] participation in protected activity and his termination by itself would not be sufficient to justify an inference of causation") (cited with approval in Morris v. Lindau, 196 F.3d 102, 113 (2d Cir.1999)).

*9 Notwithstanding this lapse of time, Battice's last administrative grievance contains other allegations that Battice claims supports an inference of retaliation; he alleges that on July 30, 2003, he observed Phillip with a list of inmates, including Battice, who were being transferred from his unit and that he then observed "that ... Phillip[ ] had a[s]econd [l]ist of [i]nmates['][n]ames that were [b]eing [m]oved [o]ff [o]f Housing Unit F-2...." Aff. of Dennis Breslin, Ex. D at 2. These circumstances would not be sufficient to establish the requisite causal connection for a claimed retaliation occurring almost five months thereafter.

First, as the corrections officer assigned to the unit, it is logical that Phillip would have possessed a list of the names of inmates who were scheduled to be transferred

from his unit. Even if, as Battice alleges, it was improper under prison regulations for Phillip to possess a list of the names of those inmates who had filed grievances against him, there is nothing in Battice's allegations regarding the lists to suggest that the two were related; Battice does not allege that Phillip was looking at the lists together, or comparing them in any manner that would suggest a connection between the names on one list and those on the other. Secondly, Battice does not allege that other inmates whose names appeared on the list of prisoners who had filed grievances were among those transferred to another housing unit; instead, Battice alleges that some inmates who had filed grievances against Phillip in the past had been subjected to other retaliatory acts, such as assaults and misbehavior reports. Finally, Phillip was allegedly seen with the two lists after the decision to transfer the inmates had been made; evidence that Phillip at some point possessed lists both of those inmates scheduled to be transferred and those who had filed grievances against him, even if true, at most allows only speculation that the transfer was ordered, or that Phillip had some role in securing that transfer, in retaliation for past grievances filed by Battice.

Because the Court concludes that the evidence put forth by Battice would be insufficient to allow a reasonable jury to return a verdict for Battice on this claim, there is no genuine issue for trial and summary judgment is appropriate. See Andersen, 477 U.S. at 249-50 (citations omitted) ("there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.... If the evidence is merely colorable, ... or is not sufficiently probative ... summary judgment may be granted.").

**3. Liability of Breslin**

Because Battice failed to present evidence sufficient to allow a reasonable jury to find that his constitutional rights were violated, the Court need not address Battice's claim that Breslin is liable for failing to prevent the alleged violations. In any event, Breslin would be entitled to summary judgment because Battice has failed to put forth any evidence to suggest that Breslin was personally involved in any deprivation of Battice's constitutional rights. Because there is no respondeat superior liability under § 1983, see Richardson v. Goord, 347 F.3d 431,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2190565 (E.D.N.Y.)

(Cite as: 2006 WL 2190565 (E.D.N.Y.))

435 (2d Cir.2003), "when a supervisor such as a prison superintendent is named as a defendant, that supervisor's involvement must be greater than 'mere linkage in the prison chain of command' to give rise to § 1983 liability." *Lipton v. County of Orange, New York,* 315 F.Supp.2d 434, 459 (S.D.N.Y.2004) (quoting *Richardson,* 347 F.3d at 435). The Second Circuit has held that a supervisor who merely receives and forwards an inmate's complaints to other officials for resolution is not sufficiently personally involved to be held liable for alleged constitutional violations. *See Sealy v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997). *See also Rivera v. Goord,* 119 F.Supp.2d 327, 344 (S.D.N.Y.2000) (plaintiff "merely asserts that he wrote to these [supervisory] defendants complaining about the conduct of various Medical and Correctional [d]efendants and that his complaints were ignored. These allegations are insufficient to hold these Official/Supervisory [d]efendants liable under § 1983").

**\*10** Breslin has submitted an affidavit stating that, consistent with his general practice, he was not personally involved in investigating or responding to any grievances or letters from Battice, which he instead forwarded to the necessary officials for response or investigation. Because the evidence shows that Breslin handled his office's receipt of the complaints in an appropriate manner by forwarding them for investigation and resolution through the prison's administrative grievance system, and Battice has not submitted any evidence to contradict Breslin's affidavit, summary judgment dismissing the claims would be proper. *See Davis v. Kelly,* 160 F.3d 917, 921 (2d Cir.1998) (stating that after "discovery, undisputed allegations that [a] supervisor lacked personal involvement will ultimately suffice to dismiss that official from the case").

**C. Section 1985 Claims**

Although Battice's complaint also alleges that defendants' actions violated 42 U.S.C. § 1985, it does not contain any allegations of a conspiracy motivated "by some racial or perhaps otherwise class-based[ ] invidious discriminatory action," *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 7 F.3d 1085, 1087 (2d Cir.1993), and Battice has not adduced any evidence that would support such allegations. Defendants are therefore also entitled to summary judgment on Battice's conspiracy claims under § 1985.

**III.**

Defendant's motion for summary judgment dismissing plaintiff's federal claims is granted; the Court declines to exercise pendent jurisdiction over plaintiff's state law claims, which are dismissed without prejudice.

**SO ORDERED.**

E.D.N.Y.,2006.

Battice v. Phillip
Not Reported in F.Supp.2d, 2006 WL 2190565 (E.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2011 WL 2436674 (S.D.N.Y.)

(Cite as: 2011 WL 2436674 (S.D.N.Y.))

C

Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Leonardo GIANELLO, Plaintiff,
v.
The PORT AUTHORITY OF N.Y. AND N.J.,
Defendant.
No. 11 Civ. 3829(JGK).

June 16, 2011.
*MEMORANDUM OPINION AND ORDER*

JOHN G. KOELTL, District Judge.

**\*1** The plaintiff filed this action *pro se,* pursuant to the federal Freedom of Information Act, 5 U.S.C. § 552, seeking documents from the defendant regarding a lease signed by the Vantone Group to occupy office space at the World Trade Center. The plaintiff paid the filing fee for this action. For the following reasons, the action is dismissed.

### STANDARD OF REVIEW

The Court has the authority to dismiss *sua sponte* a complaint, or portion thereof, for which a plaintiff has paid the filing fee where the plaintiff presents no arguably meritorious issue. See *Fitzgerald v. First E. Seventh St. Tenants Corp.,* 221 F.3d 362, 363–64 (2d Cir.2000) (holding that a district court may dismiss a frivolous complaint *sua sponte* even when the plaintiff has paid the required filing fee); *Pillay v. INS,* 45 F .3d 14, 17 (2d Cir.1995). While the law authorizes dismissal of frivolous complaints even if the filing fee has been paid, district courts "remain obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). Thus, *pro se* complaints should be read with "special solicitude" and should be interpreted to raise the "strongest [claims] that they suggest." *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474–75 (2d Cir.2006) (citations omitted).

### BACKGROUND

In March 2011, the plaintiff submitted a request for documents to the defendant. The plaintiff asserts that the defendant is "an agency of the United States and has possession of the documents" he seeks. Compl. ¶ 4. There has been some communication between the parties regarding the status of the plaintiff's request, however, the plaintiff has not received the documents or a denial of his request.

### DISCUSSION

The Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, applies to the federal government only and not to municipal or state agencies. See *Grand Cent. P'ship, Inc. v. Cuomo,* 166 F.3d 473, 484 (2d Cir.1999) ("[I]t is beyond question that FOIA applies only to federal and not to state agencies."); *Watanmaker v. Clark,* 09 Civ. 3877, 2010 WL 3516344, at *10 (E.D.N.Y. Aug. 31, 2010). The Port Authority is a bi-state entity created by compact between the States of New York and New Jersey.[FN1] *Langhorne v. Port Auth. of N.Y. & N.J.,* 03 Civ. 4610, 2005 WL 3018265 at *1 (S.D.N.Y. Nov. 10, 2005); *see also Hess v. Port Auth. Trans–Hudson Corp.,* 513 U .S. 30 (1994) (describing history and status of Port Authority). As the defendant is not a federal entity, the plaintiff cannot state a FOIA claim against it.

> FN1. Attached to the Complaint is the defendant's Freedom of Information policy stating that it "is consistent with the freedom of information laws of the States of New York and New Jersey." Compl. at 37–40.

Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction over a state law claim when it "has dismissed all claims over which it has original jurisdiction[.]" *Id.; see Martinez v. Simonetti,* 202 F.3d 625, 636 (2d Cir.2000). The Complaint could be construed as seeking relief pursuant to the New York Freedom of Information Law, N.Y. Pub. Off. Law §§ 8490. Because the plaintiff's federal claim is being dismissed, however, the Court declines to exercise supplemental jurisdiction over any state law claims the plaintiff may be raising in his Complaint.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 2436674 (S.D.N.Y.)

(Cite as: 2011 WL 2436674 (S.D.N.Y.))

### *CONCLUSION*

**\*2** Although this Court would generally permit amendment of a complaint to cure any defects before dismissing the case *sua sponte, see* Hughes v. Albany, 76 F.3d 53 (2d Cir.1996), there is no need to do so here because the plaintiff presents no claims over which this Court has jurisdiction.

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *See* Coppedge v. United States, 369 U.S. 438, 444–45 (1962).

SO ORDERED.

S.D.N.Y.,2011.

Gianello v. Port Authority of N.Y. and N.J.
Slip Copy, 2011 WL 2436674 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2012 WL 252139 (S.D.N.Y.)

(Cite as: 2012 WL 252139 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.
Barbara J. FRIED, Altitude Partners, LLC, Richard D.
Maltzman, as trustee for the Richard D. & Charlene
Maltzman Family Trust, Jefforeed Partners, L.P., and
Zelfam, LLC, on behalf of themselves and other limited
partners joining them, Plaintiffs,
v.
LEHMAN BROTHERS REAL ESTATE
ASSOCIATES III, L.P., Lehman Brothers Private
Equity Advisers, LLC, Real Estate Private Equity, Inc.,
Silverpeak Real Estate Partners, LP, Repe CP
Manageco, LLC, Mark A. Walsh, Mark H. Newman,
Brett Bossung, Rodolpho Amboss, Kevin Dinnie,
Michael J. Odrich, Christoper M. O'Meara, Richard S.
Fuld, Jr., Joseph M. Gregory, Erin Callan, Ian Lowitt,
Thomas Russo, and John Does 1 through 50,
Defendants.
No. 11 Civ. 4141(BSJ).

Jan. 25, 2012.
*Memorandum & Order*

BARBARA S. JONES, District Judge.

**\*1** On June 17, 2011, Defendants removed this
lawsuit from the Supreme Court of the State of New York
and, on June 24, 2011, moved the Court to stay the case
pending the appeal of a related case in the Second
Circuit.[FN1] On July 15, 2011, Plaintiffs moved the Court to
remand the case to state court for lack of subject matter
jurisdiction. For the reasons addressed below, Plaintiffs'
motion to remand is DENIED and Defendants' motion to
stay this case is GRANTED.

> FN1. The related case is *Fried v. Lehman
> Brothers Real Estate Associates III, L.P.,*
> 09–cv–g100 ("*Fried I*"), which features
> identical defendants (with the exception of two
> individual defendants that appear in this case).
> On March 9, 2011, this Court dismissed all of the

federal claims in that action and declined to
exercise supplemental jurisdiction over the
remaining state law claims. *Fried I* Op. 32.

*Background*

Following this Court's dismissal of the related case,
Plaintiffs filed suit in the Supreme Court of the State of
New York, pleading various federal and state law claims
against Defendants arising from failed investments with
Defendant Lehman Brothers Real Estate Associates III
("LBREA III").

Plaintiffs' Complaint alleges seventeen claims in all.
The claims cover various causes of action for
misrepresentation (Counts I and II), breach of fiduciary
duty (Counts IV, V, VI, and VII), and declaratory relief
(Counts VIII, IX, X, XI, and XII). The remaining claims
contain causes of action for securities fraud under
Delaware state law (Count III), breach of contract (Count
XIII), breach of the covenant of good faith and fair
dealing (Count XIV), aiding and abetting in fraud and
fiduciary breaches (Count XV), conspiracy (Count XVI),
and an alternative derivative claim (Count XVII). With the
exception of Count V and Count VI, the claims are based
on state law causes of action.

The general thrust of the Complaint accuses
Defendants of luring Plaintiffs to invest as limited partners
in a real estate investment vehicle, Lehman Brothers Real
Estate Partners III ("LBREP III"), despite Defendants'
knowledge that the investments were losing value. Compl.
¶¶ 10–19. Plaintiffs allege that Defendants made material
misrepresentations and omissions in the investment
documents distributed to Plaintiffs, principally the Private
Placement Memoranda ("PPMs") and Limited Partnership
Agreements ("LPAs"). Plaintiffs allege that the projections
in these documents were much more optimistic than what
Defendants knew to be the condition of the investment
properties. *Id.* In addition, Plaintiffs claim that Defendants
executed over-valued purchases of Lehman Brothers
properties even though Defendants knew that the
properties had been written down. Compl. ¶¶ 16–17. The
scheme involved Defendants stating that the selection of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 252139 (S.D.N.Y.)

(Cite as: 2012 WL 252139 (S.D.N.Y.))

investment properties would be made at a future date when, in actuality, the properties had already been acquired by Lehman Brothers and Defendants had previously decided to purchase those properties for LBREP III. Compl. ¶ 25.

### Discussion

The Court will first address Plaintiffs' motion to remand since the disposition of that motion impacts the Court's ruling on Defendants' motion to stay.

**I. Motion to Remand**

Plaintiffs move the Court to remand this lawsuit because it lacks federal subject matter jurisdiction over the action. Defendants may only remove a lawsuit if the action could have been filed in federal court as an original matter. 28 U.S.C. § 1441; see Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. 308, 312, 125 S.Ct. 2363, 162 L.Ed.2d 257 (2005). A lawsuit must be remanded if at any time it becomes apparent that the federal court lacks subject matter jurisdiction. 28 U.S.C. § 1447(c). Here, Defendants have removed on the bases of federal question jurisdiction under 28 U.S.C. § 1331 and, alternatively, "related to" jurisdiction under 28 U.S.C. § 1334(b), 28 U.S.C. § 1441; 28 U.S.C. § 1452(a). For the following reasons, the Court has jurisdiction over this lawsuit pursuant to both § 1331 and § 1334(b) because the lawsuit arises under federal law and because the lawsuit is related to an ongoing bankruptcy matter proceeding under title 11.

**A. Federal Question Jurisdiction Under § 1331**

*2 For this Court to have jurisdiction over Plaintiffs' claims under § 1331, a federal issue must be well-pleaded in the complaint and substantial. Empire Healthchoice Assur., Inc. v. McVeigh, 547 U.S. 677, 689–90, 126 S.Ct. 2121, 165 L.Ed.2d 131 (2006).

**1. Pleading of the Federal Issues**

Federal issues arise plainly on the face of Count V and Count VI of the Complaint. Both claims are based on federal statutes and incorporate the statutes explicitly, with Count V invoking the Investment Advisers Act ("IAA"), 15 U.S.C. § 80b–1 et seq., and Count VI invoking the Investment Company Act ("ICA"), 15 U.S.C. § 80a–1 et seq. Compl. ¶¶ 77–78, 80–81, 90. More specifically,

Count V asserts § 206 and § 215 of the IAA, 15 U.S.C. §§ 80b–6, –15, and Count VI asserts § 36(b) of the ICA, 15 U.S.C. § 80a–35(b). Id.

**2. Substantiality**

In both Count V and Count VI, the IAA and ICA respectively establish Defendants' liability and provide federal causes of action. The fact that the IAA and ICA establish liability makes these federal issues substantial to each claim despite the existence of complementary state law bases of liability. See D'Alessio v. New York Stock Exch., Inc., 258 F.3d 93, 101–02 (2d Cir.2001) (finding federal question jurisdiction over a removed action because the complaint alleged that the defendant "failed to perform its statutory duty, created under federal law" and the claims "require[d] a court to construe federal securities laws and evaluate the scope of the [defendant's] duties"); Marcus v. AT & T Corp., 138 F.3d 46, 55–56 (2d Cir.1998) (affirming removal based on federal question jurisdiction where plaintiffs' state law breach of warranty claim sought to enforce tariff agreements that were premised upon federal law). In Count V, Plaintiffs plead that the IAA defines the duties of Defendants to Plaintiffs in the LBREP III LPAs, defines the duties which Defendants are alleged to have breached, and provides a statutory remedy under which Plaintiffs seek relief. Compl. ¶¶ 77, 80–81. In Count VI, the ICA defines the duty violated by the excessive additional fees that Defendants are accused of improperly charging Plaintiffs. Compl. ¶ 90.

Further, and more importantly. Plaintiffs' pleadings present substantial federal issues because both the ICA and IAA provide federal causes of action, one express and the other implied, that Plaintiffs pursue in Count V and Count VI. Under § 36(b) of the ICA, Congress provided an express private right of action. 15 U.S.C. § 80a–35 (b); see Jones v. Harris Assocs. L.P., ——U.S. ——, ——, 130 S.Ct. 1418, 1423, 176 L.Ed.2d 265 (2010); Fogel v. Chestnutt, 668 F.2d 100, 111 (2d Cir.1981); In re Eaton Vance Mut. Funds Fee Litig., 380 F.Supp.2d 222, 232 (S.D.N.Y.2005) (noting that "Congress provided a private right of action for enforcement of § 36(b) of the statute"). This express private right of action, alone, carries the substantiality prerequisite to federal question jurisdiction. See Strougo v. Bassini, 282 F.3d 162, 167–68 (2d Cir.2002) (ruling that claims under § 36(a) and § 36(b) of the ICA "must 'be treated as raising federal questions' "

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 252139 (S.D.N.Y.)

(Cite as: 2012 WL 252139 (S.D.N.Y.))

(quoting *Burks v. Lasker,* 441 U.S. 471, 477, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979))).

**\*3** Under the IAA, there is no express private right of action, but this is not fully determinative of its ability to create federal question jurisdiction. A federal private right of action is certainly indicative of a substantial federal issue but is not a prerequisite or bar to federal question jurisdiction. *See Grable & Sons Metal Prods., Inc.,* 545 U.S. at 318 (characterizing a private right of action as a "welcome mat" instead of a "door key"). While lacking an express private right of action for damages, § 215 of the IAA does provide a federal private cause of action for rescission of contract. *Transamerica Mortg. Advisors, Inc. v. Lewis,* 444 U.S. 11, 19, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979) (holding that "when Congress declared in § 215 that certain contracts are void, it intended that the customary legal incidents of voidness would follow, *including the availability of a suit for rescission* or for an injunction against continued operation of the contract, and for restitution") (emphasis added); *Kahn v. Kohlberg, Kravis, Roberts & Co.,* 970 F.2d 1030, 1033 (2d Cir.1992) (stating that "the Supreme Court held [in *Transamerica Mortg. Advisors, Inc.,* 444 U.S. 11] that [§ 215 of the IAA] created an implied private cause of action for rescission of the void contract and restitution and that this was the sole private remedy available under the Advisers Act."). Accordingly, the implied private right of action in § 215 of the IAA also evinces a "serious federal interest" to support federal question jurisdiction. *Grable & Sons Metal Prods., Inc.,* 545 U.S. at 313.

**3. Supplemental** Jurisdiction Over State Law Claims

Having established that federal question jurisdiction under § 1331 exists over Counts V and VI, the Court exercises supplemental jurisdiction over the remaining state law claims in the Complaint. When the Court has original jurisdiction over a claim under § 1331, it also acquires jurisdiction over any state law claims that derive from a common nucleus of operative fact. 28 U.S.C. § 1367(a); *see United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Montefiore Med. Ctr. v. Teamsters Local 212,* 642 F.3d 321, 332 (2d Cir.2011). All of the claims in the Complaint stem from the same transactions and facts of the failed

investments in LBREP III and Plaintiffs have litigated all of these claims in one proceeding. *Montefiore Med. Ctr.,* 642 F.3d at 332.

Only under four enumerated circumstances does a court have discretion to decline supplemental jurisdiction, and none of those circumstances apply to this lawsuit. 28 U.S.C. § 1367(c). The state law claims do not raise any challenging or novel questions of state law; the state law claims lie equally with the federal claims in Count V and Count VI; the Court has not dismissed Count V or Count VI; and, lastly, there are no other compelling reasons to decline supplemental jurisdiction.

**B. "Related To" Jurisdiction Under** § 1334(b)

A court may exercise jurisdiction over any lawsuit "related to" a lawsuit currently proceeding under title 11 of the bankruptcy code. 28 U.S.C. § 1334(b). Defendants can use this basis of jurisdiction to remove an action to federal court. 28 U.S.C. § 1452(a). Defendants assert that this lawsuit is related to the ongoing title 11 bankruptcy of Lehman Brothers Holdings Inc. since Plaintiffs' ability to collect damages and certain Defendants' liability for any damages and reimbursement of litigation costs depends on those Defendants' ability to seek indemnification against Lehman Brothers Holdings Inc. and coverage from its insurance policies.[FN2]

> FN2. The Lehman Brothers Holdings Inc. bankruptcy began in September 2008 and is ongoing. *Lehman Brothers Holdings Inc.,* No. 08–13555 (Bankr.S.D.N.Y.).

**\*4** A lawsuit is "related to" a title 11 proceeding when the bankruptcy proceeding "might have any 'conceivable effect' on the bankrupt estate." *Parmalat Capital Fin. Ltd. v. Bank of Am. Corp. .,* 639 F.3d 572, 579 (2d Cir.2011) (quoting *In re Cuyahoga Equip. Corp.,* 980 F.2d 110, 114 (2d Cir.1992)) (internal quotation marks omitted). Here, there are several conceivable ways in which the outcome of this lawsuit could affect the bankrupt estate of Lehman Brothers Holdings Inc. First, the liability of the Lehman Brothers-related entities and Lehman Brothers-related individual defendants is covered by insurance policies of the bankrupt estate.[FN3] *See Kerusa Co. LLC v. W10Z/515 Real Estate Ltd.,* Nos. 04 Civ. 708, 04 Civ. 709, 04 Civ. 710, 2004 WL 1048239, at \*2

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Slip Copy, 2012 WL 252139 (S.D.N.Y.)

(Cite as: 2012 WL 252139 (S.D.N.Y.))

(S.D.N.Y. May 7, 2004). Second, the individual Lehman Brothers-related defendants, along with Defendants Silverpeak Real Estate Partners, LP and REPE CP Manage Co. LLC, may be able to seek indemnification from the bankrupt estate for the costs of defending themselves in this lawsuit. *See id.; Abbatiello v. Monsanto Co.,* No. 06 Civ. 266, 2007 WL 747804, at *2 (S.D.N.Y. Mar. 8, 2007). Third, the bankrupt estate owns a significant "indirect stake" in Defendant LBREA III and a "100 percent" direct stake in both Defendant Lehman Brothers Private Equity Advisers, LLC and Defendant Real Estate Private Equity, Inc. Any damages found against these particular defendants could affect the value of the bankrupt estate.

> FN3. The Lehman Brothers-related entities include Lehman Brothers Real Estate Associates III, L.P., Lehman Brothers Private Equity Advisers, LLC, and Real Estate Private Equity, Inc. The individual Lehman Brothers-related defendants include Defendants Walsh, Newman, Bossung, Amboss, Dinnie, Odrich, O'Meara, Fuld, Jr., Gregory, Callan, Lowitt, and Russo, all of whom were former officers, directors, or subsidiaries of Lehman Brothers.

In some instances, courts are required to abstain from exercising "related to" jurisdiction if, among other criteria, the only basis for jurisdiction over a lawsuit is § 1334 and the lawsuit could be "timely adjudicated" in state court. 28 U.S.C. § 1334(c)(2); *see Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976); *Certain Underwriters at Lloyd's, London v. ABB Lummus Global, Inc.,* No. 03 Civ. 7248, 2004 WL 224505, at *6 (S.D.N.Y. Feb.5, 2004) (listing six criteria required for mandatory abstention). Neither consideration prevents the Court from exercising jurisdiction over this lawsuit because the Court has also established jurisdiction under § 1331. Moreover, even if the Court did not have this additional basis of jurisdiction, Plaintiffs have not provided enough evidence to show that this action would be timely adjudicated in state court. Rather, they have supplied several reasons for why the action would suffer greater delay in state court.

**II. Motion to Stay**

Defendants move the Court to stay this action because Plaintiffs are currently appealing a related action against Defendants and the Second Circuit's ruling could impact this lawsuit. Plaintiffs' current lawsuit is the state court counterpart of Plaintiffs' pending federal lawsuit, *Fried v. Lehman Brothers Real Estate Associates III, L.P,* 09–cv–9100 ("*Fried I*"). In *Fried I,* Plaintiffs brought many of the same state law claims, along with several additional federal claims, including some under the Securities Exchange Act. This Court dismissed all of the federal claims in that action for failure to state a claim and declined to exercise supplemental jurisdiction over the remaining state law claims. *Fried I* Op. 32. Plaintiffs have appealed the Court's dismissal of *Fried I* but the Second Circuit has yet to issue a ruling.

**\*5** The power to stay a lawsuit is inherent in the Court's prerogative to manage its docket efficiently. *Landis v. N. Am. Co.,* 299 U.S. 248, 254, 57 S.Ct. 163, 81 L.Ed. 153 (1936); *Curtis v. Citibank, N.A.,* 226 F.3d 133, 138 (2d Cir.2000). In deciding a motion to stay under these circumstances, courts in the Second Circuit balance five factors: (1) the private interests of the plaintiffs in proceeding expeditiously with the civil litigation, as balanced against the prejudice to the plaintiffs if the litigation is delayed, (2) the private interests of and burden on the defendants, (3) the interests of the courts, (4) the interests of persons not party to the civil litigation, and (5) the public interest. *Kappel v. Comfort,* 914 F.Supp. 1056, 1058 (S.D.N.Y.1996); *Catskill Mountains Chapter of Trout Unlimited, Inc. v. United States E.P.A.,* 630 F.Supp.2d 295, 304 (S.D.N.Y.2009). This analysis must accommodate the nuances of each lawsuit and the ultimate decision lies firmly in the discretion of the Court. *See LaSala v. Needham & Co.,* 399 F.Supp.2d 421, 427 (S.D.N.Y.2005).

As Defendants contend, a stay would serve the interests of the courts and of the public. There is significant overlap between this lawsuit and the lawsuit on appeal, both legally and factually, which is a solid ground upon which to issue a stay. *See LaSala,* 399 F.Supp.2d at 427 (observing the propriety of staying a lawsuit " 'in light of a concurrently pending federal action (either because the claim arises from the same nucleus of facts or because the pending action would resolve a controlling point of law)' " (quoting *SST Global Tech., LLC v. Chapman,* 270

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 252139 (S.D.N.Y.)

(Cite as: 2012 WL 252139 (S.D.N.Y.))

F.Supp.2d 444, 455 (S.D.N.Y.2003))); *see Goldstein v. Time Warner New York City Cable Grp.,* 3 F.Supp.2d 423, 428, 437–38 (S.D.N.Y.1998) (staying a lawsuit until an appellate court decided a related case with legal bearing). Factually, Plaintiffs' two lawsuits arise from the same set of transactions and events, namely Plaintiffs' investment in LBREP III. While the claims of *Fried I* do not track exactly the claims of this lawsuit, the claims are similar and target the same transgressions and injuries. The legal issues between the two lawsuits also overlap, in particular the scienter requirement of the Rule 10b–5 claim in the first lawsuit and the state law fraud claims in the second lawsuit, specifically the § 7303 Delaware Commercial Code claim of Count III. The Second Circuit ruling on this scienter issue may very well have bearing on this Court's analysis of the state law fraud claims in this lawsuit.

Furthermore, while a stay might frustrate the interests of Plaintiffs in their desire to proceed expeditiously in state court, the private interests of and burdens on Defendants are significant. The greatest priority in deciding a motion to stay is avoiding prejudice to the parties. *See LaSala,* 299 F.Supp.2d at 427 (citing *Kappel,* 914 F.Supp. at 1058). While Plaintiffs argue that a stay of this lawsuit will increase their litigation costs, they do not explain how a cessation of litigation activity would create significant costs for them. For their part, Defendants argue persuasively that going forward with this lawsuit before the Second Circuit rules in Fried I will cause both parties to suffer the extra litigation costs of duplicative suits. Because the outcome of the *Fried I* appeal may affect the progress and disposition of this lawsuit, a stay will preserve the litigation resources of both Plaintiffs and Defendants.

**\*6** Accordingly, the Court stays this action until the Second Circuit issues a final decision in the related action, *Fried I.*

### Conclusion

For the foregoing reasons, Plaintiffs' motion to remand (Dkt. No. 18) is DENIED and Defendants' motion to stay (Dkt. No. 9) is GRANTED. The Clerk of the Court is directed to terminate these motions.

**SO ORDERED.**

S.D.N.Y.,2012.

Fried v. Lehman Bros. Real Estate Associates III, L.P.
Slip Copy, 2012 WL 252139 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.